UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
: 
SERVAAS INCORPORATED, :
: 09 CV 1862
        Plaintiffs, :
:
    v. : **DECLARATION OF DR. BEURT**
: **SERVAAS IN OPPOSITION TO**
REPUBLIC OF IRAQ and MINISTRY OF : **DEFENDANTS' MOTION TO DISMISS**
INDUSTRY OF THE REPUBLIC OF IRAQ, :
:
        Defendants. :
:
-----------------------------------------------------------X

    I, Dr. Beurt SerVaas, declare under penalties of perjury under the laws of the United States of America that the following is true and correct:

    1.    I am Dr. Beurt SerVaas, a retired medical doctor and owner and principal of Plaintiff SerVaas Incorporated ("SerVaas"). I have personal knowledge of the matters set forth herein, and respectfully submit this declaration in opposition to the motion to dismiss filed by Defendants Republic of Iraq ("Iraq") and the Ministry of Industry of the Republic of Iraq (the "Ministry").

    2.    A true and correct copy of Plaintiff's Complaint is attached hereto as **Exhibit A**.

## THE PARTIES' CONTRACT

    3.    SerVaas (a United States corporation which has been doing business since 1966) and its affiliated companies specialize in, among other things, the commercial manufacture, processing, and handling of metals.

    4.    In 1988, I was approached by representatives of Iraq. These representatives explained to me that Iraq had a large stockpile (*i.e.*, over 70,000 tons) of "scrap" Soviet-design artillery shells which were made of brass reinforced with silicon (such that the shells could be re-

used). This "scrap" was the product of Iraq's eight-year artillery war with Iran. As the Iran-Iraq war had concluded, the Iraqi representatives inquired whether SerVaas possessed the technology to remove the silicon from the brass such to facilitate the reclamation of commercially saleable copper therefrom. The Iraqi representatives explained that if the silicon could be removed, the reclaimed commercial grade copper would be worth hundreds of millions of dollars (the Iraqis estimated approximately $350 million).

5. When I later advised them that SerVaas possessed this proprietary technology, the Iraqi representatives asked whether SerVaas would agree to build and equip a factory in Iraq to reclaim silicon-free brass from its scrap shell casings. Initially, I said "no," explaining that I feared another war would break out and SerVaas would not get paid. Iraq, however, agreed that any contract entered into would be terminable in the event of such "force majeur" events, that payment would be secured by a letter of credit established with a bank in the United States, and that any disputes that the parties may have could be arbitrated in France pursuant to the Rules of Arbitration and Conciliation of the International Chamber of Commerce.

6. Given these assurances, SerVaas and the Ministry entered into a written contract dated September 9, 1988 and executed on September 10, 1988. A true and correct copy of the September 10th contract is attached hereto as **Exhibit B**.

7. On October 2, 1988, SerVaas and the Ministry executed an amended contract. A true and correct copy of the October 2, 1998 contract is attached hereto as **Exhibit C**.

8. On August 10, 1989, SerVaas and the Ministry executed a further amended contract dated August 8, 1989 (the "Contract") A true and correct copy of the August 8, 1989 Contract is attached hereto as **Exhibit D**.

9. The Contract was commercial in nature. Among other things, SerVaas agreed to provide Iraq: (1) plans for the design of the factory; (2) the machinery, equipment and spare parts necessary to operate the plant/factory; (3) the proprietary "technology, know-how and technical documents" for the removal of silicon from silicon-infused brass; and (4) certain services and training in connection with the installation and operation of the plant/factory. See generally Exhibit D (Contract).

10. In exchange, the Ministry agreed, among other things, to pay $40,602,000.00 to SerVaas in the United States. See Exhibit D (Contract) at §§ 1.13, 4.1 - 4.3, 5.2-5.10.

11. The Contract explained the "Plant Objective":

Plant Objective: Means that the Supplies and Services combined as a single plant on the Site shall be able to (a) use [the Ministry's] available scrap of approximately 70,000 tons of existing scrap [*i.e.*, shell casings] to produce slabs or billets which can be used as incoming materials for further production; [and] (b) remove the silicon from the silicon brass scrap to .00 percent to produce slabs, billets or ingots ... to produce 70/30 brass ....

Exhibit D (Contract) at § 1.14.

12. Notwithstanding the parties' execution of the agreement, the Contract was made "final and binding" only upon approval of "the appropriate governmental authority of Iraq." See Exhibit D (Contract) at § 5.1 and Art. 26. The Republic of Iraq gave the necessary approval for the Contract to become binding.

### THE PARTIES' PERFORMANCE OF THE CONTRACT

13. By telex dated October 6, 1988 (a true and correct copy of which is attached hereto as **Exhibit E**), Iraq advised that it had received governmental approval of the parties' agreement. See Exhibit E; see also Exhibit B (original contract) at § 5.1; Exhibit D (Contract) at § 5.1 ("This Contract became final and binding on both parties hereto upon the approval by the

appropriate governmental authority of Iraq on Oct. 10, 1988. Said approval was evidenced by a Telex from [the Ministry] to [SerVaas] stating the date of such approval.").

14.     The Ministry also advised that: (a) it was in the process of opening an irrevocable letter of credit to facilitate payments due under the Contract (see Exhibit B (original contract) at § 5.2); and (b) it would be shipping 5 tons of scrap shell casings to SerVaas in the United States for testing (see Exhibit B (original contract) at § 5.5).

15.     By telex dated November 14, 1988, Iraq advised that it had opened the requisite irrevocable letter of credit, in the amount of $40,602,000 and to SerVaas' favor, and that the letter of credit had been opened through the Atlanta branch of Banco Del Lavoro. A true and correct copy of Iraq's November 14, 1988 telex is attached hereto as **Exhibit F**. See also Exhibit D (Contract) at § 5.2 ("Upon the governmental approval set forth in the preceding paragraph, [the Ministry] opened an irrevocable letter of credit with a financial institution having an office or branch in the United States of America.").

16.     Shortly thereafter, SerVaas received in the United States the Ministry's shipment of five tons of scrap shell casings for testing as to the exact process to be implemented to remove the silicon from the brass. See Exhibit D (Contract) at § 5.4 ("[The Ministry] shipped by air freight at its expense to [SerVaas] at a designated address in the U.S.A. five (5) tons of shell casing ... of a composition typical of the metal to be processed ...."). True and correct photographs of the scrap shell casings that SerVaas received from the Ministry in the United States are attached hereto as **Exhibit G** and **Exhibit H**.

17.     SerVaas thereafter perfected the process for the silicon removal from the sample shell casings and so advised the Ministry. See Exhibit D (Contract) at § 5.4 ("[SerVaas] has, at

its sole expense, demonstrated the effectiveness of its silicon removal process for complete removal of silicon to .00 percent.").

18. Pursuant to the Contract, SerVaas sent to Iraq: (1) the plans for the factory/plant it had drawn in the United States; (2) the machinery and equipment built in the United States for the operation of the plant; and (3) memoranda drafted in the United States detailing SerVaas' proprietary method of silicon removal. See, e.g., Exhibit D (Contract) at § 5.5 ("Upon the satisfactory completion of the silicon removal test described in paragraph 5.4 and delivery of certain preliminary Plans and Specifications, as heretofore accepted and approved by [the Ministry], [SerVaas] was entitled to draw ten percent (10%) of the Total Contract Price as a down payment ....").

19. In accordance with the Contract, Iraq made millions of dollars of payments to SerVaas in the United States, by way of agreed upon draws on the irrevocable letter of credit the Ministry had established with the Atlanta branch of Banco Del Lavoro.

20. The installation of the machinery and equipment into the Iraqi plant was delayed because the Ministry had not completed the structural building (*i.e.* a roof had not been constructed). See generally Exhibit D (Contract) at §§ 1.3, 8.1-8.4.

21. Ultimately, SerVaas' continued performance under the Contract was precluded under United States Executive Orders (dated August 2 and 10, 1990) following Iraq's invasion of Kuwait. See Exhibit A (Cmplt.) at Exh. 2 (Judgment) ("Due to the promulgation by the President of the United States, of so-called Executive Orders on August 2 and 10, 1990 prohibiting 'the performance by any 'American' citizen of any contract or agreement relating to any industrial, commercial, or governmental project 'because of the invasion of KUWAIT by the Iraqi military forces ... SERVAAS Inc. was obliged to terminate the contract even though it had

delivered the entirety of the contractual equipment and carried out a significant part of the services provided for under the contract.").

22.     Based thereon, SerVaas terminated the Contract pursuant to its terms, and demanded payment then due for the equipment and machinery delivered to Iraq. Notwithstanding that Iraq received the fruits of the Contract – indeed, Iraq has been operating the plant for well over 20 years with the machinery, equipment and technology provided by SerVaas (see **Exhibit I** (true and correct copies of photographs of the machinery provided by SerVaas in current-day operation in the Iraqi factory) and **Exhibit J** (New York Times article, dated August 2, 2003)) – Iraq (and the Ministry) failed to pay SerVaas.

## THE FRENCH JUDGMENT

23.     In 1990, SerVaas commenced an action before the Paris Commercial Court in France against the Ministry seeking damages arising from the Contract.

24.     On April 16, 1991 the Paris Commercial Court issued an "Ordonnance de Refere" (the Judgment), ruling in favor of SerVaas and against the Ministry in the amount of $14,152,800, together with interest. The Judgment was attached to the Complaint as Exhibit 1. See Exhibit A (Cmplt.) at Exh. 1. A certified English translation of the Judgment was attached to the Complaint as Exhibit 2. See Exhibit A (Cmplt.) at Exh. 2.

25.     Following the issuance of the Judgment, the Ministry appeared before the French courts (represented by counsel) seeking to have the Judgment set aside on a number of grounds. See Exhibit A (Cmplt.) at Exhs. 4, 6, 8. Litigation in the French courts lasted for four years. Ultimately, the French courts (including the appellate courts) rejected the Ministry's challenges to the propriety of the Judgment.

26. Among other things, the French court rejected the Ministry's argument that it had not waived sovereign immunity. See Exhibit A (Cmplt.) at Exh. 6 at 2.

27. SerVaas remains the owner and holder of the Judgment, which is final, non-appealable and enforceable (thru 2017) in France and throughout the European Union.

## COLLECTION EFFORTS:

## IRAQ RECOGNIZES THE JUDGMENT AS A DEBT OF THE STATE

28. Following the issuance of the Judgment in April 1991, SerVaas undertook to enforce the Judgment in The Netherlands as against Iraqi assets held in Dutch banks, as well as certain goods discharged and seized from a shipping vessel in Middleburg. See also Exhibit A (Cmplt.), Exh. 4 at 2.

29. Prior to the auction of the seized goods, Iraq entered into an agreement with SerVaas whereby SerVaas agreed to delay the auction of the goods in exchange for Iraq's payment of $100,000. A true and correct copy of the August 27, 1992 agreement (the "Freeze Agreement") between "THE STATE OF IRAQ" and SerVaas is attached hereto as **Exhibit K.**

30. Notably, the Freeze Agreement was entered into between SerVaas and Iraq (not the Ministry, although the Head of the Legal Consultation Bureau of the Ministry of Industry executed the Freeze Agreement on behalf of Iraq). See Exhibit K (Freeze Agreement).

31. By the Freeze Agreement, Iraq specifically recognized that the Judgment was enforceable as against it, and "acknowledge[d] unconditionally" a debt to SerVaas relating to SerVaas' shipment of equipment to Iraq pursuant to the Contract:

> WHEREAS
>
> Servaas has obtained a judgment dated 16th April, 1991 against Iraq in France, in which Iraq is ordered to pay to Servaas US $14,152,800 to be increased with French statutory interest thereover from 5th April 1991 until the day of full settlement (hereinafter the "Claim")[.]
>
> Notwithstanding the fact that Iraq denies that it is in anyway in breach of the contract to which the Claim relates ... **Iraq herewith acknowledges unconditionally that it owes Servaas an amount of $7,500,000, of the Claim [as defined above]..., which amount relates to the last shipment of the equipment delivered by Servaas pursuant to the contract between the Ministry of Industry of Iraq and Servaas.**

Exhibit K (Freeze Agreement) at 1-3 (emphasis added).

32. Although the parties entered into the Freeze Agreement with hopes that an amicable compromise could be reached, no such compromise or settlement was ever consummated.

33. Today, Iraq owes SerVaas over $40 million pursuant to the Judgment.

Pursuant to 28 U.S.C. § 1746, I declare under penalties of perjury that the foregoing is true and correct.

Executed on this 13th day of August 2009.

*/s/ Beurt SerVaas*
BEURT SERVAAS

NY793375.1
213685-10001

8