# CONTRACT

Contract executed in Indianapolis, Indiana, U.S.A., this 9th day of September, 1988, by and between the MINISTRY OF INDUSTRY, AL-SHAHEED FACTORY, ANBAR, IRAQ (the "Customer") and SERVAAS, INCORPORATED, duly incorporated under the laws of the State of Indiana, United States of America (the "Contractor");

WHEREAS the Customer wishes to purchase from the Contractor certain machinery, equipment, and other tangible goods and to receive certain services, and

WHEREAS the Contractor agrees to supply such machinery, equipment, and other tangible goods and to provide or arrange for the provision of services desired by the Customer, and

WHEREAS the Contractor and the Customer have been brought together and assisted in arriving at the terms and conditions of this Contract by the world wide engineering firm of Matrix-Churchill, Ltd. of Coventry, England, which firm and its affiliates have extensive knowledge and experience in international engineering projects, including but not limited to, Iraq, and which firm will assist Contractor in the continuing performance of the obligations under this Contract,

NOW THEREFORE, in consideration of the premises and the mutual promises contained herein, Customer and Contractor agree as follows:

## ARTICLE 1
## Definitions

For the purpose of this Contract, the following terms shall have the meanings set forth below:

1.1 Customer: Means the MINISTRY OF INDUSTRY, AL SHAHEED FACTORY AMERIA-FALLUJA, ANBAR, IRAQ, P. O. BOX 93, FALLUJA, TELEX 216124 SHFA IK

1.2 Contractor: Means SERVAAS, INCORPORATED, 1000 WATERWAY BOULEVARD INDIANAPOLIS, INDIANA 46202, U.S.A., TELEX 27440 CURTIS USA

1.3 Site: Means Ammeria-Iraq or any other site within Iraq agreed upon between the Contractor and Customer, where the machinery and equipment shall be installed within a building designed and erected by Customer.

1.4 Supplies: Means all machinery, equipment, tools, spare parts, technical documents and articles of all kinds to be supplied by Contractor to Customer under the terms and conditions of this Contract.

1.5 C.O.C.: Means the Certificate of Commissioning as more fully described in Article 12.

1

1.6    T.O.C.: Means the Taking Over Certificate as more fully described in Article 14.

1.7    F.A.C.: Means Final Acceptance Certificate as more fully described in Article 16.

1.8    Services: Means the design of the foundations, preparation of technical specifications for the building and utilities to be designed and erected by the Customer, preparation of the detailed plans and specifications for the Supplies, supervision of the erection of the foundations, certain training, and preparation of technical documentation, all as more fully to be described in the final Plans and Specifications.

1.9    Plant: Means all machinery, equipment, accessories, tools, and other Supplies more fully described in the final Plans and Specifications to this Contract, which shall be installed at the Site.

1.10   Section: Means the four parts of the Plant that together perform the Plan Objective under this Contract as follows, which Sections shall be more fully described in the final Plans and Specifications:
       a. Silicon Removal
       b. Metal Preparation
       c. Melting and Casting
       d. Slab and Billet Sawing

1.11   Plans and Specifications: Means the final detailed specifications, drawings, descriptions, technical data in substantial conformity to the Proposal to be provided by Contractor and made a part of the Contract as Annex B.

1.12   Proposal: Means the proposal by Contractor to Customer to provide the Supplies, Plant and Services attached to the Contract as Annex A.

1.13   Total Contract Price: Means Forty Million Three Hundred Thirty Thousand U.S. Dollars ($40,330,000), plus reasonable transportation and living expenses as described in Article 4.

1.14   Plant Objective: Means that the Supplies and and Services combined as a single plant o the Site shall be able to (a) use Customer's available scrap of approximately 70,000 tons of shell cases to produce slabs which shall be used as incoming materials for the further production of accepted silicon brass discs in the existing facility of Al-Shaheed Factory; (b) remove the silicon from the silicon brass scrap to a zero percentage to produce ingots to be used with the available scrap, except the silicon brass shell cases, to produce 70/30 brass slabs which shall be used as incoming materials for the further production of accepted brass 70/30 sheets in the existing facility of Al-Shaheed Factory.

## ARTICLE 2
### Contract Documents

The following documents shall be incorporated as part of and shall constitute the full terms and conditions of this Contract.

2.1 Articles 1 through 27 of this Contract.

2.2 The following Annexes:

    Annex A. The Proposal, which is attached to and made part of this Contract at the date of execution.

    Annex B. The final Plans and Specifications to be provided by Contractor consistent with the Proposal, and incorporated as part of this Contract as the following Annexes:

    Annex (1). Machinery, equipment, accessories and tools.
    Annex (2). Specifications
    Annex (3). Spare parts
    Annex (4). Technology, know-how and technical documents.
    Annex (5). Description of supervision of installation and construction of the Plant.
    Annex (6). Training and technical assistance.
    Annex (7). Schedule of delivery and performance.

2.3 Modifications to this Contract or any of the Annexes which must be in writing and signed by the parties hereto.

## ARTICLE 3
### Subject of the Contract

The Contractor agrees to supply certain Supplies and perform certain Services to the Customer who will accept those Supplies and Services under the terms and conditions of this Contract:

3.1 Contractor shall supply and deliver the machinery, equipment, accessories and tools as described in Annex (1) to this Contract. The specification of these Supplies are as stated in Annex (2) to this Contract.

3.2 Contractor shall supply and deliver spare parts for the Supplies as described in Annex (3) to this Contract.

3.3 Contractor shall transfer the technology, know-how and technical documents described per Annex (4) to this Contract.

3.4 Contractor shall supply and deliver six (6) copies of the technical documentation, such as operations manuals and maintenance manuals, in the English language, one should be original.

3.5 Contractor shall supervise the installation of the foundation at the Site which will be carried by Customer's personnel at Customer's expense, and the installation of the Supplies and supervise the required

test run and commissioning as set forth in Annex (5).

3.6 Contractor shall supervise training of the Customer's start-up personnel and provide technical assistance as described in Annex (6) to this Contract.

3.7 Contractor shall supply design drawings in six (6) copies for all special tools specifying the type of material and standards used by Contractor. One additional copy of the drawings shall be on transparent paper.

3.8 Contractor shall supply any needed civil engineering designs for the machinery and equipment and the foundations. Customer shall be responsible for any civil engineering designs of the building and utilities in conformity with the specifications to be provided by Contractor.

ARTICLE 4
Prices

4.1 All prices stated in this Contract are to be in United States currency, C&F to the Site according to Incoterms 1983.

4.2 The prices in the Contract are firm, fixed and non revisable, and in no circumstances for any reason subject to an increase except for modifications of the Contract agreed to by both parties.

4.3 The Total Contract Price to cover the subject of the Contract shall be Forty million three hundred thirty thousand U.S. dollars ($40,330,000) as set forth in Annex A. The final Plans and Specifications as set forth in Annex B shall designate with greater specificity the Contract Prices for various Sections and specific items of the Supplies, which prices shall supercede Annex A, but in no event shall exceed in total $42,641,000 plus transportation and living expense costs of Contractor's supervisory personnel in Iraq, which shall be paid by direct invoice to Customer in Iraqui currency.

ARTICLE 5
Effective Time of Contract; Terms and Conditions of Payment

5.1 This Contract shall not become final and binding on either party hereto unless it has been approved by the appropriate governmental authority of Iraq by December 31, 1988. Said approval shall be evidenced by a Telex from Customer to Contractor stating the date of such approval.

5.2 Upon the governmental approval set forth in the preceding paragraph, Customer shall open or cause to be opened an irrevocable letter of credit with a financial institution having an office or branch in the United States of America. Said letter of credit shall be of a duration reasonably calculated to extend through F.A.C. The financial institution's obligations shall be rated "B" or better by a rating service of recognized

4

national standing at the time of issuance of the letter of credit.

5.3 Until such time as Customer opens the letter of credit, Contractor shall have no obligation to provide final Plans and Specifications or conduct the Silicon Test.

5.4 Upon receipt of notification of governmental approval and establishment of the letter of credit, Contractor shall prepare and deliver to Customer the Plans and Specificiations in conformity with the Proposal within six (6) weeks. Customer may suggest changes in such Plans and Specifications. The final Plans and Specifications shall become part of this Contract as Annex B.

5.5 Customer shall ship by air freight at its expense to Contractor at a designated address in the U.S.A. five (5) tons of shell casings with the primers removed for testing as to the process of removing silicon. Within forty-five (45) days following receipt of such casings, Contractor shall, at its sole expense, demonstrate the effectiveness of its silicon removal process for complete removal of silicon.

5.6 Upon satisfactory completion of the Silicon removal process and delivery of the final Plans and Specifications, Contractor shall be entitled to draw ten percent (10%) of the Total Contract Price as a down payment, provided that Contractor provides an unconditional bank guarantee in favor of Customer from a financial institution satisfactory to the Rafidain Bank of Iraq for the benefit of the Customer. Said bank guarantee shall be reduced ten percent (10%) in U.S. dollars according to approved invoices of Contractor based upon the contract prices set forth in Annex B, and shall be valid until the date of presentation by the Contractor of the following documents in respect of the last shipment of the machinery:

  i. the forwarding agent's certificate confirming that each consignment is properly sea worthy and has been irrevocably dispatched to the address of the Customer;

  ii. six (6) copies of invoices and packing lists;

  iii. a full set of shipping documents, including the bill of lading; and

  iv. legalized Certificate of Origin.

5.7 Fifty percent (50%) of the contract price for each of the Supplies set forth in Annex B shall be paid to Contractor by drawing upon the letter of credit against presentation of a complete set of shipping documents according to Incoterms 1983 for that certain part of Supplies.

5.8 Ten percent (10%) of the Total Contract Price shall be paid to Contractor by draw on the letter of credit against presentation of the C.O.C.

5.9 Twenty percent (20%) of the Total Contract Price shall be paid to

Contractor by draw on the letter of credit against presentation of the T.O.C.

5.10 The final ten percent (10%) of the Total Contract Price shall be paid to Contractor by draw upon the letter of credit against presentation of the F.A.C.

5.11 Contractor shall provide Customer, at the time of the first draw set forth in paragraph 5.6, above, a performance bond from the Rafidain Bank of Iraq in the amount of five percent (5%) of the Total Contact Price which bond shall be outstanding until the date of the F.A.C.

5.12 Customer shall be responsible for all costs and charges of the letter of credit in favor of Contractor, and Contractor shall be responsible for all costs and charges of the bank guarantee and performance bond. All guarantees, letters of credit and performance bonds shall specify payment in U.S. dollars.

## ARTICLE 6
### Taxes and Duties

6.1 All taxes and duties or similar charges to be paid outside of Iraq for the performance of this Contract shall be borne and paid by the Contractor as well as any patents, royalties or rights related to the object of this Contract.

6.2 All taxes and duties to be paid in or to Iraq (if any) for the performance of this Contract shall be borne and paid by the Customer. Customer shall assist Contractor in expediting the resolution of any and all Iraqi customs or other Iraqi restrictions or limitations on Contractor's performance.

## ARTICLE 7
### Packing and Marking

7.1 All Supplies shall be packed according to the international standards for export packing suitable for the machinery, equipment and other articles to be supplied under this Contract.

7.2 Each piece shall be clearly marked with the Customer's name, address, piece number and number of the letter of credit.

## ARTICLE 8
### Site and Building

8.1 The Contractor shall provide the Plans and Specifications which are required for the Site and the building to house the Plant. Contractor does warrant that such Plans and Specifications would comply with local laws and regulations in Indianapolis, Indiana.

8.2 The Customer shall prepare the Site at its cost and expense.

6

8.3 The Contractor shall visit the Site at least one time during the preparation at Customer's expense.

8.4 The Customer shall, at its sole cost and expense, be responsible for the design and construction of the building on the Site and the utilities to the point of hook-up with the Plant.

8.5 The Plans and Specifications shall designate an estimated date for the arrival of machinery, etc, and an estimated date for commencement of installation of the foundation and equipment. Customer shall provide, at its expense, safe, secure, and appropriate storage areas near the Site and shall have completed the preparation of the Site and the required portions of the building preceding the estimated date of installation commencement.

## ARTICLE 9
### Delivery and Performance

9.1 The Contractor shall deliver and perform the other activities under this Contract according to the schedule set forth in Annex (7).

9.2 Unloading and checking of delivered Supplies shall be carried out by a committee representing the Contractor, Customer and the insurance company.

9.3 The Customer shall provide the necessary areas and environment required by the contractor where the supplies shall be stored until the date of demand.

9.4 The Contractor shall provide the export licenses and any other U.S. government approvals for all the supplies and services, to Iraq, under this Contract.

9.5 Contractor's performance is subject to the specific approval of the United States Department of Commerce, Export Administration, and the United States Department of State.

## ARTICLE 10
### Installation

10.1 The Contractor shall supervise the installation of the Plant at the Site and shall provide for the performance of the said supervision as set out in Annex (5).

10.2 Customer shall be responsible for reasonable costs of transportation and living expenses of Contractor's supervisory personnel.

## ARTICLE 11
### Penalty

11.1 The schedule in Annex (7) shall provide that each Section shall be ready for issuance of a T.O.C. on or before twenty-four (24) months

following the date upon which Contractor has received the letter of credit and notice of governmental approval as set forth in paragraph 5.4, above.

11.2 In the event that the Contractor fails to deliver the Supplies or perform the Services for any Section within the time or times stipulated in Annex (7) for the issuance of a T.O.C. for that Section, the Contractor shall pay the Customer a penalty at the rate of 0.75% (seventy-five one hundreths percent) per week of delay of the contract price of the Section for which a T.O.C. would be issued. A similar penalty shall be imposed for any unreasonable delay in the provision of tools or spare parts that delay the full operation of any Section.

11.3 The total amount of penalty payable by the Contractor shall not exceed 5% (five percent) of the Total Contract Price.

11.4 The Customer, without prejudice to any other method of recovery, may deduct the amount of penalty from any payments due to Contractor unless the Contractor shall object and state its reasons that the penalty shall not apply, in which case the issue shall go to arbitration.

11.5 The payment of such penalties shall relieve the Contractor only from those specific obligations for prompt performance.

11.6 No penalty shall be imposed if the delay is in any manner caused, in whole or in part, by the failure of performance of Customer or by force majeure.

ARTICLE 12
Commissioning (C.O.C.)

12.1 As soon as the machinery and equipment of the entire Plant or any Section has been properly installed, tested, inspected, and made ready for commissioning all in accordance with the Contract, the Contractor shall notify the Customer in writing in this respect. The Customer shall jointly with the Contractor inspect the Plant or the Section to ascertain that it is ready for commissioning. This inspection shall be carried out in accordance with a procedure and test schedule to be prepared by the Contractor and submitted to the Customer for approval at least one (1) month before the scheduled date for completion of the installation of the Plant or section.

12.2 The commissioning of the Plant or Section shall be carried out by the Contractor through the Customer's start-up personnel assigned by the Customer for that purpose, who shall work under the complete direction and responsibility of the Contractor. The Contractor shall train a sufficient number of well qualified personnel for said purpose, but the cost of said personnel shall be borne by Customer.

12.3 During the period of commissioning the Contractor shall put into service the Plant or Section, ascertain that Plant or Section is in proper working order and make it ready for normal operation.

12.4 During the period of commissioning the Contractor shall carry out all necessary adjustments, safety precautions, and such work as is

8

necessary.

12.5 The Contractor shall supply at his own expense all spare parts and materials for the safe and efficient operation of the Plant or Section during the commissioning period.

12.6 All spare parts, accessories, tools, and documents for the Plant or Section shall be handed over to the Customer by the Contractor at least two months before commissioning.

12.7 Upon the completion of the inspection as provided herein, the Customer shall issue to the Contractor a Certificate of Commissioning (C.O.C.) of the Section or the Plant. Payments as provided in Article 5 shall occur when Contractor has received a C.O.C. for all Sections of the Plant.

ARTICLE 13
Test Run

13.1 When in the opinion of the Contractor all commissioning activities, including adjustment and changes, are complete and normal operation has been achieved, the Contractor shall notify Customer in writing of his intention to carry out the test run of the Plant or the Section. A date will be fixed mutually between the Customer and the Contractor for carrying out of the test run. The Contractor shall carry out the test run through the Customer's personnel assigned by the Customer for the purpose, who shall work under the direction and responsibility of the Contractor. The Contractor shall employ at his own expense a sufficient number of well-qualified supervisory personnel and the Customer shall provide at its expense a sufficient number of trainable operators who shall be trained by Contractor at its expense.

13.2 The procedure and conditions of the test run are to be submitted to the Customer one month before the commencement of the test run. The Customer shall have the right to require the Contractor to make modifications reasonably necessary to carry out the objective of the Plant or Section as set out in Annex B on a three shift/six day per week schedule and any additional test necessary shall be carried out by the Contractor at no additional cost to the Customer.

13.3 The Customer will reasonably evaluate the test run results in accordance with procedure outlined in this Article and if it is satisfied that those results show that the Plant or Section tested has met its performance objective, the Customer shall notify the Contractor in writing that the Plant or Section has passed the test run effectively as of the last day of the successful test run. Otherwise the Customer will notify the Contractor in writing of the purported failure of the Plant or Section to meet its performance objective giving details of such alleged failure.

13.4 If the Plant or Section fails the test run, the Contractor shall, as soon as possible thereafter, remedy the defective parts and make all the necessary modification and the test run shall be repeated

9

on the same terms and conditions.

13.5 All costs and charges incurred by the Contractor under this Article shall be deemed included and covered by the Total Contract Price.

13.6 All failures discovered from commissioning and test run shall be cured or fulfilled by the Contractor before the issuance of the T.O.C.

## ARTICLE 14
### Taking Over Cerificate (T.O.C.)

14.1 As soon as the Plant or any Section has been completed according to the Contract and has passed the test run as per Article 13 of this Contract, the Customer shall issue a Taking Over Certificate (T.O.C.) to the Contractor in which it shall certify the date on which the Plant or Section has been so completed and passed the said tests and this date shall be deemed as the date of completion of the Plant or Section under the Contract. Payment under Article 5 shall be due when Customer has issued the T.O.C. for each Section or the whole Plant.

## ARTICLE 15
### Warranties

15.1 The Contractor warrants that the Supplies to be furnished pursuant to this Contract shall be new, not previously used, and free from defects in design, material or workmanship and shall comply with the final Plans and Specifications as contained in Annex B. Said warranty shall extend for a period of twelve (12) months from the date of the T.O.C. during which time Contractor shall provide, at its cost, a specialist agent who shall consult with the Customer concerning any alleged warranty claims. All reasonable transportation or living expense costs for such agent in Iraq shall be borne by Customer.

15.2 If during the period of the warranty any Supply so furnished is found to be defective, the Contractor shall, at its sole expense, either repair or replace the Supply without undue delay.

15.3 In the case of replacement or repair, the provisions of this Article shall apply to the replaced Supply as if that had been taken over on the date of replacement.

15.4 The warranty set forth in paragraph 15.1 shall not apply to any Supply damaged or found to be defective as the result of accident, negligence on the part of the Customer or its agents and employees and operations of the Plant not in accordance with the Plans and Specifications, or a force majeure.

15.5 The Contractor shall be responsible to compensate the Customer for any shortage in spare parts or tools to be supplied under this Contract.

15.6 The parties signing this Contract warrant that they have

authority to do so.

## ARTICLE 16
### Final Acceptance Certificate

16.1 Twelve (12) months from the date of issuance of the T.O.C., and providing that the Contractor has fulfilled all its obligations hereunder, the Contractor shall so notify Customer that the Final Acceptance Certificate (F.A.C.) should issue. Within fourteen (14) days of receipt of said notice, Customer shall issue the F.A.C. unless there are outstanding warranty claims under Article 15, above.

## ARTICLE 17
### Training

17.1 The training of the Customer's personnel by the Contractor shall be performed in accordance with the specifications set forth in Annex (6) to this Contract.

## ARTICLE 18
### Technical Assistance

18.1 The Contractor shall render technical assistance to the Customer in accordance with the specifications set forth in Annex (6) to this Contract.

## ARTICLE 19
### Patent Rights

19.1 The Contractor shall at all times fully indemnify the Customer against all actions, claims, demands, costs, charges and expenses arising out of or incurred by reason of any infringement of letters patent, design copyright, trademark, or trade name protected in the country in which any Supplies or Plant were designed or manufactured. However, such indemnity shall not cover any use of the Plant by Customer.

19.2 The Contractor shall obtain the best available patent indemnities from any vendor of Supplies, and shall render assistance in the enforcement of such indemnities.

19.3 In the event of any claim being made or action brought against the Customer arising out of the subject matter of this Article, the Customer shall promptly notify Contractor and Contractor shall, at its sole expense, conduct all negotiations for the settlement of the same, and shall defend any litigation that may arise therefrom. The Customer shall make no admissions or statements which may prejudice Contractor's rights unless Contractor shall have refused to defend or indemnify within three (3) months of receipt of written notice from Customer.

19.4 In the event of the commencement of litigation pursuant to

this Article, Customer may demand of Contractor such reasonable security as shall from time to time be required by the Customer to cover the amount ascertained or agreed or estimated as the compensation, damage, expense and costs for which the Customer may become liable in respect to such infringements.

19.5 The Customer shall, at Contractor's expense, provide all available assistance for the purpose of contesting or defending any claim made or action brought pursuant to this Article.

## ARTICLE 20
## Spare Parts

20.1 The Contractor guarantees that any reasonable and foreseeable requirements of spare parts by Customer will be available to the Customer for a period of 15 years from the date of the T.O.C.

20.2 The Contractor guarantees to supply Customer with spare parts for the Plant for two years from the date of the F.A.C. based upon the operation of three (3) shifts per day as set forth in Annex (3).

## ARTICLE 21
## Assignment

Contractor shall not assign or sub-let this Contract, in whole or in part, or any rights or obligations arising from the Contract, without the prior written consent of the Customer.

## ARTICLE 22
## Termination

22.1 This Contract may be terminated by the Contactor, without obligation or liability, at any time prior to receipt of notice of governmental approval and the letter of credit as set forth in Article 5, by giving notice to the Customer.

22.2 This Contract may be terminated by the Customer, without obligation or liability, at any time prior to receipt of governmental approval as set forth in Article 5, by giving notice to the Contractor.

22.3 This Contract may be terminated by the Customer, in whole or in part, if the Contractor transfers its obligations or rights under this Contract to a third party without the prior agreement of the Customer.

22.4 This Contract may be terminated by the Customer, in whole or in part, if the Contractor requests to be declared a bankrupt or is adjudicated a bankrupt.

22.5 This Contract may be terminated by the Customer if the total penalty payable pursuant to Article 11, above, is reached.

## ARTICLE 23
## Force Majeure

23.1 Neither party to this Contract shall be considered in default nor be liable for any loss, penalty, or damage of any nature whatsoever incurred or suffered by the other party due to omission, delays or default in performance caused by circumstances beyond its control, which could not have been reasonably foreseen and provided against by an experienced Contractor or Customer (as the case may be) in the exercise of due diligence.

23.2 Force majeure as herein described shall not be construed to include any act or circumstance which is due to, or is principally attributable to, the fault or negligence of the party seeking to obviate its obligations. If Contractor's performance is prevented or delayed, however, by any hostilities, or labor disputes involving the Customer or the government of Iraq, Contractor may terminate its Contract and shall be entitled to payment for the portion of the Plant that has been completed plus the costs of any Supplies that have been ordered in reliance upon this Contract prior to termination. Such compensation shall be based upon the costs to Customer established in Annex B.

23.4 Either party effected by Force Majeure shall notify the other party of the Force Majeure and its nature without delay and not later than fourteen (14) days after discovery. Any longer delay shall constitute waiver of the right under this Article.

23.5 In case of delay in the fullfillment of the obligations caused by Force Majeure the respective party shall be entitled to claim an extension of time therefore, which shall be reasonable and proper.

## ARTICLE 24
## Arbitration

Any dispute arising out of, or in connection with, this Contract which is not amicably solved between the parties shall be finally settled according to the Rules of Arbitration and Conciliation of the International Chamber of Commerce by three arbitrators in accordance with said rules.

## ARTICLE 25
## Language and Law

25.1 This Contract is written in the English language.

25.2 The interpretation of the terms and conditions of this Contract shall be construed in accordance with the law of Iraq in effect at the date of this Contract, which law is based upon the principles of French law. Neither party, nor any of its officers, directors, employees or agents, however, shall be required or requested to violate the laws or governmental regulations of its

13

domicile or of any nations or political subdivision having jurisdiction of any action to be performed hereunder.

25.3 Neither the technical data nor any information, whether learned, delivered, or otherwise obtained by Customer, in respect to the Plant nor the direct product of that technical data is intended to be shipped, either directly or indirectly, to country groups Q, S, W, Y, or Z or Afghanistan or the Peoples Republic of China, without first obtaining the approval of the United States Department of Commerce's Export Administration. The countries within these country groups are:
(1) Country Group Q: Romania

(2) Country Group S: Libya; Country Group W: Hungary, Poland; Country Group Y: Albania, Bulgaria, Czechoslovakia, Estonia, the German Democratic Republic, Laos, Latvia, Lithuania, Mongolian Peoples Republic, Union of Soviet Socialists Republic; Country Group Z: Cambodia, Cuba, North Korea, North Vietnam.

ARTICLE 26
Coming into Force of Contract

This Contract shall come into force upon its approval by the competent Iraqi authorities as provided in Article 5.

ARTICLE 27
Signature of Contract

This Contract is made in two (2) original copies, one (1) copy for the Customer and one (1) copy for the Contractor:

SIGNED IN _Indianapolis IN USA_     ON THE _16th_ DAY OF 1988.

FOR THE CUSTOMER

Ministry of Industry
Al-Shaheed Factory

By _____

Name: FAROUK B. YACOUB

Title: FACTORY DIRECTOR

Witness: _____

Name: NAWFAL N. ISSA  Dr. Suham Al-din
       BASIM M. SOAYED  K. Hussan
                                    14

FOR THE CONTRACTOR

SerVaas Incorporated

By _____

Name: BEURT SERVAAS

Title: President

Witness: _____

Name: Robert N. Davies