## CONTRACT

Contract executed in Indianapolis, Indiana, U.S.A., this 10th day of September, 1988, and revised on 2nd day of October, 1988, and further revised this 8th day of August, 1989, by and between the MINISTRY OF INDUSTRY, AL-SHAHEED FACTORY, ANBAR, IRAQ (the "Customer") and SERVAAS, INCORPORATED, duly incorporated under the laws of the State of Indiana, United States of America (the "Contractor");

WHEREAS the Customer wishes to purchase from the Contractor certain machinery, equipment, and other tangible goods and to receive certain services, and

WHEREAS the Contractor agrees to supply such machinery, equipment, and other tangible goods and to provide or arrange for the provision of services desired by the Customer, and

WHEREAS the Contractor and the Customer have been brought together and assisted in arriving at the terms and conditions of this Contract by the world wide engineering firm of Matrix-Churchill, Ltd. of Coventry, England, which firm and its affiliates have extensive knowledge and experience in international engineering projects, including but not limited to, Iraq, and which firm will assist Contractor in the continuing performance of the obligations under this Contract,

WHEREAS, this Contract was revised on the 2nd day of October, 1988, and has been further revised on this 8th day of August, 1989, by changing the wording in certain articles of the Contract and this draft of the Contract dated August 8, 1989, shall constitute the entire Contract between the parties and supercedes and is in lieu and substitution of earlier renditions of the Contract.

NOW THEREFORE, in consideration of the premises and the mutual promises contained herein, Customer and Contractor agree as follows:

## ARTICLE 1
### Definitions

For the purpose of this Contract, the following terms shall have the meanings set forth below:

1.1     Customer: Means the MINISTRY OF INDUSTRY, AL SHAHEED FACTORY, AMERIA-FALLUJA, ANBAR, IRAQ, P. O. BOX 93, FALLUJA, TELEX 216124 SHFA IK

1.2     Contractor: Means SERVAAS, INCORPORATED, 1000 WATERWAY BOULEVARD, INDIANAPOLIS, INDIANA 46202, U.S.A., TELEX 27440 CURTIS USA or 402219

1.3     Site: Means Ameria-Iraq or any other site within Iraq agreed upon between the Contractor and Customer, where the machinery and equipment shall be installed within a building designed and erected by Customer.

1.4     Supplies: Means all machinery, equipment, tools, spare parts, technical documents and articles of all kinds to be supplied by

Contractor to Customer under the terms and conditions of this Contract.

1.5 C.O.C.: Means a Certificate of Commissioning as more fully described in Article 12.

1.6 T.O.C.: Means a Taking Over Certificate as more fully described in Article 14.

1.7 F.A.C.: Means Final Acceptance Certificate as more fully described in Article 16.

1.8 Services: Means the design of the foundations, preparation of technical specifications for the building and utilities to be designed and erected by the Customer, preparation of the detailed plans and specifications for the Supplies, supervision of the erection of the foundations, certain training, and preparation of technical documentation, all as more fully to be described in the final Plans and Specifications.

1.9 Plant: Means the Al-Shaheed Copper Scrap Refinery and all machinery, equipment, accessories, tools, and other Supplies more fully described in the final Plans and Specifications to this Contract, which shall be installed at the Site.

1.10 Section: Means the four parts of the Plant that together perform the Plant Objective under this Contract as follows, which Sections shall be more fully described in the final Plans and Specifications:
    a. Silicon Removal
    b. Metal Preparation
    c. Melting and Casting
    d. Slab and Billet Sawing

1.11 Plans and Specifications: Means the final detailed specifications, drawings, descriptions, technical data in substantial conformity to the Proposal to be provided by Contractor and made a part of the Contract as Annex B. Annex B may consist of numerous documents provided by Contractor and approved by Customer and Annex B may be amended from time to time as provided in Article 5.11. Annex A is incorporated into Annex B to the extent that its terms are not varied by the terms of Annex B documentation which has no effect on the objective of the Contract.

1.12 Proposal: Means the proposal by Contractor to Customer to provide the Supplies, Plant and Services attached to the Contract as Annex A.

1.13 Total Contract Price: Means Forty Million, Six Hundred and Two Thousand U.S. Dollars ($40,602,000.00), as more fully described in Article 4, plus reasonable transportation and living expenses.

1.14 Plant Objective: Means that the Supplies and Services combined as a single plant on the Site shall be able to (a) use Customer's available scrap of approximately 70,000 tons of existing scrap to produce slabs or billets which can be used as incoming materials for further production; (b) remove the silicon from the silicon brass scrap to .00 percent to produce slabs, billets, or ingots to be used with the available scrap and/or virgin materials, to produce 70/30 brass which shall be used as incoming material for further production in the

2

existing facility of Al-Shaheed Factory.

## ARTICLE 2
## Contract Documents

The following documents shall be incorporated as part of, and when read together shall constitute the full terms and conditions of, this Contract.

2.1  Articles 1 through 27 of this Contract.

2.2  The following Annexes:

Annex A. The Proposal, which was revised on 2nd day of October, 1988 and 8th day of August, 1989, and which is attached to and made part of this Contract at the date of execution.

Annex B. The final Plans and Specifications as provided by Contractor consistent with the Proposal and accepted by Customer and incorporated as part of this Contract as the following Sub-Annexes:

Annex (1). Machinery, equipment, accessories and tools.
Annex (2). Specifications
Annex (3). Spare parts
Annex (4). Technology, know-how and technical documents.
Annex (5). Description of supervision of installation and construction of the Plant.
Annex (6). Training and technical assistance.
Annex (7). Schedule of delivery and performance.

2.3  Modifications to this Contract or any of the Annexes must be in writing and signed by the parties hereto to be deemed effective and a part of this Contract.

## ARTICLE 3
## Subject of the Contract

The Contractor agrees to supply certain Supplies and perform certain Services to the Customer who will accept those Supplies and Services under the terms and conditions of this Contract:

3.1  Contractor shall supply and deliver the machinery, equipment, accessories and tools as described in Annex (1) to this Contract.  The specifications of these Supplies are as stated in Annex (2) to this Contract.

3.2  Contractor shall supply and deliver spare parts for the Supplies as described in Annex (3) to this Contract.

3.3  Contractor shall transfer the technology, know-how and technical documents described per Annex (4) to this Contract.

3.4  Contractor shall supply and deliver six (6) copies of the technical documentation, such as operations manuals and maintenance manuals, in the English language; one shall be the original.

3.5 Contractor shall supervise the installation of the foundation at the Site, and the installation of the Supplies and supervise the required test run and commissioning as set forth in Annex (5), all of which will be performed by Customer's personnel and at Customer's expense.

3.6 Contractor shall supervise training of the Customer's start-up personnel and provide technical assistance as described in Annex (6) to this Contract.

3.7 Contractor shall supply design drawings in six (6) copies for all special tools or tooling included in Annex 4, specifying the type of material and standards used by Contractor. One additional copy of the drawings shall be on transparent paper.

3.8 Contractor shall supply any needed civil engineering designs for the machinery and equipment and the foundations. Customer shall be responsible for any civil engineering designs of the building and utilities in conformity with the specifications to be provided by Contractor.

## ARTICLE 4
## Prices

4.1 All prices stated in this Contract are in United States dollars, CIF to the Site according to Incoterms 1983.

4.2 The prices in the Contract are firm, fixed and non revisable, and in no circumstances for any reason subject to an increase except for modifications of the Contract, and agreed to by both parties.

4.3 The Total Contract Price to cover the subject of the Contract shall be Forty Million, Six Hundred and Two Thousand U.S. Dollars ($40,602,000.00) as set forth in Annex A. The final Plans and Specifications as set forth in Annex B shall designate with greater specificity the Contract Prices for various Sections and specific items of the Supplies, which prices shall supercede Annex A, but in no event shall exceed in total Forty Million, Six Hundred and Two Thousand U.S. Dollars ($40,602,000.00), plus transportation and living expense costs of Contractor's supervisory personnel in Iraq, which shall be paid by direct invoice to Customer in Iraqi currency.

## ARTICLE 5
## Effective Time of Contract; Terms and Conditions of Payment

5.1 This Contract became final and binding on both parties hereto upon the approval by the appropriate governmental authority of Iraq on Oct. 10, 1988. Said approval was evidenced by a Telex from Customer to Contractor stating the date of such approval. The effective date of this contract is January 2, 1989, as specified in Article 26.

5.2 Upon the governmental approval set forth in the preceding paragraph, Customer opened an irrevocable letter of credit with a financial institution having an office or branch in the United States of America. Said letter of credit is of a duration reasonably calculated to extend through F.A.C. and will be extended if F.A.C. is extended. The financial institution's obligations were rated "B" or better by a rating

4

service of recognized national standing at the time of issuance of the letter of credit.

5.3   Upon receipt of notification of governmental approval and establishment of the letter of credit, Contractor shall prepare and deliver to Customer the Plans and Specifications in conformity with the Proposal within six (6) weeks.  Customer may suggest changes in such Plans and Specifications.  The final Plans and Specifications shall become part of this Contract as Annex B.

5.4   Customer shipped by air freight at its expense to Contractor at a designated address in the U.S.A. five (5) tons of shell casings with the primers removed, of a composition typical of the metal to be processed, for testing as to the process of removing silicon.  Contractor has, at its sole expense, demonstrated the effectiveness of its silicon removal process for complete removal of silicon to .00 percent.

5.5   Upon satisfactory completion of the Silicon removal test described in paragraph 5.4 and delivery of certain preliminary Plans and Specifications, as heretofore accepted and approved by Customer, Contractor was entitled to draw ten percent (10%) of the Total Contract Price as a down payment, and Contractor provided an unconditional bank guarantee in favor of Customer from a financial institution satisfactory to the Rafidain Bank of Iraq for the benefit of the Customer.

5.6   Contractor shall also be entitled to draw an additional 10 percent of the total contract price as a progress payment after 90 days from the first 10 percent draw.   The Contractor shall provide an additional unconditional bank guarantee for this additional draw in favor of the Customer from a financial institution satisfactory to the Rafidain Bank of Iraq for the benefit of the Customer. Said bank guarantees shall be reduced ten percent (10%) in U.S. dollars according to invoices from Contractor based upon the Contract prices set forth in Annex A, and shall be valid until the date of presentation by the Contractor of the following documents in respect of the last shipment of the machinery:

   i.   the forwarding agent's certificate confirming that
        each consignment is properly seaworthy and has been
        irrevocably dispatched to the address of the
        Customer;

  ii.   six (6) copies of invoices and packing lists;

 iii.   a full set of shipping documents, including the bill
        of lading; and

  iv.   legalized Certificate of Origin.

5.7   Forty percent (40%) of the contract price for each of the Supplies set forth in Annex B shall be paid to Contractor by drawing upon the letter of credit against presentation of a complete set of shipping documents according to Incoterms 1983 for that certain part of Supplies.

5.8   Ten percent (10%) of the Total Contract Price shall be paid to Contractor by draw on the letter of credit against presentation of the last C.O.C.

5.9   Twenty percent (20%) of the Total Contract Price shall be

5

paid to Contractor by draw on the letter of credit against presentation of the last T.O.C. by individual section as detailed in Annex "A" attached.

5.10  The final ten percent (10%) of the Total Contract Price shall be paid to Contractor by draw upon the letter of credit against presentation of the F.A.C.

5.11  Customer and Contractor agree that certain verbal modifications to Sub-Annexes have been made from time to time and may be made in the future to the completion of this Contract.  Such modifications shall be written and included in Annex B and when as written and included shall become part of this Contract, without changing the main objective of the Contract.

5.12  Contractor has provided Customer, above, a performance bond from the Rafidain Bank of Iraq in the amount of five percent (5%) of the Total Contact Price which bond shall be outstanding until the date of the F.A.C.

5.13  Customer shall be responsible for all costs and charges of the letter of credit in favor of Contractor, and Contractor shall be responsible for all costs and charges of the bank guarantee and performance bond.  All guarantees, letters of credit and performance bonds shall specify payment in U.S. dollars.

## ARTICLE 6
### Taxes and Duties

6.1  All taxes and duties or similar charges to be paid outside of Iraq for the performance of this Contract shall be borne and paid by the Contractor as well as any payments for patents, royalties or rights related to the object of this Contract.

6.2  All taxes and duties to be paid in or to Iraq (if any) for the performance of this Contract shall be borne and paid by the Customer.  Customer shall assist Contractor in expediting the resolution of any and all Iraqi customs or other Iraqi restrictions or limitations on Contractor's performance.

## ARTICLE 7
### Packing and Marking

7.1  All Supplies shall be packed according to the international standards for export packing suitable for the machinery, equipment and other articles to be supplied under this Contract.

7.2  Each piece of equipment and supplies shall be clearly marked with the Customer's name, address, piece number and number of the letter of credit.

## ARTICLE 8
### Site and Building

8.1  The Contractor shall provide the Plans and Specifications

which are required for the Site and the building to house the Plant.
Contractor does warrant that such Plans and Specifications would
comply with local building standards laws and regulations in
Indianapolis, Indiana.

8.2 The Customer shall prepare the Site at its cost and expense.

8.3 The Contractor shall visit the Site at least one time during
the preparation at Customer's expense.

8.4 The Customer shall, at its sole cost and expense, be
responsible for the design and construction of the building on the
Site and the utilities to the point of hook-up with the equipment
panel of machinery, equipment, and accessories (Plant).

8.5 The Plans and Specifications shall designate an estimated
date for the arrival of machinery, etc, and an estimated date for
commencement of installation of the foundation and equipment.
Customer shall provide, at its expense, safe, secure, and appropriate
storage areas near the Site and shall have completed the preparation
of the Site and the required portions of the building preceding the
estimated date of installation commencement.

## ARTICLE 9
## Delivery and Performance

9.1 The Contractor shall deliver and perform the other activities
under this Contract according to the schedule set forth in Annex (7).

9.2 Unloading and checking of delivered Supplies shall be carried
out by a committee representing the Contractor, Customer and the
insurance company insuring their delivery.

9.3 The Customer shall provide the necessary areas and
environment required by the Contractor where the Supplies shall be
stored until the date of demand.

9.4 The Contractor shall provide the export licenses and any
other U.S. government approvals for all the Supplies and Services
shipped to Iraq under this Contract.

9.5 Contractor's performance is subject to the specific approval
of the United States Department of Commerce, Export Administration, or
other United States governmental agencies as required.

9.6 The Contractor shall, at its sole expense, in the joint names
of the Contractor and the Customer, insure the Supplies for all risks
for the full replacement cost until they are delivered to the Site.
The Customer shall, at its sole expense, in the joint names of the
Contractor and the Customer, insure the Supplies for all risks for
their full replacement cost from their delivery to the Site until the
F.A.C.  The Contractor shall from the time set out in paragraph 5.3
through F.A.C., at its sole cost, insure in commercially reasonable
amounts against any and all claims for injuries, losses or damages by
reason of actions or omissions by the Contractor, its officers,
employees or agents, under this Contract. The Customer shall, from the
time set out in paragraph 5.3 through F.A.C., at its sole cost, insure
in commercially reasonable amounts against any claims for injuries,

losses or damages by reason of actions or omissions by the Customer, its officers, employees or agents under this Contract. Said insurance shall be carried with insurance companies reasonably acceptable to both parties, and copies of the insurance policies shall be provided to the other party within two (2) weeks following the time set out in paragraph 5.3. Each party shall be responsible for insurance meeting the standards of this paragraph by any subcontractor or provider of services required under this Contract.

## ARTICLE 10
### Installation

10.1 The Contractor shall supervise the installation of the Plant at the Site and shall provide for the performance of the said supervision as set out in Annex (5).

10.2 Customer shall be responsible for reasonable costs of transportation and living expenses of Contractor's supervisory personnel.

## ARTICLE 10A
### Baler

10A.1 Customer shall provide a Baler, provide all technical documents necessary to its operation, and provide and train all personnel in operation of the Baler, at its own cost and expense.

10A.2 Customer warrants and represents that for a period of two (2) years following T.O.C, it shall maintain spare parts for the Baler sufficient to ensure consistent and uninterrupted operation in accordance with the Plans and Specifications.

10A.3 In the event that the Baler fails, for any reason whatsoever, to perform for products other than shells, wire from the wire stripper and shredder, or cable from the cable stripper and shredder, no Penalty under Article 11 shall be assessed against Contractor, and no payments due Contractor under Article 5 shall be delayed or withheld due to the failure of the Baler to perform.

## ARTICLE 11
### Penalty

11.1 The schedule in Annex (7) shall provide that each Section shall be ready for issuance of a T.O.C. on or before twenty-four (24) months following the date upon which Contractor has received the letter of credit and notice of governmental approval as set forth in Article 5, above.

11.2 In the event that the Contractor fails to deliver the Supplies or perform the Services for any Section within the time or times stipulated in Annex (7) for the issuance of a T.O.C. for that Section, the Contractor, subject to the provisions of Article 10A, shall pay the Customer a penalty at the rate of 0.75% (seventy-five one hundreths percent) per week of delay of the contract price of the Section for which a T.O.C. would be issued. A similar penalty shall be imposed for any unreasonable delay in the provision of tools or spare parts that delay the full operation of any Section.

11.3 The total amount of penalty payable by the Contractor shall

not exceed 5% (five percent) of the Total Contract Price.

11.4 The Customer, without prejudice to any other method of recovery, may deduct the amount of penalty from any payments due to Contractor unless the Contractor shall object and state its reasons that the penalty shall not apply, in which case the issue shall be subject to arbitration as provided in Article 24.

11.5 The payment of such penalties shall relieve the Contractor only from those specific obligations for prompt performance.

11.6 No penalty shall be imposed if the delay is in any manner caused, in whole or in part, by the failure of performance of Customer or by a force majeure.

11.7 Delays caused by the Customer.

The delays caused by Customer in completing the site, building, utilities, foundations and/or installation shall be tabulated as such delays occur and agreed by both the Customer and Contractor. The length of the delay involved shall also be included in the daily log regarding the Contract progress. The Contractor is charged based upon delays by item; therefore, the Customer delays will also be determined by item. If the total delays caused by the Customer do not cause the Contractor to exceed the time allowed the Contractor for such operation, there shall be no penalty to the Customer. However, such delay time shall be added to the Contractor's time schedule available before a penalty is imposed on the Contractor.

Additional delays of up to 6 months caused by the Customer that should cause the Contractor to exceed his time allotted for the operation shall cause the Contractor to extend his time allotted to cover the period of the delay caused by the Customer. Maximum period for completion of the C.O.C. and T.O.C. of the contract would therefore be 30 months. In the event Customer delays prohibit Contractor from completing C.O.C. and T.O.C. beyond 30 months, Contractor shall be entitled to payment of 90% of Contract price less performance deficiencies by the Contractor. Delays and payment of the required penalty shall not prohibit Contractor from completion of F.A.C. and receipt of final payment.

11.8 Contractor shall be allowed F.A.C. payment no later than July 2, 1992, if Customer delays Contractor completion of F.A.C. beyond such date.

11.9 Customer shall extend its time schedule of the Letter of Credit as required by delays caused by Customer. Customer shall also allow the Contractor to extend the performance bond up to 42 months from the start of the Contract or until July 2, 1992. The Letter of Credit may be amended from time to time in order to reflect modifications to this Contract incorporated into Annex B.

11.10 If the Contract is delayed beyond 42 months, Customer shall also allow Contractor to cancel the performance bond as if the Contractor had completed all of its responsibilities required by the Contract. However, SerVaas will continue to use its best efforts beyond the 42 months to complete the contract as originally stipulated at no cost to the Ministry of Industry.

# ARTICLE 12
## Commissioning (C.O.C.)

12.1 As soon as the machinery and equipment of the entire Plant or any Section have been properly installed, tested, inspected, and made ready for commissioning all in accordance with the Contract, the Contractor shall notify the Customer in writing in this respect. The Customer shall jointly with the Contractor inspect the Plant or the Section to ascertain that it is ready for commissioning. This inspection shall be carried out in accordance with a procedure and test schedule to be prepared by the Contractor and submitted to the Customer for approval at least one (1) month before the scheduled date for completion of the installation of the Plant or Section.

12.2 The commissioning of the Plant or Section shall be carried out by the Contractor through the Customer's start-up personnel assigned by the Customer for that purpose, who shall work under the complete direction and responsibility of the Contractor. The Contractor shall train a sufficient number of well qualified personnel for said purpose, but the cost of said personnel shall be borne by Customer.

12.3 During the period of commissioning the Contractor shall put into service the Plant or Section, ascertain that Plant or Section is in proper working order and make it ready for normal operation.

12.4 During the period of commissioning the Contractor shall carry out all necessary adjustments, safety precautions, and such work as is necessary.

12.5 The Contractor shall supply at its own expense all spare parts and materials for the safe and efficient operation of the Plant or Section during the commissioning period.

12.6 All spare parts, accessories, tools, and documents for the Plant or Section shall be handed over to the Customer by the Contractor at least two months before commissioning.

12.7 Upon the completion of the inspection as provided herein, the Customer shall issue to the Contractor a Certificate of Commissioning (C.O.C.) of the Section or the Plant. Payments as provided in Article 5 shall occur when Contractor has received a C.O.C. for all Sections of the Plant.

# ARTICLE 13
## Test Run

13.1 When in the opinion of the Contractor all commissioning activities, including adjustment and changes, are complete and normal operation has been achieved, the Contractor shall notify Customer in writing of its intention to carry out the test run of the Plant or the Section A date will be fixed mutually between the Customer and the Contractor for carrying out of the test run. The Contractor shall carry out the test run through the Customer's personnel assigned by the Customer for that purpose, who shall work under the direction and responsibility of the Contractor. The Contractor shall employ at its own expense a sufficient number

10

of well-qualified supervisory personnel, and the Customer shall provide at its expense a sufficient number of trainable operators who shall be trained by Contractor at its expense.

13.2 The procedure and conditions of each test run are to be submitted to the Customer one month before the commencement of the test run. The Customer shall have the right to require the Contractor to make modifications reasonably necessary to carry out the objective of the Plant or Section as set out in Annex B, and any additional test necessary shall be carried out by the Contractor at no additional cost to the Customer. The test runs shall be designed to demonstrate that the Plant will meet the Plant Objective on a three shift/six day work week schedule.

13.3 The Customer will reasonably evaluate the test run results in accordance with procedure outlined in this Article, and if it is satisfied that those results show that the Plant or Section tested has met its performance objective, the Customer shall notify the Contractor in writing that the Plant or Section has passed the test run effectively as of the last day of the successful test run. Otherwise the Customer will notify the Contractor in writing of the purported failure of the Plant or Section to meet its performance objective giving details of such alleged failure.

13.4 If the Plant or Section fails the test run, the Contractor shall, as soon as possible thereafter, remedy the defective parts and make all the necessary modifications, and the test run shall be repeated on the same terms and conditions.

13.5 All costs and charges incurred by the Contractor under this Article shall be deemed included and covered by the Total Contract Price.

13.6 All failures discovered from commissioning and test run shall be cured or fulfilled by the Contractor before the issuance of the T.O.C.

## ARTICLE 14
## Taking Over Cerificate (T.O.C.)

14.1 As soon as the Plant or any Section has been completed according to the Contract and has passed the test run as per Article 13 of this Contract, the Customer shall issue a Taking Over Certificate (T.O.C.) to the Contractor in which it shall certify the date on which the Plant or Section has been so completed and passed the said tests and this date shall be deemed as the date of completion of the Plant or Section under the Contract. Annex A, equipment used prior to the completion of the complete Section involved, shall have T.O.C. issued by individual items as such equipment is approved and T.O.C. payments shall be made for such Section, in advance of the total Section, by the Customer. At this time Customer does not intend to use any equipment prior to the completion of the complete Section. Payment under Article 5 shall be due when Customer has issued the T.O.C. for each Section or the whole Plant.

## ARTICLE 15
## Warranties

15.1 The Contractor warrants that the Supplies to be furnished pursuant to this Contract shall be new, not previously used, and free from defects in design, material or workmanship and shall comply with the final Plans and Specifications as contained in Annex B. ("Warranty") said Warranty shall extend for a period of twelve (12) months from the date of the T.O.C. during which time Contractor shall provide, at its cost, a specialist agent who shall consult with the Customer concerning any alleged Warranty claims. All reasonable transportation or living expense costs for such agent in Iraq shall be borne by Customer.

15.2 If during the period of the Warranty any Supply so furnished is found to be defective, the Contractor shall, at its sole expense, either repair or replace the Supply without undue delay.

15.3 In the case of replacement or repair, the provisions of this Article shall apply to the replaced Supply as if that had been taken over on the date of replacement.

15.4 The Warranty set forth in paragraph 15.1 shall not apply to any Supply damaged or found to be defective as the result of accident, negligence on the part of the Customer or its agents and employees, operation of the Plant not in accordance with the Plans and Specifications, or a force majeure.

15.5 The Contractor shall be responsible to compensate the Customer for any shortage in spare parts or tools to be supplied under this Contract.

15.6 The parties signing this Contract warrant that they have authority to do so.

## ARTICLE 16
### Final Acceptance Certificate

16.1 Twelve (12) months from the date of issuance of the last T.O.C. required under this Contract, and providing that the Contractor has fulfilled all its obligations hereunder, the Contractor shall so notify Customer that the Final Acceptance Certificate (F.A.C.) should issue. Within fourteen (14) days of receipt of said notice, Customer shall issue the F.A.C. unless there are outstanding warranty claims under Article 15, above.

## ARTICLE 17
### Training

17.1 The training of the Customer's personnel by the Contractor shall be performed in accordance with the specifications set forth in Annex (6) to this Contract.

In regard to training Iraq engineers and technicians in the USA or at sites selected by SerVaas outside of Iraq, it is understood that the number of trainees and the time period shall be up to 36 man weeks of such training. The cost of such training shall be paid as follows:

a) Transportation from Iraq to training site, salaries and wages

of trainees, and expenses incurred by trainee to site shall be paid by the Customer.

b) Cost of trainer, meals and lodging of trainee, transportation from site to site and $400.00 USD per week per man shall be paid by the Contractor.

## ARTICLE 18
### Technical Assistance

18.1 The Contractor shall render technical assistance to the Customer in accordance with the specifications set forth in Annex (6) to this Contract.

## ARTICLE 19
### Patent Rights

19.1 The Contractor shall at all times fully indemnify the Customer against all actions, claims, demands, costs, charges and expenses arising out of or incurred by reason of any infringement of letters patent, design copyright, trademark, or trade name protected in the country in which any Supplies or Plant were designed or manufactured. However, such indemnity shall not cover any use of the Plant by Customer.

19.2 The Contractor shall obtain the best available patent indemnities from any vendor of Supplies, and shall render assistance in the enforcement of such indemnities.

19.3 In the event of any claim being made or action brought against the Customer arising out of the subject matter of this Article, the Customer shall promptly notify Contractor and Contractor shall, at its sole expense, conduct all negotiations for the settlement of the same, and shall defend any litigation that may arise therefrom. The Customer shall make no admissions or statements which may prejudice Contractor's rights unless Contractor shall have refused to defend or indemnify within three (3) months of receipt of written notice from Customer.

19.4 In the event of the commencement of litigation pursuant to this Article, Customer may demand of Contractor such reasonable security as shall from time to time be required by the Customer to cover the amount ascertained or agreed or reasonably estimated as the compensation, damage, expqense and costs for which the Customer may become liable in respect to such infringements.

19.5 The Customer shall, at Contractor's expense, provide all available assistance for the purpose of contesting or defending any claim made or action brought pursuant to this Article.

## ARTICLE 20
### Spare Parts

20.1 The Contractor guarantees that any reasonable and foreseeable requirements of spare parts by Customer will be available to the Customer for a period of 15 years from the date

of the T.O.C.

20.2 The Contractor guarantees to supply Customer with sufficient spare parts, based upon the recommendations of the manufacturers of the Supplies, for the normal operations of the Plant for two years from the date of the F.A.C. based upon the operation of three (3) shifts per day as set forth in Annex (3).

## ARTICLE 21
### Assignment

21.1 Contractor shall not assign or sub-let this Contract, in whole or in part, or any rights or obligations arising from the Contract, without the prior written consent of the Customer, and in no event shall Contractor be released from its obligations of full performance under this Contract.

## ARTICLE 22
### Termination

22.1 This Contract may be terminated by the Contractor, without obligation or liability, at any time prior to receipt of notice of governmental approval and the letter of credit as set forth in Article 5, by giving notice to the Customer.

22.2 This Contract may be terminated by the Customer, without obligation or liability, at any time prior to receipt of governmental approval as set forth in Article 5, by giving notice to the Contractor.

22.3 This Contract may be terminated by the Customer, in whole or in part, if the Contractor transfers its obligations or rights under this Contract to a third party without the prior agreement of the Customer.

22.4 This Contract may be terminated by the Customer, in whole or in part, if the Contractor requests to be declared a bankrupt or is adjudicated a bankrupt.

22.5 This Contract may be terminated by the Customer if the total penalty payable pursuant to Article 11, above, is reached.

## ARTICLE 23
### Force Majeure

23.1 Neither party to this Contract shall be considered in default nor be liable for any loss, penalty, or damage of any nature whatsoever incurred or suffered by the other party due to omission, delays or default in performance caused by circumstances beyond its control, which could not have been reasonably foreseen and provided against by an experienced Contractor or Customer (as the case may be) in the exercise of due diligence.

23.2 Force majeure as herein described shall not be construed to include any act or circumstance which is due to, or is principally attributable to, the fault or negligence of the party seeking to obviate its obligations. If Contractor's performance is prevented or delayed, however, by any hostilities,

or labor disputes involving the Customer or the government of Iraq, or other items under the control of the customer, that would prevent completion of this Contract, Contractor may terminate this Contract, and shall be entitled to payment for the portion of the Plant that has been completed plus the costs of any Supplies that have been ordered in reliance upon this Contract prior to termination.  Such compensation shall be based upon the costs to Customer established in Annex B.

23.3 Either party effected by a force majeure shall notify the other party of the force majeure and its nature without delay and not later than fourteen (14) days after discovery.  Any longer delay shall constitute waiver of the right under this Article.

23.4 In case of delay in the fulfillment of the obligations caused by a force majeure, the respective party shall be entitled to claim an extension of time therefore, which shall be reasonable and proper.

### ARTICLE 24
### Arbitration

24.1 Any dispute arising out of, or in connection with, this Contract which is not amicably resolved between the parties shall be finally settled according to the Rules of Arbitration and Conciliation of the International Chamber of Commerce by three arbitrators in accordance with said rules.

### ARTICLE 25
### Language and Law

25.1  This Contract is written in the English language.

25.2  The interpretation of the terms and conditions of this Contract shall be construed in accordance with the law of Iraq in effect at the date of this Contract, which law is based upon the principles of French law.  This Contract together with Annex B as same may be modified in writing from time to time shall constitute the entire agreement between the parties.  Neither party, nor any of its officers, directors, employees or agents, however, shall be required or requested to violate the laws or governmental regulations of its domicile or of any nations or political subdivision having jurisdiction of any action to be performed hereunder.

25.3  All notices required to be given hereunder shall be in writing and in the English language.  Notice shall be given first by Telex, followed by first class mail, to the addresses and numbers set forth in paragraphs 1.1 and 1.2, above.  Either party may change its address by giving the other party notice pursuant to this Article.

25.4  Neither the technical data nor any information, whether learned, delivered, or otherwise obtained by Customer, in respect to the Plant, nor the direct product of that technical data is intended to be shipped, either directly or indirectly, to country groups Q, S, W, Y, or Z or Afghanistan or the People's Republic of China, without first obtaining the approval of the United States

Department of Commerce's Export Administration. The countries within these country groups are:

(1) Country Group Q: Romania

(2) Country Group S: Libya; Country Group W: Hungary, Poland; Country Group Y: Albania, Bulgaria, Czechoslovakia, Estonia, the German Democratic Republic, Laos, Latvia, Lithuania, Mongolian People's Republic, Union of Soviet Socialist Republics; Country Group Z: Cambodia, Cuba, North Korea, North Vietnam.


### ARTICLE 26
### Coming into Force of Contract


This Contract shall come into force upon its approval by the competent Iraqi authorities as provided in Article 5. The effective start date of this Contract is January 2, 1989, regarding the performance of this Contract and for purposes of calculating delays and penalties.

**ARTICLE 27**
**Signature of Contract**

This Contract is made in two (2) original copies, one (1) copy for the Customer and one (1) copy for the Contractor:

SIGNED IN _Indianapolis, Ind._ ON THE _10th_ DAY OF _August_ 1989.

FOR THE CUSTOMER
Ministry of Industry
Al-Shaheed Factory

By _____

Name: _FAROUK B. YACOUB_

Title: _FACTORY DIRECTOR_

Witness: _Nafal N. Issa_

Name: _____

Title: _____

FOR THE CONTRACTOR
SerVaas, Incorporated

By _Beurt SerVaas_

Name: _BEURT SER VAAS_

Title: _PRESIDENT_

Witness: _Mary Beth Vogle_
3-24-92

Name: _____

Title: _VP Secretary Treasurer_

3,9/197

17

Signed on the 10ᵗʰ day of August 1989.

FOR THE CUSTOMER
Ministry of Industry
Al-Shaheed Factory

By: _____
    Zuhair A. Al Izzi

By: _____
    Farouk B. Yacoub

FOR THE CONTRACTOR
SerVaas, Incorporated

By: _____
    Clarence C. Ormsby

By: _____
    Beurt SerVaas

3,9/186

**ANNEX B** _____

The following agreements are necessary to clarify certain statements in the Contract, letters of credit, and so forth regarding the contract by and between the Ministry of Industry, Al-Shaheed Factory and SerVaas, Incorporated.

1. By mutual agreement the dates included in the letters of credit or Contract, including shipping dates, expiration dates, guarantee dates, performance bond date and other dates in conflict with the revised contract shall be amended as required by Customer or Contractor, based upon Customer's requested extension of the Final Acceptance Certificate (F.A.C.), as they may occur on or before July 2, 1992.

2. Commercial invoices must certify the supplies are of USA origin, or when approved by Customer supplies shall be authorized for importation into Iraq from the following countries: EEC countries, Canada or Switzerland for all equipment as shown on Schedule A. The bills of lading and invoices shall include a statement regarding country origin of the equipment involved as well as the components if assembled.

3. Shipments shall be made CIF as insurance responsibility shall be to the Contractor and delivered to Al-Shaheed Copper Scrap Refining site.

4. Shipment on deck is allowed where necessary, and the letter of credit instructions shall be modified in accordance with this agreement.

5. In case of absence of an Iraqi commercial attache or his representative, legalization by any authorized Arab diplomat or any other authorized agent by the Foreign Minister of Iraq shall be acceptable.

6. By mutual agreement, there will be no change in future in condition or terms and sequence of payments.

SERVAAS INCORPORATED
1000 WATERWAY BOULEVARD
INDIANAPOLIS, INDIANA 46202
U.S.A.

## AL-SHAHED BRASS REFINERY
## CONTRACT WITH MINISTRY OF INDUSTRY
## AL-SHAHED FACTORY AMERIA-FALLUJA, ANBAR, IRAQ

ANNEX A
REVISED AUGUST 8, 1989

SUMMARY
($ in Thousands)

|  | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 100 Silicon Removal Total | $ 8,601 | $ 1,841 | $ 181 | -0- | $ 408 | $ 308 | $ 230 | $ 282 | $11,851 |
| 200 Metal Preparation Total | $ 5,800 | $ 1,385 | $ 95 | -0- | $ 436 | $ 191 | $ 35 | $ 191 | $ 7,932 |
| 300 Melting & Casting Total | $12,239 | $ 3,892 | $ 132 | -0- | $ 508 | $ 207 | $ 146 | $ 418 | $17,542 |
| 400 Slab and Billet Sawing | $ 2,654 | $ 171 | $ 65 | -0- | $ 124 | $ 108 | $ 41 | $ 114 | $ 3,277 |
| TOTAL | $29,094 | $ 7,289 | $ 473 | -0- | $ 1,475 | $ 814 | $ 452 | $ 1,005 | $40,602 |

1. Supply and Delivery of Machines, Tools and Accessories.
2. Supply and Delivery of Spare Parts, (estimated requirements) for two (2) years.
3. Supply and Delivery of Technical Documentation, such as operation manuals, maintenance manuals, etc. in English (6 copies).
4. Installation Cost of Equipment, including foundations, buildings, and all utilities to be furnished by purchaser to our requirements.
5. Construction and Installation Supervision, NOT including transportation and living expenses, etc.
6. Start-up Personnel, NOT including transportation and living expenses, etc.
7. Supply of Drawings for Special Tooling, specifying type of material and standards used by supplier.
8. Foundation Design.

SERVAAS INCORPORATED
1900 WATERWAY BOULEVARD
INDIANAPOLIS, INDIANA 46202
U.S.A.

AL-SHAHEED BRASS REFINERY
CONTRACT WITH MINISTRY OF INDUSTRY
AL-SHAHEED FACTORY AMERIA-FALLUJA, ANBAR, IRAQ

ANNEX A
REVISED AUGUST 8, 1989
100 SILICON REMOVAL
($ In Thousands)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **110 Fire Refining Furnaces** <br> Two (2) each gas fired drum type refining furnaces approximately 2m diameter x 4.6m long, lined with hard brick refractory, complete with combustion controls. Estimated production rate per furnace 1,980 kg/hr, based on charge of 18,000 kg. | $ 865 | $ 490 | $ 46 | -0- | $ 115 | $ 191 | $ 36 | $ 46 | $1,787 |
| **120 Charging Equipment** <br> Two (2) charge conveyors of adequate design to feed scrap into furnaces. | 379 | 70 | 5 | -0- | 15 | 3 | 6 | 10 | 487 |
| **130 Slag & Removal Equipment** <br> Two (2) deslagging conveyors to dispose of fluid slag and skimmings removal conveyors (2 each) to remove solid slag. | 286 | 48 | 5 | -0- | 11 | 2 | 6 | 15 | 372 |
| **140 Slag Processing Equipment** <br> One (1) Ball Mill with adequate ventilation to crush slag, separate metal and recycle through fire refining furnace to recover additional metal. | 1,090 | 215 | 37 | -0- | 44 | 5 | 15 | 25 | 1,431 |
| **150 Ingot Caster** <br> One (1) ingot caster to produce small ingots at the rate of 3160 kg/hr, suitable for charging into the melting furnaces proposed in melting and casting facility. | 389 | 162 | 42 | -0- | 19 | 15 | 32 | 16 | 674 |
| **160 Exhaust Equipment** <br> Adequate exhaust equipment with stack and devices to remove particulate emission from the exhaust gas stream. | 2,150 | 163 | 17 | -0- | 86 | 5 | 10 | 24 | 2,455 |
| **170 Forklift Trucks** <br> Three (3) each Forklift Trucks of adequate capacity to handle scrap and supply of scrap boxes to contain scrap and ingots. | 280 | 32 | 4 | -0- | -0- | -0- | -0- | -0- | 316 |



| Item | Description | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 191 Casting Equipment | Casting equipment able to hold and cast refined metals from the two refining furnaces, consisting of one (1) 600 kt/22000 kg Ajax holding furnace and one (1) Loma casting machine capable of casting bars up to 870 mm wide x 145 mm thick x 3300 mm long (2 each per drop). Also one (1) lot of hydraulic equipment for furnace and caster operation and a sealed type water cooling and recirculating system to cool furnace inductors and hydraulic units. | 2,604 | 591 | 14 | -0- | 77 | 66 | 120 | 125 | 3,597 |
| 192 Overhead Crane | 45 metric ton overhead crane to remove bars from DC caster, to service holding furnace, and to service refining furnaces. | 390 | 38 | 10 | -0- | 29 | 8 | 3 | 19 | 497 |
| 193 Propane System | Propane generating system consisting of an unloading station for transfer of propane from transport to storage tank provided by customer, propane vaporizing and mixing equipment, pressure control and safety valves and piping to provide adequate supply of gas for equipment provided by contractor. | 169 | 32 | 2 | -0- | 12 | 14 | 2 | 4 | 235 |
| SILICON REMOVAL TOTAL | | 8,601 | 1,841 | 181 | -0- | 408 | 308 | 230 | 282 | 11,851 |

1. Supply and Delivery of Machines, Tools and Accessories.
2. Supply and Delivery of Spare Parts, (estimated requirements) for two (2) years.
3. Supply and Delivery of Technical Documentation, such as operation manuals, maintenance manuals, etc. in English (6 copies).
4. Installation Cost of Equipment, including foundations, buildings, and all utilities to be furnished by purchaser to our requirements.
5. Construction and Installation Supervision, NOT including transportation and living expenses, etc.
6. Start-up Personnel, NOT including transportation and living expenses, etc.
7. Supply of Drawings for Special Tooling, specifying type of material and standards used by supplier.
8. Foundation Design.

SERVAAS INCORPORATED
1000 WATERWAY BOULEVARD
INDIANAPOLIS, INDIANA 46202
U.S.A.

AL-SHAHED BRASS REFINERY
CONTRACT WITH MINISTRY OF INDUSTRY
AL-SHAHED FACTORY AMERIA-FALLUJA, AMBAR, IRAQ

ANNEX A
REVISED AUGUST 8, 1989

200 METAL PREPARATION
($ In Thousands)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **210 Mobile Crane With Scrap Grapple** — One (1) Caterpillar type mobile crane equipped with scrap grapple to pick up scrap from ground and load on truck to carry to processing equipment. | $ 297 | $ 91 | $ 11 | $ -0- | $ 21 | $ 15 | $ 1 | $ -0- | $ 416 |
| **220 Cable Strippers** — Two (2) cable strippers (up to 75mm dia. cable) to remove covering (steel or lead) of insulated cable and prepare this material for shredder. One machine will process up to 31mm dia. cable, the other 1mm to 75mm dia. | 156 | 68 | 5 | -0- | 21 | 16 | 2 | 12 | 270 |
| **240 Cable Shredder/Shear** — One (1) cable shredder with one (1) cable shear and associated handling equipment, air flotation insulation removal to produce bare copper wire from copper cable. | 1,949 | 547 | 38 | -0- | 262 | 93 | 16 | 99 | 3,004 |
| **260 Scrap Driers** — One (1) dryer to dry small shells and explode primers, to dry other forms of brass scrap, and to remove solder from radiators. One (1) brass chip drying system for milling chips and other brass chips with emission control system. | 1,667 | 357 | 20 | -0- | 87 | 31 | 8 | 50 | 2,220 |
| **281 Shell Preparation** — Shell primer removal and related handling equipment with automatic shell compression and shearing equipment for charge preparation. | 1,286 | 299 | 15 | -0- | 48 | 28 | 4 | 18 | 1,698 |
| **282 Wirebar Shear** — Bar shear for preparation of copper wire bars and other brass and copper rods or tubes for charging induction furnaces. | 245 | 33 | 6 | -0- | 17 | 8 | 4 | 12 | 325 |



METAL PREPARATION TOTAL    6,600   1,385   96   -0-   435   191   35   191   7,932

1.  Supply and Delivery of Machines, Tools and Accessories.
2.  Supply and Delivery of Spare Parts, (estimated requirements) for two (2) years.
3.  Supply and Delivery of Technical Documentation, such as operation manuals, maintenance manuals, etc. in English (6 copies).
4.  Installation Cost of Equipment, including foundation, buildings, and all utilities to be furnished by purchaser to our requirements.
5.  Construction and Installation Supervision, NOT including transportation and living expenses, etc.
6.  Start-up Personnel, NOT including transportation and living expenses, etc.
7.  Supply of Drawings for Special Tooling, specifying type of material and standards used by supplier.
8.  Foundation Design.

SERVAAS INCORPORATED
1000 WATERWAY BOULEVARD
INDIANAPOLIS, INDIANA 46202
U.S.A.

ANNEX A
CONTRACT WITH MINISTRY OF INDUSTRY
AL-SHAHED BRASS REFINERY
AL-SHAHED FACTORY AMERIA-FALLUJA, AMBAR, IRAQ

REVISED AUGUST 8, 1989

300  MELTING AND CASTING
($ in Thousands)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| 310 | $ 6,327 | $ 3,353 | $ 44 | $ -0- | $ 210 | $ 132 | $ 102 | $ 260 | $ 10,318 |
| 330 | 1,518 | 97 | 18 | -0- | 90 | 25 | 5 | 54 | 1,807 |

**310 Casting Facility (Slabs)**

This will consist of two (2) lines, each consisting of the following:

One (1) 1000 kw channel type induction melting furnaces complete with all electrics for 380 volt, 50 cycle 3-phase power supply with capacitors for power factor correction. Each furnace will have a pour capacity of 6800 kg and melting rate of 3000 kg/hr. (70/30 brass).

The molten metal is transferred to one (1) 800 kw channel-type induction holding furnace with all electrics for 380 volt, 50 cycle, 3-phase power supply with capacitors for power factor correction. This furnace will have a pour capacity of 6800 kg. All these furnaces will have tilting frames for ease of installation.

Also included are feeding equipment for metal into the melters, from the melters into holding furnace, and from holding furnace to DC caster and sealed type cooling and water recirculating systems to cool furnace inductors and hydraulic units.

DC caster is capable of casting bars up to 670 mm wide x 145 mm thick x 3300 mm long bars (2 each per drop).

We estimate total gross casting capacity of 36,000 metric tons/year of (70/30 brass) based on 6,000 hrs/year or approx. 60 bars/day. Gross castings/year are based on a metal input of 37,000 metric tons/year with an expected yield of 33,000 metric tons/year of gated bars or a minimum of 28,600 metric tons/year of gated billets.

**330 Cooling Tower**

A cooling tower will be provided for adequate cooling of caster water with associated piping and pumps to circulate DC caster cooling and provide adequate water pressure and volume for caster operation.

**340 Exhaust Equipment**

Adequate hoods and ductwork and device to remove particulate emission from the exhaust gas stream.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 2,150 | 188 | 17 | -0- | 86 | 5 | 10 | 24 | 2,480 |

**350 Overhead Cranes**

Two (2) overhead cranes (18 metric tons) to remove bars and billets from DC casters, to remove furnace off-line for relining, and to load feeding conveyors and service metal preparation area.

| 603 | 61 | 15 | -0- | 45 | 12 | 5 | 30 | 771 |

**360 Forklift Trucks**

Three (3) forklift trucks of adequate capacity to brill metal to charging platform and handle cast bars.

| 336 | 48 | 4 | -0- | -0- | -0- | -0- | -0- | 388 |

**370 Scrap Boxes**

Supply 100 scrap boxes to be used throughout the refinery for scrap handling, furnace charge preparation and to convey metal to the charge conveyors of the melting furnaces.

| 77 | -0- | -0- | -0- | -0- | -0- | -0- | -0- | 77 |

**380 Startup Furnace**

| 118 | 26 | 12 | -0- | 30 | 16 | 12 | 60 | 272 |

**391 Billet Molds**

Billet molds for use with casting machines two (2) 4-strand 165 mm, two (2) 4-strand 180 mm, and two (2) 2-strand 210 mm.

| 668 | 128 | 6 | -0- | -0- | -0- | -0- | -0- | 702 |

**392 Pneumatic Tubes**

Pneumatic tube system to provide for transport of casting samples from silicon removal area and casting area to laboratory.

| 35 | 8 | 2 | -0- | 4 | 6 | 2 | -0- | 57 |

**393 Laboratory Analysis Equipment**

Multi-channel x-ray unit for laboratory equipped with voltage stabilizer, closed circuit water cooling system and one (1) sample preparation machine.

| 507 | 84 | 14 | -0- | 43 | 12 | 10 | -0- | 670 |

**MELTING AND CASTING TOTAL**

| 12,239 | 3,892 | 132 | -0- | 508 | 207 | 146 | 418 | 17,542 |

1. Supply and Delivery of Machines, Tools and Accessories.
2. Supply and Delivery of Spare Parts, (estimated requirements) for two (2) years.
3. Supply and Delivery of Technical Documentation, such as operation manuals, maintenance manuals, etc. in English (6 copies).
4. Installation Cost of Equipment, including foundations, buildings, and all utilities to be furnished by purchaser to our requirements.
5. Construction and Installation Supervision, NOT including transportation and living expenses, etc.
6. Start-up Personnel, NOT including transportation and living expenses, etc.
7. Supply of Drawings for Special Tooling, specifying type of material and standards used by supplier.
8. Foundation Design.

SERVAAS INCORPORATED
1000 WATERWAY BOULEVARD
INDIANAPOLIS, INDIANA 46202
U.S.A.

## 400   SLAB AND BILLET SAWING EQUIPMENT
($ In Thousands)

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | Total |
|---|---|---|---|---|---|---|---|---|---|
| **410 Slab Sawing Equipment** | $ 1,712 | $ 97 | $ 35 | $ -0- | $ 68 | $ 60 | $ 21 | $ 60 | $ 2,053 |
| **420 Billet Sawing Equipment** | 1,476 | 74 | 30 | -0- | 56 | 48 | 20 | 54 | 1,768 |
| **SLAB AND BILLET SAWING EQUIPMENT TOTAL** | $ 3,188 | $ 171 | $ 65 | $ -0- | $ 124 | $ 108 | $ 41 | $ 114 | $ 3,811 |

### 410 Slab Sawing Equipment

This will consist of slab loading device onto the infeed conveyor to the sawing machine. This machine will be capable of cutting 570 mm wide x 145 mm thick x 3000 mm long slabs. Material to be cut will be 63/37 brass up to copper, including 70/30 brass.

Discharge conveyor, unloading device and scrap removal conveying system will be included.

### 420 Billet Sawing Equipment

This will consist of billet loading device onto infeed conveyor to the saving machine. This sawing machine will be capable of cutting billets 185, 180, and 210 mm in diameter up to 3000 mm long into any desired length for further processing. Material to be cut will be free machining brass (63/37) brass up to copper. Discharge conveyor, unloading device and scrap removal conveying system will be included.

1. Supply and Delivery of Machines, Tools and Accessories.
2. Supply and Delivery of Spare Parts, (estimated requirements) for two (2) years.
3. Supply and Delivery of Technical Documentation, such as operation manuals, maintenance manuals, etc. in English (6 copies).
4. Installation Cost of Equipment, including foundations, buildings, and all utilities to be furnished by purchaser to our requirements.
5. Construction and Installation Supervision, NOT including transportation and living expenses, etc.
6. Start-up Personnel, NOT including transportation and living expenses, etc.
7. Supply of Drawings for Special Tooling, specifying type of material and standards used by supplier.
8. Foundation Design.

