**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
——————————————————————X
                                :

**SERVAAS INCORPORATED,**
                                :

          **Plaintiff,**
                                :       **Case No. 09 CV 1862 (RMB)**

     **v.**
                                :

**REPUBLIC OF IRAQ and**
**MINISTRY OF INDUSTRY OF THE**    :
**REPUBLIC OF IRAQ,**

                                :

          **Defendants.**
——————————————————————X

## DECLARATION OF HANAN M. NASSEF
### IN SUPPORT OF DEFENDANTS': (1) MOTION FOR PROTECTIVE ORDER; AND (2) OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

I, Hanan M. Nassef, declare, pursuant to 28 U.S.C. Section 1746, as follows:

1.      I have personal knowledge of the facts stated herein, unless otherwise stated.  If called and sworn as a witness, I could and would competently testify to such facts, as stated in each of the following paragraphs of this declaration (the "Declaration").

2.      I make this declaration in support of: (1) the motion of defendants Republic of Iraq ("Iraq") and Ministry of Industry ("Ministry") (collectively "Defendants") for a protective order with respect to plaintiff Servaas Incorporated's ("Plaintiff") Interrogatories and the Requests for Production of Documents; and Defendants' opposition to Plaintiff's motion to compel Defendants' production of answers to the Interrogatories and responses to the Requests for Production of Documents.

3.      At all times relevant to the matters discussed in this Declaration, I have been and continue to be the Director General of the Legal Department of the Ministry of Justice of the Republic of Iraq ("Director General").  As Director General of the Legal Department, I am an

———————————————————————————————————————

attorney qualified to provide an expert opinion on the laws and regulations of the Government of Iraq pertaining to the organization of the Government of Iraq, including the laws under which the Ministries of the Government of Iraq and the State-Owned Enterprises of Iraq are organized as separate juridical persons from one another and from the State (the Republic of Iraq), and the effect of those Iraqi laws to preclude one such juridical person from creating legal responsibilities or liabilities for either the State (the Republic of Iraq) as a whole or for any other such separate juridical person.

4.      I possess the following legal credentials:

A.      <u>Education</u>:  Bachelor of Law from the University of Al-Nahreen in Baghdad / Iraq;

B.      <u>Legal positions</u>:  I have held the following legal positions within the Government of Iraq:

(1)      I have been appointed in the Legal Department of Secretariat of the Council of Ministers on February 1992;

(2)      I have been appointed as a manager in the Legal Department of the Ministry of Justice on September 2003;

(3)      I have been appointed as the Director General of the Legal Department of the Ministry of Justice on October 2005;

5.      As part of my responsibilities as Director General, I am involved in the management of litigation outside Iraq (including litigation in the federal courts of the United States) in which claims are made against the Government of Iraq, its agencies and instrumentalities, Accordingly, I have knowledge of and experience in (1) methods of the mandatory processes established under the laws, regulations and rules of Iraq by which outside legal counsel are engaged to appear and defend against cases brought in U.S. federal courts against the Republic of Iraq, the Ministries of the Republic of Iraq, the State-Owned Enterprises of the Republic of Iraq as well as other entities of the Republic of Iraq ; (2) the legal status and

structure, organizational structure, administration and management of the Republic of Iraq, the Ministries of the Republic of Iraq, the State-Owned Enterprises of the Republic of Iraq as well as the other entities of the Republic of Iraq, and the relationships between those entities;  (3) the adjudication in and decisions by international tribunals of the legal status of the Republic of Iraq, the Ministries and State-Owned Enterprises recognizing each as separate juridical persons from each other under Iraqi law and, therefore, not legally liable or responsible for either alleged breaches of contract or other alleged wrongs by another such juridical person or a judgment entered against another such juridical person.

6.      I have validated the statements that I make in this Declaration concerning the provisions and applicability of Iraqi law by reference to Iraqi law, as codified in the statute books of the Republic of Iraq and established by decisions of Iraqi courts.

7.      As to each Iraqi law and Iraqi regulation that I mention or discuss in this Declaration, I will provide by way of separate Declaration a true and correct copy of the statute or regulation as officially published in Arabic by the Government of Iraq and a true and correct English translation of the relevant provisions.

8.      I have knowledge of: (1) the judgment entered by the District Court against the Defendants, Iraq and the Ministry, in the above-referenced action, *Servaas Incorporated v. Republic of Iraq and Ministry of Trade of Republic of Iraq* (the "Action"); as well as (2) Plaintiff's Interrogatories and Request for Production of Documents (the "Discovery Requests") in this Action; and (3) Plaintiff's Motion to Compel in this Action (the "Motion to Compel").

9.      Plaintiff seeks to compel discovery from entities that, under Iraqi law, are Iraqi sovereign entities that are separate juridical persons from Iraq and the Ministry (which I discuss further, below), including but not limited to: the Ministry of Trade, all "political subdivisions, agencies, and/or instrumentalities" of Iraq, all "state-owned entities, enterprises, and other commercial entities beneficially owned by Iraq", and all "state-owned enterprises, agencies, and/or instrumentalities of the Ministry".

DECLARATION OF HANAN M. NASSEF

10.     No such entity is a party to the Action.  I refer to such entities in this Declaration as "Non-Party Iraqi Sovereign Entities".

11.     As Director General of the Legal Department, I have knowledge and extensive experience in the mandatory procedure established by the U.S. Foreign Sovereign Immunities Act ("FSIA") for effecting service on an Iraqi foreign sovereign entity (defined by the FSIA as a "foreign state" or an "agency or instrumentality of a foreign state"), as set forth in Section 1608 of Title 28, United States Code ("FSIA Section 1608").  No Non-Party Iraqi Sovereign Entity has been served with any legal process whatsoever, whether in compliance with FSIA Section 1608 or otherwise, with respect or relating to the subject matter of: (1) the Action; or (2) the Discovery Requests; or (3) the Motion to Compel.

12.     Also as Director General of the Legal Department, I have knowledge of the appointment and authority given by the Legal Department of the Ministry of Justice to the attorneys in this Action to represent Iraq and the Ministry in the Action (as separate juridical persons from each other and from each of the other from whom Plaintiff now seeks to compel discovery) (the "Defendants' Attorneys").  At no time have the Defendants' Attorneys been given any authority or power to represent any Non-Party Iraqi Sovereign Entity  or any other juridical person except Iraq or the Ministry in their capacities as separate juridical persons from each other and from all other juridical persons.  Specifically, Defendants' Attorneys: (1) never have possessed any authority or power to act in any way on behalf of or represent any Non-Party Iraqi Sovereign Entity; (2) never have possessed any authority or power to accept service on behalf of either Iraq, the Ministry or any Non-Party Iraqi Sovereign Entity; and (3) never have possessed any authority or power to waive the foreign sovereign immunity of either Iraq, the Ministry or any Non-Party Iraqi Sovereign Entity.

13.     Plaintiff also seeks to compel discovery from a former State-Owned Enterprise, the Iraqi National Oil Company, which is an entity that has not existed since 1987.

**Legal and Administrative Organization of the Government of Iraq and Its Ministries**

14.     I annex to this Declaration at Exhibit 1 an organization chart depicting the Government of Iraq executive branch (Presidency, Prime Ministers and Deputy Prime Ministers) and Ministries.  There are three separate major offices within the Presidency (President and two Deputy Presidents), and three separate major offices within the Prime Ministry (Prime Minister and two Deputy Prime Ministers).

15.     As to ministries, there is one Council of Ministers and 34 major ministries whose ministers sit on the Council of Ministers.  Article 47 of the Iraqi civil code is worded as follows:

> Juristic [Juridical] persons are:
>
> (a)     The state;
>
> (b)     Departments and public entities that the law granted the status of juristic [juridical] person, independent of that of the state, with the conditions attached thereto.

Article 1 of the Law No. 50 of 1964 (Executive Authority) provides that:

> Such one of the ministries is granted juristic [juridical] personality and shall enjoy all the rights stipulated in the civil code and other laws and that for each of them the word government may be used.

Thus, Law No. 50 of 1964 establishes the Council of Ministers as well as each ministry as a separate juridical person from the Republic of Iraq as well as from each other.  Each ministry is administratively complex, organized in accordance with Iraqi law and Iraqi regulations with numerous administrative entities and separate juridical persons within a Ministry, including, in most ministries, State-Owned Enterprises (discussed below).

16.     Under Iraqi law and regulations, each ministry functions not only with legal separateness (as a distinct juridical person) but also with administrative separateness from the Republic of Iraq.  Under Iraqi law and regulations, some examples of the administrative separateness include each of the following: each ministry keeps and maintains its own records, is in charge of its own affairs, makes and administers its own contracts, has its own budget, is accountable for its own actions but not for the actions of any other ministry or other Iraqi

sovereign juridical person; and may sue and be sued itself in Iraqi and foreign courts for its own actions or failure to act, but not for the actions or failure to act of any other juridical person. Also, the various administrative bodies and offices of each ministry have their own offices in various different parts of Iraq.

17.     As yet, the ministries have not achieved administrative efficiency in record keeping or information retrieval. For instance, there is no central repository of information and documents described in the Discovery Requests either within the ministries or elsewhere within the government of Iraq, from which to retrieve such body of documents and information.

18.     A search for the information and documents sought from Non-Party Iraqi Sovereign Entities who are other than State-Owned Enterprises would involve: (1) translating the Discovery Requests into Arabic (a burden that FSIA Section 1608 places upon a party seeking to commence an action against a foreign sovereign entity); (2) the Ministry of Justice sending the translation to the other ministries with a request to respond; (3) each particular ministry, as a separate juridical person, evaluating the Discovery Requests to determine whether the particular ministry is a party to the Action and whether the ministry has a legal duty to respond under the applicable laws (including Iraqi law); (4) if a particular ministry determines on its own authority that it is either a party or has a legal duty to respond, then that ministry engaging qualified American legal counsel to provide advice and counsel to the particular ministry and, if merited, to make an appearance and represent the particular ministry in the appropriate court; (5) the particular ministry then attempting to compile potentially responsive records and information (much which are likely to be in Arabic) from among the particular ministry's various administrative entities and offices in preparation for translating such potentially responsive records and information from Arabic into English (a very labor-intensive and time-consuming task) so as make it possible for the particular ministry to provide its American legal representatives with intelligible potentially responsive information and documents; (6) translating the documents and information from Arabic into English; (7) providing the

DECLARATION OF HANAN M. NASSEF

intelligible set of documents and information (Arabic documents/information and English translations) to the American legal representatives for purposes of review and providing counsel to the particular ministry; and (8) the American legal representatives taking appropriate actions on behalf of the particular ministry, including potential legal challenges to the Discovery Requests.

19.     At a minimum, such activity would require upward of four to six months for each Non-Party ministry to complete *but only if* a Non-Party ministry first determined that it was under a legal obligation to respond to the Discovery Requests.

**Legal and Administrative Organization of Iraqi State-Owned Enterprises**

20.     I annex to this Declaration at Exhibit 2 an accurate, detailed list of the 192 Iraqi State-Owned Enterprises (SOEs) that continued to exist following the change of national government in Iraq in 2003 that was occasioned by the U.S-led military invasion of Iraq.

21.     Under Iraqi law, a State-Owned Enterprise is a separate juridical person from any other juridical person, including, but not limited to, a separate juridical person from the ministry that an SOE is designated to by Iraq law  An SOE is created and organized as a separate company by way of registration (incorporation) with Companies Registrar's Office of the Ministry of Trade (headed by the Registrar) in accordance with the State Companies Law No. 22 for the Year 1997 ("State Companies Law").  Article 2 of the State Companies Law (which defines the legal personality of each SOE), provides that an SOE is a juridical person separate from all other juridical persons, with financial and administrative independence, as of the date that the Registrar registers the SOE and issues a certificate attesting to the SOE's establishment. The separate legal personality as well as the financial and administrative independence of an SOE then may be stated as well in an SOE's Internal Regulation. By Iraqi law, an SOE's Internal Regulation must be consistent with the State Companies Law.  By way of example, Article (1) of the Internal Regulation of the State Company for Passenger Transportation (listed in Exhibit 2 as SOE # 183) provides that the State Company for Passenger Transportation is has separate legal

DECLARATION OF HANAN M. NASSEF

personality (that  is, is a separate juridical person) and has financial and administrative independence.  By way of additional example, Article 2 of the Internal Regulation of the Wasit Company for Textile Industries (listed in Exhibit 2 as SOE # 83) provides that this SOE too has separate legal personality and has financial and administrative independence.

22.     Under Iraqi law and regulations as well as the pertinent Internal Regulation for the SOE, an SOE functions not only with legal separateness (as a distinct juridical person) but also with administrative and economic separateness from the ministry to which it is designated through shareholding but also from the Republic of Iraq.  Under Iraqi law and regulations and the pertinent Internal Regulations, some examples of the administrative separateness include each of the following: an SOE keeps and maintains its own records, is in charge of its own affairs, makes and administers its own contracts, has its own budget and monies, is accountable for its own actions but not for the actions of any other SOE or other Iraqi sovereign juridical person; and may sue and be sued itself in Iraqi and foreign courts for its own actions or failure to act, but not for actions or failure to act of any other juridical person.  Also, the SOE has its own offices in various different parts of Iraq and, for some SOEs, outside Iraq (but not in the United States).

23.     As yet, SOEs have not achieved administrative efficiency in record keeping or information retrieval. For instance, there is no central repository of information and documents described in the Discovery Requests either within the ministries or elsewhere within the government of Iraq, from which to retrieve such body of documents and information relating to SOEs.

24.     A search for the information and documents sought from SOEs would involve: (1) translating the Discovery Requests into Arabic (again, a burden that FSIA Section 1608 places upon a party seeking to commence an action against a foreign sovereign entity); (2) the Ministry of Justice sending the translation to the particular ministries to which SOEs are designated with a request to respond; (3) each particular ministry deciding whether to forward the request to each

SOE designated to that ministry; (4) the SOE, in its capacity as a separate juridical person that is a Non-Party to the Action, referring the request to the SOE in-house legal advisor for evaluation and then to the SOE's board of directors for determination whether the particular SOE is under any legal duty to respond under the applicable laws (including Iraqi law); (5) if a particular SOE determines on its own authority and in its own behalf that it has a legal duty to respond, then that SOE causing qualified American legal counsel to be engaged to provide advice and counsel to the SOE and, if merited, to make an appearance and represent the particular SOE in the appropriate court; (6) the particular SOE then attempting to compile potentially responsive records and information (much which are likely to be in Arabic) from among the particular SOE's various administrative departments and offices in preparation for translating such potentially responsive records and information from Arabic into English (a very labor-intensive and time-consuming task) so as make it possible for the particular SOE to provide its American legal representatives with intelligible potentially responsive information and documents; (7) translating the documents and information from Arabic into English; (8) providing the intelligible set of documents and information (Arabic documents/information and English translations) to the American legal representatives for purposes of review and providing counsel to the particular ministry; and (9) the American legal representatives taking appropriate actions on behalf of the particular SOE, including potential legal challenges to the Discovery Requests.

25.     At a minimum, such activity would require upward of four to six months to complete per SOE *but only if* an SOE determines that it was under a legal obligation to respond to the Discovery Requests.

### International Legal Decisions Recognizing the Separate Juridical Personality of Iraqi Ministries and State-Owned Enterprises from Each Other and From the Republic of Iraq and Non-Liability of Other Juridical Persons for Their Actions

26.     I am aware of and append to this Declaration true and correct copies of the following international legal decisions that recognize the separate juridical personality under Iraqi law both of Iraqi ministries as well as Iraqi SOEs, and, given that a ministry and an Iraqi

SOE each is a separate juridical person distinct from all other juridical persons, no other juridical person (including the Republic of Iraq) is liable for its alleged wrongful acts:

      A.     *Instrubel N.V. v. State of Iraq, Ministry of Industry Research and Development, Ministry of Defence and Salah Aldin State Establishment*, International Chamber of Commerce (ICC), International Court of Arbitration Case No. 7472/CK, Interim Award dated January 26, 1995, which I append to this Declaration as Exhibit 3.  It is significant that:

      (1)     The arbitral tribunal was composed of eminent international legal experts Prof. Dr. Rolf A. Schultze, Pierre Van Ommeslaghe, Professor at the Faculty of the Law at ULB and former chairman of the Bar Council for lawyers of the Cour de cassation, and Diedier Matray, senior lecturer at the Faculty of Law of ULG and lawyer at the Liege Bar;

      (2)     The Arbitral Tribunal based its decision on the principle set out in the French Cour de cassation's supreme court judgment of July 21, 1987, under which it cannot be accepted that the control carried out by a state is sufficient to cause bodies be considered as emanations of the state (Journal de droit international, 1988, pp. 108 – see also on that point, the judgment of July 6, 1988, Journal de droit international 1989, p.376.  In that case, the Cour de cassation rejected the argument that an emanation of the state (such as an SOE) must bear the debts of the state even though the emanation had a personality which was separate from the state.  *See* Interim Award at pp.12-13;

      (3)     The Arbitral Tribunal rejected the premise that the founder of a corporate entity is deemed responsible for the undertakings given by that entity because "the separation of assets which is implied by the setting up of entities which have legal personality prevents such a result, *id.* at 15;

      (4)     The Arbitral Tribunal found that the defendant party State-Owned Enterprises in the proceeding were separate juridical persons from the Iraqi state, *id.* at pp. 12-15;

(5)     The Arbitral Tribunal rejected the claim that an Iraqi ministry can represent the Iraqi state because "the ministry represents the government which in its turn represents the state.  The tribunal adopted the reply by the defendants Iraqi state and the Iraqi Ministry of Defense that the law distinguishes between the political and administrative role of the Iraqi minister which, politically is part of the government and can, in that capacity represent the state, and who administratively, is the head of a ministry and, in that capacity, binds the ministry which has a separate legal personality.  The tribunal concluded that the fact that under the law of 1964 the term *government* can be used to refer to a ministry is not conclusive, since in the case, such a mention does not appear in the contracts at issue given that: (a) none of the contract involve, in that capacity, an Iraqi minister; and (b) claimant failed to prove that there was any legal device by which the ministry, in its capacity as a separate corporate entity from the state, binds the state itself.  *Id.* at pp. 18-19.

(6)     The tribunal reached its decision unanimously.

B.     *Greek Powder and Cartridge Company S.A. v. Ministry of Defence (Iraq)*, International Chamber of Commerce (ICC), International Court of Arbitration Case No. 7094/CK/AER/ACS, Award dated January 31, 2003, which I append to this Declaration as Exhibit 4.A.  The decision was supported by the written legal opinion of the expert witness appointed by the Arbitral Tribunal, Mr. Abdel Hamid El-Ahdab dated October 27, 2001, who was charged by the Arbitral Tribunal with the mission to determine the legal status under the laws of Iraq of the Ministry of Defence of the State of Iraq for the period from the year of signature of the contract through the date of the decision on the award.  Mr. Abdel Hamid El-Ahdab concluded that the Ministry of Defence is, by virtue of Article 29 of the Iraqi Code of Procedure, Law Number 83 of 1969, as well as paragraph 2 of Article 1 of the Executive Power Law No. 50 of 1964, a legal person separate from the legal person of the state, having its own assets and entering into its own contractual commitments, separate from those of the State.  (I append Mr. Abdel Hamid El-Ahdab dated October 27, 2001 to this Declaration as Exhibit 4.B.)

The Arbitral Tribunal consequently rejected claimant's contention that under Iraqi laws the Ministry of Defence and the Iraqi state are the same legal person.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _8_ day of June 2012, in Baghdad, Iraq.

_____

Hanan M. Nassef

DECLARATION OF HANAN M. NASSEF

**EXHIBIT 1**

**Government of Iraq Executive Branch and Ministries**

DECLARATION OF HANAN M. NASSEF

**Government of Iraq Executive Branch and Ministries**



DECLARATION OF HANAN M. NASSEF

[THIS SPACE INTENTIONALLY LEFT BLANK]

**EXHIBIT 2**

**Detailed List of Iraqi State-Owned Enterprises**

## DETAILED LIST OF IRAQI STATE-OWNED ENTERPRISES

| Ministry | No. | Name |
|---|---|---|
| Agriculture | 1 | State Co. for Agricultural Supplies |
| | 2 | State Co. for Veterinary Service |
| | 3 | State Co. for Horticulture and Forestry |
| | 4 | State Co. for Animal Resources Services |
| | 5 | State Co. for Industrial Crops |
| | 6 | State Co. for Seeds |
| | 7 | Mixed – Seeds Co. |
| | 8 | Mixed – Fishery Co. |
| | 9 | Mixed – Meat Co. |
| | 10 | Mixed – Agriculture Produce Co. |
| Electricity | 11 | GEEP |
| | 12 | Technical Directorate |
| | 13 | Projects Co. |
| | 14 | Baghdad District |
| | 15 | North District |
| | 16 | South District |
| | 17 | Manufacturing Co. |
| | 18 | EPC Rehabilitation |
| | 19 | Rafadain Co. |
| | 20 | Rehabilitation Co. |
| | 21 | Planning & Studies Co. |
| Finance | 22 | National Insurance Co. |
| | 23 | Iraqi Insurance Co. |
| | 24 | Iraqi Reinsurance Co. |
| | 25 | Rafadin Bank |
| | 26 | Rasheed Bank |
| | 27 | Socialist Bank |
| | 28 | Agriculture Bank |
| | 29 | Industry Bank |
| | 30 | Housing Bank |
| Health | 31 | State Company for Import and Sale of Medicine |
| Housing and Construction | 32 | Al Idressy Centre for Consultants |
| | 33 | National Centre for Labs |
| | 34 | National Centre for Consultants |
| | 35 | Al Farouq SCC |
| | 36 | Al Mansoor SCC |
| | 37 | Al Rasheed SCC |
| | 38 | Al Mu'tasim SCC |
| | 39 | Hamurabi SCC |
| | 40 | Ashur SCC |
| | 41 | Al Tahrir |
| | 42 | Al Anfal SCC |

### DETAILED LIST OF IRAQI STATE-OWNED ENTERPRISES

| Ministry | No. | Name |
|---|---|---|
| | 43 | Taj Al Ma'arik |
| | 44 | Al Yaum Al Adeem SCC |
| | 45 | Ramadan Mubarak SCC |
| | 46 | Al Jihad |
| Industy and Minerals | 47 | Mishraq Sulfur |
| | 48 | Training & Rehabilitation |
| | 49 | General Systems Co. |
| | 50 | Hand Woven Carpets |
| | 51 | Al Furat Chemical Industries |
| | 52 | Petrochemical Industries |
| | 53 | Phosphate |
| | 54 | Northern Fertilizer |
| | 55 | Southern Fertilizer |
| | 56 | Northern Cement |
| | 57 | Iraqi Cement |
| | 58 | Southern Cement |
| | 59 | Al Faris |
| | 60 | Al Qadesia Electrical Industries |
| | 61 | Industrial Design & Consultation |
| | 62 | Ur Engineering Industry |
| | 63 | Geological Survey & Mining |
| | 64 | Nassr SC for Mechanical Industries |
| | 65 | Drugs & Medical Supplies – Sammara |
| | 66 | Drugs & Medical Supplies – Ninawa |
| | 67 | Glass & Ceramics |
| | 68 | Information Systems |
| | 69 | Industrial Design & Construction |
| | 70 | Specialized Institute for Engineering Industries |
| | 71 | Woolen Industries SC |
| | 72 | Textile Industries – Hilla |
| | 73 | Vegetable Oils Industry |
| | 74 | Leather Industries |
| | 75 | Battery Industries SC |
| | 76 | Mechanical Industries |
| | 77 | Cotton Industries SC |
| | 78 | Ready Made Wear Industries |
| | 79 | Tobacco & Cigarettes |
| | 80 | Iron & Steel |
| | 81 | Electrical Industries SC |
| | 82 | Tires Industries – Najaf |
| | 83 | Wasit Textile |
| | 84 | Construction Industries |

## DETAILED LIST OF IRAQI STATE-OWNED ENTERPRISES

| Ministry | No. | Name |
|---|---|---|
| | 85 | Al Sawari Chemical Industries |
| | 86 | Paper Industry |
| | 87 | Rubber Industries |
| | 88 | Industrial Development |
| | 89 | Sugar Industry |
| | 90 | Furniture Factory |
| | 91 | Dairy Products SC |
| | 92 | Nissan (17) |
| | 93 | Research & Development |
| | 94 | Car Manufacturing (Vehicle Industries) |
| Irrigation | 95 | Al-Kadisiah Co. |
| | 96 | Al-Rafedine Co. |
| | 97 | Al-Fow Co. |
| | 98 | Well Drilling Co. |
| | 99 | Soil Research Co. |
| | 100 | Nasar Co. |
| | 101 | Al-Hadbaa Co. |
| | 102 | Al-Mouthana Co. |
| | 103 | Electric & Mechanical Co. |
| | 104 | Fourat Design Co. |
| | 105 | Dujla Design Co. |
| Formerly Military Industrial Complex (now Industry and Minerlas) | 106 | Al-Ikhaa (Saddam) State Co. |
| | 107 | Al-Noaman State Co. |
| | 108 | Ibn Sena State Co. |
| | 109 | Al-Battany State Co. |
| | 110 | Al-Nasr Al-Ahdeem State Co. |
| | 111 | Al-Mansour State Co. |
| | 112 | Al-Shaheed State Co. |
| | 113 | Al-Fao Engineering State Co. |
| | 114 | Saad State Co. |
| | 115 | Al-Majd State Co. |
| | 116 | Al-Sumood State Co. for Steel Industries |
| | 117 | Salahadeen State Co. |
| | 118 | Al-Kindy State Co. |
| | 119 | Al-Fat'h State Co. |
| | 120 | 28 April Research Center |
| | 121 | Al-Rasheed State Co. |
| | 122 | IBN-Firrnas State Co. |
| | 123 | Al-Salam State Co. |
| | 124 | Al-Basil State Co. |
| | 125 | Tariq State Co. |

DECLARATION OF HANAN M. NASSEF

## DETAILED LIST OF IRAQI STATE-OWNED ENTERPRISES

| Ministry | No. | Name |
|---|---|---|
| | 126 | Al-Melad State Co. |
| | 127 | Al Zawra'a State Co. |
| | 128 | Hamoorabi State Co. |
| | 129 | Sanhareeb State co. |
| | 130 | Al-Fida State Co. |
| | 131 | Al-Tahady State Co. |
| | 132 | Al-Rayah State Co. |
| | 133 | Ibn-Majid State Co. |
| | 134 | Al-Khawarezmi State Co. |
| | 135 | Al-Qudis State Co. |
| | 136 | Ibn-Rushd State Co. |
| | 137 | Al-Zahaf Al-Kabeer State Co. |
| | 138 | Ibn-Al-Waled State Co. |
| | 139 | Al-Yarmouk State Co. |
| | 140 | Al-Nidaa State Co. |
| | 141 | Al-Kadisiya State Co. |
| | 142 | Al-Qaqa State Co. |
| | 143 | Nissan State Co. |
| | 144 | Al-Uboor State Co. |
| | 145 | Al-Ezz State Co. |
| | 146 | Al-Razze State Co. |
| | 147 | Um-Almarik State Co. |
| | 148 | Al-Radhwam State Co. |
| | 149 | Huteem State Co. |
| | 150 | Al-Harith State Co. |
| | 151 | Jaber Ben Hayan State Co. |
| | 152 | Tabooq State Co. |
| | 153 | Bader State co. |
| Oil | 154 | State Oil Marketing |
| | 155 | North Oil |
| | 156 | South Oil |
| | 157 | Projects |
| | 158 | Exploration |
| | 159 | Tankers |
| | 160 | Drilling |
| | 161 | Middle Refinery |
| | 162 | South Refinery |
| | 163 | North Refinery |
| | 164 | Products Distribution |
| | 165 | North Gas |
| | 166 | Pipelines |
| | 167 | Gas Filling |

DECLARATION OF HANAN M. NASSEF

## DETAILED LIST OF IRAQI STATE-OWNED ENTERPRISES

| Ministry | No. | Name |
|---|---|---|
|  | 168 | South Gas |
|  | 169 | Research and Development |
|  | 170 | Training Institute – Baghdad |
|  | 171 | Training Institute – Baji |
|  | 172 | Training Institute – Basra |
| Trade | 173 | Grain Board |
|  | 174 | Food Stuffs |
|  | 175 | Grain Processing |
|  | 176 | Shopping Centers |
|  | 177 | Construction Materials |
|  | 178 | Automobile and Machinery |
|  | 179 | International Fairs |
|  | 180 | Export and Import |
| Transportation | 181 | Iraqi Railways |
|  | 182 | Land Transportation |
|  | 183 | Passenger Transportation |
|  | 184 | Private Transportation |
|  | 185 | Delegates Transportation |
|  | 186 | Al-Dilal Co. |
|  | 187 | Iraqi Airways |
|  | 188 | Water Transportation |
|  | 189 | Port |
| Communications | 190 | Telecommunication and Post |
|  | 191 | State Co. for Internet Service |
|  | 192 | Specialized Construction Co. |

DECLARATION OF HANAN M. NASSEF

## EXHIBIT 3

*Instrubel N.V. v. State of Iraq, Ministry of Industry Research and Development, Ministry of Defence and Salah Aldin State Establishment*

**International Chamber of Commerce (ICC), International Court of Arbitration**

**Case No. 7472/CK, Interim Award dated January 26, 1995**

DECLARATION OF HANAN M. NASSEF

**ICC**

International Chamber of Commerce

# INTERNATIONAL COURT OF ARBITRATION

3.1.

# AWARD
# SENTENCE



Chambre de Commerce Internationale

# COUR INTERNATIONALE D'ARBITRAGE

# INTERNATIONAL COURT OF ARBITRATION
# COUR INTERNATIONALE D'ARBITRAGE

CASE N°   7472/CK
AFFAIRE N°

### INSTRUBEL N.V.
(BELGIUM)

VS/

### 1. THE STATE OF IRAQ
(IRAQ)

### 2. THE MINISTRY OF INDUSTRY RESEARCH AND DEVELOPMENT
(IRAQ)

### 3. THE MINISTRY OF DEFENCE
(IRAQ)

### 4. THE SALAH ALDIN STATE ESTABLISHMENT
(IRAQ)

This document is an original of the award rendered in conformity with the Rules of the ICC International Court of Arbitration.

＊＊＊＊＊

Ce document est un original de la sentence rendue conformément au Règlement de la Cour Internationale d'Arbitrage de la CCI.

International court of Arbitration

Case n° 7472/ok

## INTERIM AWARD

BEFORE THE TRIBUNAL :

1.                    **INSTRUBEL N.V.**, having offices at NN.2612
                     XE Delst, van Mierveltlaan 9

                     **CLAIMANT**

                     represented by Luk de Schrijven Esq and Serge Van Eeghem, Esq
                     attorneys at law, De Schrijver and partners, Apostelhuizen, 26R, B-
                     9000 Gent,

                     **CLAIMANT AND COUNTERDEFENDANT**

AGAINST :            **1. THE STATE OF IRAQ**

                     **2. THE MINISTRY OF INDUSTRY RE-
                     SEARCH AND DEVELOPMENT**,

                     having its offices at Bab-al Mudam, P.O. Box
                     14080 Bagdad

                     **3. THE MINISTRY OF DEFENCE**, directorate
                     of Armament and Supply

                     having its offices in Bagdad

.../...                                                                    2.-

**4. THE SALAH ALDIN STATE ESTABLISH-**
**MENT**, with its head office at An-Dour, Iraq,

**DEFENDANT AND COUNTERCLAIMANT**

represented by Dr. Alphons Puelinckx, attorney at law, Puelinckx,
Linden, Grolig, Uyttersprot,

Rue Royale 87, 1000 Brussels

**HAVING REGARD TO :**

1.    The request for Arbitration dated January 27, 1992;

2.    The respondent's submissions and counterclaims dated September 2, 1993;

3.    The Terms of Reference, dated September 14, 1993 and October 1993,
      respectively signed by claimant and defendant;

4.    The claimant's submission dated December 20, 1993;

5.    The defendant's second submission dated March 20, 1993;

6.    The letter of the chairman to the Arbitral Tribunal regarding the question as
      to whether the ministries in Iraq are separate legal entities or not, dated
      April, 1994;

7.    The letter of the defendant's counsel to the chairman of the Arbitral Tribunal
      dated June 7, 1994;

                                                                          .../...

.../...                                                3.-

8.    The claimant's second submission, dated May 16, 1994;

9.    The defendant's third submission, dated May 24, 1994;

10.   The claimant's third submission, dated June 10, 1994;

11.   The rider to the Terms of Reference;

12.   The claimant's fourth submission, dated August 24, 1994;

13.   The restatement on behalf the State of Iraq;

14.   The letter of the claimant dated September 16, 1994 with enclosure.

15.   The defendant's second submission after amendment of the terms of
      reference;

16.   The defendant's third submission after amendment of the terms of reference;

17.   The claimant's fifth submission;

18.   The defendant's letter dated November 2nd, 1994;

19.   The claimant's letter dated November 3rd, 1994;

20.   The defendant's letter dated November 3rd, 1994.

.../...

4.-

## I.   <u>SHORT ACCOUNT OF FACTS</u>

a)   Five contracts were entered into between November 1985 and July 1990; in chronological order they are as follows :

1.   <u>Contract AS/NAVY/29/84</u> :

That contract includes the following :

*It has been agreed upon the Ministry of Defence, having its legal seat at Bagdad-Iraq, hereinafter called the purchaser, first party and*

*INSTRUBEL N.V., having its legal seat at Antwerp, Belgium, Bisschoppen-hoflaan, 353, hereinafter called the seller as second party.*

2.   <u>Contract n° 10</u>

That contract includes the following :

*Whereas,*

*INSTRUBEL N.V. having its legal seat at Oudenaarde, Westerring 21, Belgium, hereinafter called the Seller, has access to experience in the design and production of electro-optical equipment includind night vision equipment, laser range finders and thermal observation and aiming equipment,*

*Whereas,*

*Seller has satisfactorily produced and delivered night vision equipment to the Iraq Ministry of Defence,*

.../...

.../...                                                                              5.-

*Whereas,*

*The Ministry of Industry having its legal seat Bagdad, Iraq, hereinafter called the Purchaser, has shown to Seller that experienced production facilities for optics, electronics and mechanics are operational or will become operational in Iraq,*

3.    Contract n° 87/AS/1822

That contract includes the following :

*It has been agreed upon between :*
*The Ministry of Defence, having its legal seat at Baghdad - Iraq, hereinafter called the Purchaser, first party,*
*and*
*INSTRUBEL N.V. having its legal seat at Deurne-Antwerp/Belgium, Bisschoppenhoflaan, 353,*
*hereinafter called the Seller, as second party, on the following terms, agreements and 2 conditions :*

4.    Contract n° 10A

That contrat includes the following :

*It has been agreed upon between :*

*- SALAH ALDIN STATE ESTABLISHMENT, having its legal seat at Al Dour-Iraq, hereinafter called the Purchaser, first party, and*

*- INSTRUBEL N.V. having its legal seat at Oudenaarde - BELGIUM, Westerring, 21 hereinafter called the Seller, as second party, on the following terms, agreements and conditions.*

5.    Contract n° 11

That contract includes the following :

*It has been agreed upon between :*

*- The Ministry of Industry and Military Industrialisation, having its legal seat at Baghdad-Iraq, hereinafter called the Purchaser, first party, and*

*- INSTRUBEL N.V. having its legal seat at Oudenaarde-BELGIUM, Westerring 21 hereinafter called the Seller, as second party, on the following terms, agreements and conditions;*

Those various contracts gave rise to arbitration proceedings being filed by INSTRUBEL on January 27, 1992.

II.    **LIMITED SUBJECT MATTER OF THIS AWARD**

During the preparatory inquiries relating to this dispute, additional terms of reference were drafted under which :

*The Arbitral Tribunal shall render a partial award on the issue whether the state of Iraq is a party to the contracts mentioned under 6.3 of the terms of reference and accordingly whether it is the right defendant to the arbitration procedure.*

Depending on the answer to that question, the subsequent steps in the procedure are adapted to the appropriate defendant. The purpose of the present

.../...                                                                7.-

interim award is to solve the question mentioned above, leaving open all other issues raised by the parties in this arbitration.


### III.   **ARGUMENTS**

1.       The claimant considers that the state of Iraq is party to the contract; being committed by its organs (1).  At the very least, defendants 2 to 4 are neither independant nor extraneous to the state.  That fact justifies the state answering for the actions of the aforementioned defendants (2).

The Alter ego theory leads to the same result (3).

The claimant further states that the state of Iraq is represented by defendants 2 to 4 (4).

The state of Iraq should be declared party to the contract by means of the theory of apparent authority (5).


2.       The defendants dispute the validity of the foregoing arguments.


1° Whether the defendants sub 2 to 4 are organs of the state of Irak.

Position of the parties

1.       The claimant maintains that defendants 2 to 4 are organs of the state of Iraq and, therefore, that the state of Iraq is the legal entity with which it signed the five contracts.

.../...

In support of that argument the claimant states that 4 of the 5 contracts were signed by an Iraqi minister.  The claimant points out that under all legal systems, a minister is an organ of the state.

As for contract n° 10 A, signed by an Iraqi public establishment, the claimant affirms that such establishment is a mere operational organ, being the property of the state and managed by it.

2.      The claimant further bases its arguments on the general principe of unity of the state, under which :

> *conduct of any state organ having that status under the internal law of that state shall be considered as an act of the state concerned under international law, provided that organ was acting in that capacity in the case in question.*

3.      The defendants reply that under Iraqi law, namely law n° 50 of 1964 on executive power, ministries have legal personality.

The same applies as regards the fourth defendant, being a state public establishment, the setting up of which has its legal basis in Art. 5 § 2 of law n° 13 of 1964 concerning *State organisations of technical industries.*

4.      Relying upon the opinion given by a jurisconsult, Professor DILGER, the claimant raises the question as to whether the Iraqi law invoked by the defendants is still in force.

It considers that that fact is not proved by a qualified and independant authority.

.../...

9.-

Decision of the Arbitral Tribunal

1.      Four of the contracts were between the claimant and a ministry, whose registered office is identified.

The defendants rightly point out that a ministry is not the same as a minister.

Since the contracts were entered into with a ministry, they have been signed on behalf of that ministry, the capacity of the minister or the representative of the state is not mentioned in relation to the signature (1)  the arguments of the defendant under which a state is always bound by its ministers appear to be irrelevant.

2.      The legal personality of defendants 2 to 4 can only reasonably be determined by reference to the Iraqi law.

*The question of controlled entities constitutes a significant aspect in the system of state contracts.*
*As regards that data, there is a universal rule that the status of a corporate entity is determined by the law under which it exists; that rule is generally affirmed in relation to private entities, but is valid with stronger reason for entities having a link with the state (Bernard Audit, l'arbitrage transnational et les contrats d'Etat : bilan et perspectives, Centre d'Etude et de recherches de droit international et de relations internationale, 1987, pp. 34 et 35).*

The claimant does not dispute that point.  It focuses most of its arguments around the implicit abolition of the Iraqi law invoked by the defendants.

---

(1)     Contract AS/NAVY/29/84 is signed by the director of Iraqi armement and supply directorate, acting for and on behalf of the Ministry of defence.

.../...

.../...                                                                10.-

        The reasoning of the arbitral award, which the claimant relies upon, states that for the principle of unity of the state to apply, it presupposes that the capacity to act as organ state (la qualité d'organe d'état) is determined in accordance with the internal law of that state.

      3.      Article 47 of the Iraqi civil code is worded as follows :

Juristic persons are :

(a) The state
(b) Departments and public entities that the law granted the status of juristic person, independant of that of the state, with the conditions attached thereto.

      Article 1 of law n° 50 of 1964 provides that :

*Such one of the ministries is granted juristic personality and shall enjoy all the rights stipulated in the civil code and other laws and that for each of them the word government may be used.*

        The defendants bring forward a legal opinion given by Professor YAMULKI in which he states that *the law n° 50 of 1964 on executive power has not been touched by that reform in any way whatsoever and there has never been any question of taking away the distinct legal personality of the ministeries* (telex of 06.06.94).

      4.      The argument of the claimant that the defendants should prove by way of an independant authority that the law on executive power is still in force cannot be accepted :

      - The legal opinion stated by Professor DILGER is not affirmative, but doubting;

.../...

.../...

11.-

- The burden of proving implicit abolition of the law of 1964 rests on the claimant who invokes that implicit abrogation.

That principle, regarding the burden of proof, is accepted in international arbitration (droit et pratique de l'arbitrage commercial international par Alan REDFERN, Martin HUNTER, Murray SMITH, 2nd Edition, p. 266);

- According to Professor YAMULKI, the President of the Iraqi Republic, in 1978, passed a regulation for which the statutory basis is the law of 1964 (exhibit defendants' file), that is to say subsequent to July 16, 1970, being the date put forward by the claimant as that of the implicit abolition of the law.

That factor, which is not disputed as such, destroys the argument of the claimant.

5.      The fact that the fourth defendant is the property of the state and controlled by the state - which is not disputed - in no way implies that the establishment does not have legal personality (see hereinafter sub 2°).

6.      The existence of the legal personality of defendants 2 to 4 prevents them from being considered as organs of the state of Irak.

2° The independance and extraneous character of defendants 2 to 4 in relation to the Iraqi state

Position of the parties

1.      The plaintiff states that neither the Iraqi ministers nor the state establishments have an existence which is independent of or extraneous to the existence of the state of Iraq itself.

.../...

.../...                                                                12.-


The claimant points out that the ministries do not have their own assets and serve the interests of the state.  The various payments made in relation to the contracts in dispute were made by state banks.

The Claimant relies :

-       on an arbitral decision given in relation to force majeure, where the arbitral court considered that the state and one of its emanations should be considered as one and the same entity;

-       on the AOI award under which, despite the separate legal personality of an international organisation, the founding states remain liable for undertakings made by the association.

2.      The defendants reply that the factual circumstances raised by the claimant cannot lead to the conclusion that the state of Iraq should be liable for ministries or state establishments.

The various factual elements relied upon by the claimant are, in the opinion of the defendants, likewise present in the context of groups of companies and do not lead to the results put forward by the claimant.

## Decision of the Arbitral Tribunal

1.      The Arbitral Tribunal bases itself on the principle set out in the French Cour de cassation's supreme court judgment of July 21, 1987, under which it cannot be accepted that the control carried out by a state is sufficient to cause the bodies be considered as emanations of that state (Journal de droit international, 1988, pp.108 - see also on that point, the judgment of July 6, 1988, Journal de droit international 1989, p.376).

.../...

In that case, the argument rejected by the Cour de cassation was to make an emanation of the state bear the debts of that state, even though that emanation had a personality which was separate from that of the state.

2.     The arbitral case-law relied upon by the claimant must be put in its context : that is to say where an *emanation of the state* relies upon an event of force majeure.

*(…)*

*The question of force majeure has been raised and especially considered by the Court of arbitration in two Iranian cases : EURODIF and FRAMATO-ME. They concerned the issue of whether the decision of the new islamic government to abandon the nuclear energy programme of the former imperial government constituted, in relation to the contractual provisions, an outside event which could not be overcome and which excused the non execution of its obligations by the Iranian contracting party. In the EURODIF case, the two Iranian defendants were, first, a mere department of the Ministry of finances, second, the Agency for atomic energy of Iran (AEOI), enjoying corporate personality. The arbitrators, noting that AEOI was under the complete control of the state, did not allow the plea of force majeure.*

In the FRAMATOME case the dispute was between French companies, on the one hand, and AEOI, alone, on the other hand. The arbitrators relied upon the principle of good faith in order to reject the AEOI's plea that it had no contractual liability on the basis of the separate personality of the state and the extraneous nature of the governmental decision to stop the building of nuclear plants (Isabelle HAUTOT, Les difficultés spécifiques dues à l'intervention d'Etats ou de personnes publiques dans l'arbitrage commercial international, in L'intervention de l'Etat ou d'une firme étatique dans l'arbitrage commercial international, Berlin Congress, August 23-27, 1992, pp. 20 to 22).

.../...

14.-

The fact that a public undertaking wrongly invokes as a force majeure event - due to the lack of any outside element - an act carried out by the state of which it is an "emanation", does not imply that the state is party to the initial contract.

On the other hand, the fact that the State of Iraq is not a party to the contract does not imply neither that the Arbitral Tribunal should be bound, in any way whatsoever, in subsequently judging the presence or absence of an extraneous element required by the concept of force majeure.

During the proceedings, the claimant will be able to rely upon the factual elements which it invokes, on which, in the report, the Arbitral Tribunal does not rule on.

3.     The award given in relation to AOI cannot constitute a relevant precedent.

The claimant omits to point out that :

-     AOI had been dissolved and, therefore, the claimant had no other alternative than that to turn against the founding states (Isabelle HAUTOT, op.cit., p. 27).

In fact, there is nothing comparable in this case, since, even under the rider to the terms of reference, the claimant is dealing with parties which will follow the arbitration proceedings to their conclusion.

.../...

-       One of the awards was annulled by the Swiss Federal Court under the following terms :

> *Ther personality with which the AOI has been bestowed and the independance which has been given to it on a legal, financial and procedural level, even includes a specific provision which granted it the possibility of entering into the arbitration clause or arrangement, are clear and unequivocal signs of total legal independence of the body in relation to the founding states.*
>
> *That independence excludes that the contracts that it makes with third parties, and in particular the arbitration clauses which it enters into can be categorized as acts carried out by a representative or an organ committing the founder states (Isabelle HAUTOT, op.cit. p.27).*

Finally, the Arbitral Tribunal is not able to adopt the decisive ground in the AOI award under which, in the absence of stipulation to the contrary, the founder of a corporate entity is deemed responsible for the undertakings given by that entity.

The separation of assets which is implied by the setting-up of entities which have legal personality prevents such a result.

> *... the personalisation of activity has as its objective, recognized by the majority of national laws, to limit the liability of the personalized entity to the consequences of the activity to which it relates and within the limit of the assets affected by that activity. The terms of setting-up and the legal systems certainly vary from one country to another but the principle is well-established* (Philippe KAHN, Note sous cassation française 21 juillet 1987, cited above, Journal de droit international, 1988, pp. 108).

.../...                                                    16.-

### 3° The Alter Ego argument

### Position of the parties

1.      Under the title *alter ego doctrine*, the claimant asks for the corporate veil to be pierced in respect of defendants 2 to 4,  being indentified with the state of Iraq, and affirms that in the absence of such piercing there would be an injustice, namely an immunity for defendants who do not have their own assets.

The claimant brings forward numerous quotations, extracts of the defendants'written submissions, which show that the defendants have developed a line of argument presuposing implicitly or explicitly, that the Iraqi state was party to the contract.

The claimant likewise points out that the terms of reference were signed by the state of Iraq.

Finally, the claimant maintains that the defendants do not behave in the scheme of logic which they have argued.

2.      The defendants state that by reason of the very difficult factual circumstances, linked in particular to the destruction of archives following acts of war, their counsel had to study the dispute whilst only having very little or no information and was only notified late of the corporate personality of the Iraqi ministers.

Therefore, the submissions filed do not have the bearing which the claimant attaches to them.  This is even more so, since those written submissions contained an express reservation, linked to the existence of factual circumstances.

The defendants likewise point out that by requesting that their second written submissions, drawn up on behalf of the ministries and the state

.../...

establishment, be disregarded, on the grounds that those submissions did not come from a party to the arbitration, the claimant implicitly acknowledged the separate existence of defendants 2 to 4.

### Decision of the Arbitral Tribunal

1.      The considerations concerning unity of interest and state control over public undertakings have been dealt with above sub 2, given that the concepts of *alter ego* and *emanation* are overlapping each other.

2.      The Arbitral Tribunal is not able to accept the conclusion of the claimant concerning the alleged injustice that removing the state of Iraq from the proceedings could - in its opinion - lead to.

When the contracts were signed, the claimant could only reasonably count on the assets of the parties to the contract and must have assessed the consequences of that situation.

The claimant comes forward with a petition as to a matter of principle and considers as shown, the fact that it has to prove, namely the immunity which defendants 2 to 4 would dispose of if the state of Iraq were excluded from the proceedings.

On the contrary, the acknowledgement of the legal personality (supra 1) implies the existence of separate assets to those of the state (Art. 48, 3° of the Iraqi Civil Code).

In the oral pleadings the parties accepted that defendants 2 to 4 had assets and, in particular, the real estate comprising their head office.

.../...                                                                    18.-

3.      The issue which forms the subject of this interim award is one of law : the identification of the other party to the contract.

The Arbitral Court considers that that issue cannot be the subject of an *affirmation* either by the claimant or the defendants.

In addition, the tribunal observes that the factual circumstances variously alluded to by the defendants in the reservation set out at the beginning of their submissions are probable and enable it to be accepted that a mistake could have been made by that counsel.

4.      In the terms of reference signed by the state of Iraq, it is disputed that it is party to the contracts.

5.      Finally, under the terms of reference the claimant is not deprived of an adversary following the exclusion of the state of Iraq from the proceedings, since the defendants sub 2 et 4 have agreed to continue the action.

This case is therefore the opposite of the situation in the AOI award.

4° The alleged representation of the state of Iraq by defendants 2 to 4

Position of the parties

1.      The claimant states that the legal personality which the Iraqi ministries enjoy is not incompatible with the fact that the ministry can represent the state, on the grounds that the ministry represents the government which in its turn represents the state.

2.      The defendants reply by destinguishing the political and administrative role of the Iraqi minister which, politically is part of the government and can,

.../...

.../...                                                          19.-

in that capacity, represent the state, and who administratively, is the head of a ministry and, in that capacity, binds the ministry which has a separate legal personality.

### Decision of the Court of Arbitration

1.      As a matter of principle, it is accepted that what the claimant states is correct, namely that one corporate entity can act on behalf of another corporate entity.

However, if this is correct it is for the claimant to show that this in fact occured, which it fails to do.

2.      The fact that under the law of 1964 the term *government* can be used to refer to a ministry is not conclusive, since in this case such a mention does not appear in the contracts.

As mentioned hereinabove, none of the contracts involve, in that capacity, an Iraqi minister.

The claimant does not state by what legal device the ministry, in its capacity as a separate corporate entity from the state, binds the state itself.

The same observation applies as regards the fourth defendant.

...../..

5° <u>Apparent authority</u>

<u>Position of the claimant</u>

On the basis of the facts which it relies upon sub 2° and sub 3°, the claimant further considers that the state of Iraq should be bound as a contractual partner under the theory of apparent authority.

<u>Decision of the Arbitral Tribunal</u>

1.      The error which the claimant puts before the Arbitral Tribunal does not relate to any appearance created by the defendants, but to the erroneous view which it held as to the nature of Iraqi ministeries.

However, that particularity could and should have been known by the claimant.

As regards contracts entered into by emanations of the state which are not assimilated to that state, it has been observed that *the socialist states seem particularly attached to that view, seeing fit to demarcate themselves from entities which are entrusted with foreign trade transactions* (Bernard Audit, op.cit. p. 35).

The situation in this case is in no way exceptional for states operating under a socialist economy.  In its capacity as a trader in international trade, it was for the claimant to inform itself in this regard.

2.      The claimant does not bring forward any element which shows that the defendants created a situation intended to make the claimant believe as being true that which was not true.

.../...                                                                21.-


ON THOSE GROUNDS

The Arbitral Tribunal composed of :

- Prof. Dr. Rolf A. Schütze

- Pierre Van Ommeslaghe, Professor at the Faculty of the law of ULB, former chairman of the Bar Council for lawyers of the Cour de cassation

- Didier Matray, senior lecturer at the Faculty of law of ULG, lawyer at the Liège Bar

rules that the Iraqi state is not party to the five contracts referred to above.

Consequently,


The following entities :


THE MINISTRY OF INDUSTRY RESEARCH AND DEVELOPMENT, having its offices in Bab-al Mudam, P.O. Box 14080 Bagdad,


THE MINISTRY OF DEFENCE, directorate of Armament and supply having its offices in Bagdad


THE SALAIL ALDIN STATE ESTABLISHMENT with its head office in An-Dour, Iraq,


.../...

.../...                                                          22.-

Shall become parties as defendants and counterclaimants to the procedure which will continue on the basis of the terms of reference and this rider.

Reservation on hearing and determining the remainder of the application.

P4/2
9301005
25.10.94

Done in Paris
January 16, 1995

## <u>EXHIBIT 4.A</u>

*Greek Powder and Cartridge Company S.A. v. Ministry of Defence (Iraq)*

**A.  International Chamber of Commerce (ICC), International Court of Arbitration**

**Case No. 7094/CK/AER/ACS, Award dated January 31, 2003**

DECLARATION OF HANAN M. NASSEF

*A.H.Puelinckx*
 *Advocaat*

Meester Philippe WILLEMSENS
Dalstraat, 43,
**1000 BRUSSEL**

27 februari 2003

Waarde confrater,

Ingesloten vindt U een kopie van de uitspraak inzake PYRKAL.

Vriendelijk en hoogachtend,
Uw dv cfr

A. PUELINCKX



International Chamber of Commerce
*The world business organization*

**International Court of Arbitration   •   Cour internationale d'arbitrage**

# AWARD
# SENTENCE

ICC International Court of Arbitration · Cour internationale d'arbitrage de la CCI
38, Cours Albert 1er, 75008 Paris, France
Telephone +33 1 49 53 28 28   Fax +33 1 49 53 29 33
Website www.iccwbo.org   E-mail arb@iccwbo.org

# INTERNATIONAL COURT OF ARBITRATION
# COUR INTERNATIONALE D'ARBITRAGE

### CASE No. 7094/CK/AER/ACS

### GREEK POWDER AND CARTRIDGE COMPANY S.A.
(Greece)

vs/

### THE MINISTRY OF DEFENCE
(Iraq)

This document is an original of the Final Award rendered in conformity with the Rules of the ICC International Court of Arbitration.

\*\*\*\*\*\*\*

Ce document est un original de la Sentence Finale rendue conformément au Règlement de la Cour Internationale d'Arbitrage de la CCI.

ICC Arbitration No. 7094/CK/AER/ACS

between

<u>Greek Powder and Cartridge Company SA</u>,

Claimant,

vs.

<u>The Ministry of Defence of Iraq</u>,

Respondent.

<u>AWARD</u>

I.    PROCEDURAL POINTS

1. The Parties

1.1.   Claimant

Claimant is Greek Powder and Cartridge Company SA, a company organized under the laws of Greece and having its registered office at 1, Iliopouleos Avenue, 172 36 Hymettus, Greece. It will be referred to as "Claimant" or its Greek language abbreviation "Pyrkal" in the award.

Claimant is represented for the purpose of the present arbitration procedure by Mr. Nikos Frangakis, attorney-at-law, Souriadakis, Frangakis & Associates, 6, Kriezotou Str., 106 71 Athens, Greece.

1.2.   Respondent

Respondent is The Ministry of Defence – Directorate of Armament and Supplies, Baghdad, Iraq. It will be referred to as "Respondent" or "the Ministry".

It was originally represented by Mr. Alphons-Hendrik Puelinckx, attorney-at-law, Puelinckx Linden Grolig Uyttersprot, Brussels, Belgium, and then by Messrs. André Linden and Joe Sepulchre, attorneys-at-law, Schiltz Linden Grolig, Brussels, Belgium.

In June 1999, Messrs. Linden and Sepulchre advised that they had withdrawn from the representation of Respondent, and that any further communications should be sent to Respondent directly with copy to Dr. Fakhri A. Kadhum, Legal Consultation Bureau, Council of Ministers' Building, Baghdad - Karrad Mariam, Iraq.

During the October 24 and 25, 2001 evidentiary session, Respondent was accompanied by Mr. Puelinckx. Although Respondent made clear during that session that Mr. Puelinckx was their counsel, Mr. Puelinckx stated that Respondent was not domiciled within his law firm. The briefs posterior to the above evidentiary session were filed on behalf of Respondent by Mr. Puelinckx.

2. The Arbitral Tribunal

The Arbitral Tribunal is composed of :

– Dr. Anthony Antapassis
  Professor at Athens University
  10, Akti Poseidonos
  185 31 Piraeus
  Greece

  Arbitrator nominated by Claimant.

– Dr. Hans-Jürgen Schroth
  KPMG Treuhand Beiten Burkhardt GmbH
  Ganghoferstrasse 33
  80339 Munich
  Germany

  Arbitrator nominated by Respondent.

  Dr. Schroth was appointed in replacement of the arbitrator originally nominated by Respondent, Dr. Khaled Kadiki, who had died in the course of 1997.

– Dr. Jacques Werner
  Werner & Associés
  13, rue du Rhône
  1204 Geneva
  Switzerland

  Third Arbitrator and Chairman of the Arbitral Tribunal.

  Dr. Werner was appointed in replacement of the third arbitrator and chairman of the Arbitral Tribunal originally appointed, Dr. Robert Briner, who had resigned in 1996 upon his election as chairman of the ICC International Court of Arbitration.

3. Terms of Reference

The Parties and the Arbitral Tribunal signed the Terms of Reference by May 6, 1993, which contain in particular the following provisions concerning the procedure :

– Place of Arbitration

"6.   Place of Arbitration

As agreed between the Parties in Article 13 of the Contract and as confirmed by the International Court of Arbitration of the ICC, Geneva, Switzerland, is the place of arbitration.

The Arbitrators are, however, free to meet internally or with the representatives of the Parties at any other place or to communicate by conference call."

– Rules Applicable to the Arbitration Proceedings

"7.   Applicable Procedural Rules

The procedure shall be in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce as now or hereafter in force."

– Various Particular Points

"8.   Other particulars

1.   The language of the arbitration is English.

2.   If a Party produces a document in a language other than English, then that Party shall also produce a translation of that document into English.

3.   All documents, correspondence, etc. submitted by either Party shall be delivered simultaneously and directly to the other Party, to each Arbitrator and to the Secretariat of the ICC International Court of Arbitration.

4.   Rulings and Orders on procedural matters shall be signed by the Chairman alone on behalf of the Arbitral Tribunal.

5.   The Parties will notify forthwith to the Arbitral Tribunal any complaint they might have regarding the proceedings."

– Issues to Be Determined

"4. Definition of the issues to be determined

The Arbitral Tribunal will decide whether it has jurisdiction over this dispute and, in the affirmative, whether the claims of the Claimant listed in Chapter 2 above can be granted."

## 4. Claims of the Parties

### 4.1. Claimant

Claimant's final Prayers for Relief as contained in their Brief and Statement of Claim of February 12, 2001, are as follows :

"IV. PRAYERS FOR RELIEF

113. In view of the facts and legal arguments laid out above, Claimant requests the Arbitral Tribunal to condemn the State of Iraq in a final award to pay PYRKAL the following :

A.) - **US$ 107'424'597.55** in payment of (a) the outstanding principal of US$ 53'834'774.01, (b) interest of US$ 53'329'394.54 and (c) claimed damages of US$ 260'429.00 incurred by PYRKAL;

- Interest as of February 1, 2001 at 3-month US$ LIBOR + 3% on the proceeding amount until the final award is rendered by the Arbitral Tribunal.

B.) Post-award interest on the amounts awarded at 3-month US$ LIBOR + 3% as of the date of final award until final payment.

C.) All costs of the arbitration including all of PYRKAL's legal expenses, to be specified at the end of the arbitral proceedings."

In its post-hearing Brief of March 13, 2002, Claimant confirmed the above claims.

In its Statement of Legal Fees and Costs of Arbitration of June 20, 2002, Claimant asked for a further US$ 3,879,680.64 of capitalized interest up to June 30, 2002, bringing the total of claimed principal amount to US$ 111,304,278.10.

4.2.  <u>Respondent</u>

In the Terms of Reference, Respondent had set out the following claims :

"3.3  The Defendant therefore claims under all reservations and without prejudice

1. that the Arbitral Tribunal does not have competence to adjudicate this Case;

2. alternatively, that the Claimant's action be declared not lawful and not grounded;

3. alternatively, the Claimant be ordered to produce all and any documents, correspondence, contracts, invoices, bills of lading, acceptance certificates, licenses, bank documents related to the facts or arguments raised in the Request for Arbitration;

4. that the Claimant be condemned to pay the Defendant's expenses and the costs of the proceedings."

In its post-hearing Brief of March 18, 2002, Respondent concluded as follows :

"1. Having regard to the rights of defence, guaranteed by the ICC practice and the European Convention on Human Rights, and having regard to the embargo, the Respondent requests to suspend this Arbitration until the end or softening of the embargo in order to ensure that Respondent has had the opportunity to properly prepare its defence with its counsel or in any case, until travel and other communications will have made possible consultation between Respondent and its Counsel. Therefore, Respondent's counsel requests a minimum flexibility in the pleading calendar taking into account the extreme embargo circumstances.

2. In the alternative, and should the Arbitral Tribunal decide that the Arbitral procedure has to be continued, then the Respondent requests a partial award, dismissing GREEK POWDER's claim as unfounded since it cannot unilaterally modify the terms of reference and extend its claim to the State of Iraq. The State of Iraq is not the proper Respondent to the present arbitral procedure.

- 7 -

The Respondent therefore requests a <u>partial award</u>, dismissing GREEK POWDER's claim and action as misdirected and to suspend the arbitration for the remainder. For obvious reasons and under the above-mentioned circumstances counsel of Respondent cannot further develop and make factual or otherwise statements f.i. on the merits of the case."

In its post-hearing rebuttal Brief of May 20, 2002, Respondent modified its previous conclusions as follows :

"Respondent confirms its main plea and invites the arbitral tribunal to submit its request for suspension of the arbitral proceedings to the I.C.C. Court in view of the specific international procedural legal implications involved in this extraordinary case against a country under embargo, as set forth at length in the main plea.

Respondent confirms the alternative of its main plea as to the dismissal of claimant's claim for lack of admissibility adding that in case for unexpected reasons the arbitral tribunal would not follow respondent's reasoning as set forth in its main plea, then claimant's claim should be dismissed anyway because inadmissible since being directed by the wrong party, which - in that alternative - should have been from the outset of the proceedings the Greek State."

5. <u>Main Points of the Arbitral Proceedings</u>

— The Request for Arbitration was filed by Claimant with the ICC International Court of Arbitration ("ICC Court") on December 4, 1990.

— Respondent filed a Reply on April 15, 1993.

— The Terms of Reference were signed by May 6, 1993.

— By Procedural Order No. 1 of December 16, 1993, the Arbitral Tribunal set to Claimant a time-limit to January 31, 1994 to submit a Brief of Claims, and to March 14, 1994 to Respondent to submit its Brief of Reply.

- By Procedural Orders No. 2 of January 26, 1994 to 21 of May 29, 2000, the Arbitral Tribunal, at the request of Claimant and with consent of Respondent, granted successive extensions of the time-limits set to the parties for filing their Briefs. Such extensions were granted in view of the parties' on-going settlement, discussions and in particular the Preliminary Settlement Agreement concluded by them on November 25, 1996.

- On December 21, 2000 Claimant informed the Arbitral Tribunal that it had decided to proceed with the filing of its Brief and Statement of Claim, which was made on February 13, 2001.

- Respondent failed to file its Brief of Reply by the April 6, 2001 time-limit set by the Arbitral Tribunal.

- The Arbitral Tribunal held in Geneva on May 17, 2001 a procedural session with the parties in order to consider Claimant's request for a witness' hearing and planify the next procedural steps.

  Respondent was neither present nor represented at this session.

  During such session, the next procedural steps were discussed and decided, and embodied in Procedural Order No. 23 of May 23, 2001. It was in particular set that a witness' hearing would take place in Geneva on July 16, 17 and 18, 2001.

- On July 1, 2001, Respondent requested a postponement of the hearings, on the ground that the conditions of the embargo imposed on Iraq made the chosen dates not suitable.

  As Claimant did not oppose Respondent's request for postponement, the witness' hearings were postponed to October 24, 25 and 26, 2001.

- On July 1, 2001, Respondent proposed as well two witnesses for the witness' hearing and indicated that their witness' statement would be communicated no later than August 2, 2001.

- On September 21, 2001, the Arbitral Tribunal appointed as an expert-witness on the question of the legal status of the Ministry of Defence under Iraqi law Mr. Abdul Hamid El-Ahdab. Mr. El-Ahdab submitted his expert-opinion on October 17, 2001.

- On September 27 and October 16, 2001, Respondent submitted four documents, namely Legal Pleas, statement by one of the proposed witnesses, a note concerning payment to Claimant, as well as a note on lawful payment.

- An arbitration session devoted to the hearing of the witnesses proposed by the parties as well as the expert-witness appointed by the Arbitral Tribunal was held on October 24 and 25, 2001, in Geneva.

- Parties filed by March 18, 2002 simultaneous post-hearing briefs.

- On April 10, 2002, the Arbitral Tribunal issued a procedural order denying Respondent's request of March 18, 2002 for a suspension of the proceedings.

- Parties filed by May 20, 2002, simultaneous post-hearing rebuttal briefs.

- As neither party called for closing oral arguments, the Arbitral Tribunal advised the parties on June 3, 2002 that the proceedings were closed.

II.   SALIENT FEATURE OF THE DISPUTE

On November 10, 1985, Greek Powder and Cartridge Company SA and the Ministry of Defence of Iraq entered into a contract ("the Contract") for the supply of ammunitions. The essential points of the Contract were as follows :

- Object and Price

  1. 400'000 rounds of 105-mm artillery ammunition with Point Detonating fuses (PD M557), at US$ 112 per round,

  2. 100'000 rounds of 105-mm artillery ammunition with Mechanical Times Super Quick fuses (MTSQ M557), at US$ 190 per round,

  3. 80'000 rounds of smoke 105-mm artillery ammunition with Point Detonating fuses (PD M557), at US$ 165 per round.

                                                    (Contract, Appendix A).

Total price for delivery C and F Port of Quadaimah, Saudi Arabia, was US$ 77,000,000 (Contract, Article 2).

- Delivery Schedule

Delivery of the goods was to be completed within 17 months from the notification of the opening of the letter of credit, according to a schedule which called for delivery every two months (Contract, Appendix C).

  &ndash; <u>Payment</u>

The Ministry was to open an irrevocable letter of credit in favour of Pyrkal, issued by the Central Bank of Iraq to Pyrkal's bank, in the amount of US$ 77,000,000. Payment was to be made in three installments :

  &ndash; 20 % paid against presentation of the shipping documents;

  &ndash; 25 % paid 24 months after presentation of the shipping documents, this amount bearing a 4 % yearly simple interest from the time of the shipping documents presentation until payment;

  &ndash; 55 % paid 36 months after presentation of the shipping documents, this amount bearing a 4 % simple interest from the time of the shipping documents presentation until shipment.

(Contract, Article 3).

  &ndash; <u>Performance</u>

The letter of credit was issued in the amount of US$ 83,622,000 (purchase price plus 4 % contractual interest) by the Central Bank of Iraq on January 1, 1986 and then notified by the National Bank of Greece to Pyrkal. It was, however, neither confirmed by the National Bank of Greece nor by any other Greek or foreign bank.

During 1986, 15 deliveries were made by Pyrkal. The first 20 % installment was paid by the Ministry on all those shipments.

During 1987, three deliveries were made. The first 20 % installment was paid by the Ministry.

During 1988, Pyrkal was no longer able to acquire from their manufacturer in the United States the needed MTSQ (Mechanical Times Super Quick) fuses, by reason of the restriction on sale of military equipment to Iraq which the U.S. Government had started to impose. Pyrkal proposed that the undelivered 35'709 rounds of 105-mm ammunition with MTSQ fuses be replaced by the US$ equivalent of 105-mm ammunition with PD (Point Detonating) fuses, totaling 60'578 rounds. The Ministry accepted, and Amendment to Contract was executed in December 1988.

The 19th delivery was made in 1988, but the first installment on such delivery was paid in part only.

Payment of the second installment for the deliveries made in 1986 was made in part only.

In 1989, the 20th and last delivery was made. First installment was paid on this delivery.

On August 2, 1990 the Gulf War started, with as immediate consequence the UN Security Council Resolution embargoing all commercial exchanges with Iraq and freezing Iraq assets abroad.

The embargo had as particular consequence in the present case that Pyrkal was prevented from fulfilling the balance of the Contract, and that the Ministry did not have available the financial resources necessary for the payment of the outstanding amounts due to Pyrkal in view of the halt to Iraq's sale of oil.

In view of this situation, Pyrkal filed in December 1990 its Request for Arbitration for the payment of the balance of contractual price of the delivered goods.

Following the initiation of the arbitration proceedings, parties met several times in order to settle their dispute (Meetings in Athens on March 20-21, 1992 and July 10 and 14, 1994; in Baghdad on July 22 to 24, 1995; in Amman in November 1996, during which meeting the Preliminary Settlement Agreement of November 25, 1996 was concluded). Despite the seven-years suspension of the proceedings, their efforts to bring the matter to a close turned out, however, to be unsuccessful.

III. **ON THE REQUEST FOR FURTHER SUSPENSION OF THE ARBITRAL PROCEEDINGS**

Respondent requests a suspension of the arbitral proceedings until the end or until a marked diminution of the embargo imposed on Iraq, as the situation created by the embargo is such that Respondent is prevented from communicating with its counsel effectively and consequently from having its defence normally assured. Respondent further requests that the Arbitral Tribunal, rather than deciding itself on such request, transmits it for decision to the Court of the International Chamber of Commerce.

Respondent's request has a procedural aspect and a substantive aspect.

Ordering a postponement or a suspension of the arbitral proceedings belongs to the conduct of the arbitral proceedings which, under both the former and the current ICC Rules of Arbitration, is a function which falls exclusively within the responsibility of the Arbitral Tribunal. As indicated under Articles 2.1 of the 1988 Rules and 1.2 of the 1998 Rules, the Court does not itself settle disputes, but has as a function to ensure the application of the ICC Rules of Arbitration. While the Court may extend the time-limit for rendering the award, it may not substitute itself for the Arbitral Tribunal and take part in the conduct of the proceedings by ordering their postponement or suspension.

It is for this reason that the Arbitral Tribunal, when first asked by Respondent in its Brief of March 18, 2002 to suspend the proceedings, had decided upon this request by a procedural order (Procedural Order No. 26).

As the ICC Court has no competence, both under the ICC Rules and its own Statutes and Internal Rules, for taking the measures asked for by Respondent, such request lacks admissibility.

As far as the substantive aspect of Respondent's request is concerned, the Arbitral Tribunal would like to remind the following :

–  The Arbitral Tribunal has agreed to suspend the case during a probably unprecedented seven years (1994 to 2000). Such suspension was granted at parties joint request filed at regular intervals and this in order to enable them to conduct meaningful settlement negotiations despite the heavy practical difficulties created by the UN embargo on Iraq.

–  After the resumption of the proceedings in 2001, the Arbitral Tribunal agreed, despite Respondent's failure to appear at the procedural session held on May 17, 2001, to postpone the witness hearing scheduled for July 16 to 18, 2001, to October 24 to 26, 2001, and this in order to accommodate Respondent's travel difficulties.

–  The Arbitral Tribunal granted to the parties a longer than usual four-month period for filing their simultaneous post-hearing brief, this to accommodate Respondent's difficulties in communicating with its counsel.

The result of these various accommodations is that Respondent has been able to argue its case in an extensive manner. We would like in particular to notice that the October 24 and 25, 2001 hearing in Geneva was attended by no less than five high-level officials from various ministries in Baghdad, and that they were as well accompanied by their newly constituted outside counsel, Mr. Puelinckx. And that two post-hearing briefs were filed by Mr. Puelinckx on behalf of his clients. We would like finally to note that the Arbitral Tribunal had offered the parties to hold closing oral arguments; however neither party seized this opportunity to further argue their points.

It is a fact of life in international arbitration that parties living under different political or economic circumstances may not have the same factual ease for presenting their cases, the one having no problem while the other is confronted to serious obstacles. An arbitral tribunal conscious of its role will endeavour to accommodate the party at a disadvantage in order to level the field, without however disrupting the overall calendar of the case and preventing the claims to be adjudged in good time. In our case, while the Arbitral Tribunal is mindful of the great practical difficulties which Respondent encountered for attending the witness hearing in Geneva, such attendance was finally possible and the various witnesses called by Respondent heard. And while the communications between Respondent and its new counsel was certainly not easy, the Arbitral Tribunal considers that it was always possible, as various travel routes to and from Baghdad remained practicable throughout.

The Arbitral Tribunal considers that the proceedings were conducted in such a way that Respondent had the possibility to effectively present its case, and that there are consequently no reasons for further delaying its award.

The Arbitral Tribunal rejects Respondent's request for lack of admissibility and subsidiarily, as unjustified. It will order accordingly under point 1. of its Order.

## IV. ON THE EXCEPTION OF LACK OF JURISDICTION OF THE ARBITRAL TRIBUNAL

Article 4 of the Terms of Reference provides that the Arbitral Tribunal will decide whether it has jurisdiction over the dispute, and this prior to deciding on the substantive claims.

The exception of lack of jurisdiction was raised under point 3. "Position of the Defendant" of the Terms of Reference, more particularly point 3.2. :

> "3.2 Consequently, Defendant reserves the right to claim that:
> 1. no agreement has been entered into with the Defendant,
> 2. such an agreement, if it has been entered into, is invalid, void and/or unenforceable,
> ...................."

and 3.3. :

> "3.3 The Defendant therefore claims under all reservations and without prejudice
> 1. that the Arbitral Tribunal does not have competence to adjudicate this Case;
> ...................."

Respondent did not elaborate further in any of its subsequent filings.

The Arbitral Tribunal fails to see any merit in the two reasons invoked : the conclusion of the Contract between the parties is uncontested, and no element has been brought forward to the effect that it would be "invalid, void, and/or unenforceable".

Consequently the Arbitral Tribunal rejects the exception of lack of jurisdiction as unfounded. It will order accordingly under point 2. of its Order.

V.   ON THE LAW APPLICABLE TO THE MERITS OF THE DISPUTE

The Contract did not specify by which substantive law it would be governed. As to the Terms of Reference, they did not provide under which law the merits of the present dispute would be decided.

In the absence of a choice-of-law agreement between the parties, the determination of the applicable law has to be made, in accordance with the applicable Rules of Arbitration of the ICC, by the Arbitral Tribunal. First must be determined, however, whether are applicable to the present dispute the 1988 Rules of Arbitration or the 1998 Rules of Arbitration. The question has its importance, as the methods which are to be used by the arbitrators under these succeeding versions of the Rules are not the same.

The 1988 Rules provided the following, at their Article 13.3. :

> "The parties shall be free to determine the law to be applied by the arbitrator to the merits of the dispute. In the absence of any indication by the parties as to the applicable law, the arbitrator shall apply the law designated as the proper law by the rule of conflict which he deems appropriate."

Under these provisions the arbitrators have to follow the indirect, two-steps method for determining the applicable law. In a first step, the arbitrators must determine which rules of conflict would be appropriate. In doing so the arbitrators are not restricted to the rules of conflict of the country of the seat of the arbitration, and may very well choose the rules of another country they would consider as preferable. In a second step, and by the application of the rules of conflict selected, they will determine the substantive law applicable to the merits of the dispute.

The 1998 Rules on their part provide as follows, at their Article 17.1. :

> "The parties shall be free to agree upon the rules of law to be applied by the Arbitral Tribunal to the merits of the dispute. In the absence of any such agreement, the Arbitral Tribunal shall apply the rules of law which it determines to be appropriate."

Abandoning the indirect, two-steps method of the 1988 Rules, the 1998 Rules have adopted the direct, one-step method where the arbitrators are free to apply directly the law which they deem appropriate without the necessity of a detour by conflict-of-law rules.

Article 6.1. of the 1998 Rules provides for the following transitory regime :

> "Where the parties have agreed to submit to arbitration under the Rules, they shall be deemed to have submitted *ipso facto* to the Rules in effect on the date of commencement of the arbitration proceedings unless they have agreed to submit to the Rules in effect on the date of their arbitration agreement."

Both the date of the Contract (November 10, 1985) and of the initiation of the arbitrators proceedings (December 4, 1990) are anterior to the 1998 Rules in force since January 1, 1998, which would mean in principle their exclusion. However, it has been stated authoritatively by the chairman of the ICC Court that :

> "... the parties are also given the possibility to agree that the 1998 Rules shall apply to cases filed before 1 January 1998. This can be done by means of a separate agreement, or after the constitution of the Arbitral Tribunal, normally in the Terms of Reference." (The ICC International Court of Arbitration Bulletin, Vol. 8/No. 2, December 1997, p. 7, Robert Briner, "The Implementation of the 1998 ICC Rules of Arbitration").

It appears that in the present case the parties, when drawing up the Terms of Reference, have specifically considered the prospect of having the 1988 Rules then in force replaced at some later point by new Rules, and expressed their intent of having the new Rules apply whenever they would be in force. This is the logical deduction of the word "or hereafter" of Article 7 of the Terms of Reference, which otherwise would be devoided of signification ("The procedure shall be in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce as now or hereafter in force.")

The Arbitral Tribunal considers consequently that the 1998 ICC Rules of Arbitration apply, and that the choice of law is to be made according to its provisions.

It should be noted that the solution under the 1998 Rules correspond to the solution reached applying Article 187 of the Swiss Private International Law Act ("SPILA"), applicable in our case in a subsidiary manner only, which does provide that the Arbitral Tribunal will apply the rules of law which have the closest connection with the case.

In its Brief of February 13, 2001, Claimant, in addressing the question of the choice of law, made a distinction between the situation where the absence in the contract of a choice-of-law clause is merely an omission ("unqualified lacuna"), and the other situation where such absence would reflect parties' intent of not having either of their municipal laws to apply ("qualified lacuna"). In the latter case parties would have actually proceeded to an implied negative choice of law, which arbitrators would have to respect.

Claimant contends that in the present case parties, by not designating in the Contract the law applicable to the merits, have precisely proceeded to such an implied negative choice of law: the Seller, a corporation majority-owned by the Greek government, was unwilling to accept that such an important transaction be subject to Iraqi laws, while the Purchaser, as a sovereign entity, was not prepared to accept Greek law; this resulted in their tacit understanding that neither of these two laws would apply. In application of Article 13.5. of the 1988 Rules, which provides that in all cases the arbitrators will take into account the relevant trade usages, Claimant requests the Arbitral Tribunal to apply as substantive rules the Unidroit Principles of International Commercial Contracts ("Unidroit principles") or the United Nations Convention on Contracts for the International Sale of Goods ("CISG").

Alternatively, Claimant requests the application of the Greek law in application of Article 117 of the Swiss Private International Law Act.

Respondent has not taken a position on the question of the law applicable to the merits of the dispute.


When exercising its faculty to proceed with the choice of the rules of law applicable to the merits of the dispute, the Arbitral Tribunal has to be guided foremost by what are the legitimate expectations of the parties in this respect.

The Arbitral Tribunal accepts Claimant's contention that parties have made in the Contract an implied negative choice of law and have tacitly convened that neither Greek nor Iraqi law would apply, as this enabled them to overcome during their contractual negotiations the choice-of-law obstacle and proceed with the conclusion of the Contract, which was in both parties' best interest. Parties' intentions have to be respected and the application of either Greek or Iraqi law be discarded.

This narrows consequently the choice either to transnational rules such as the Unidroit principles or the CISG, or to a national legal system.

The commonly admitted understanding of both Article 17.1. of the 1998 Rules as well as Article 187 of SPILA is that the Arbitral Tribunal is not restricted to specific national laws but may choose rules of law which have other sources, such as international conventions, principles elaborated by international organizations such as Unidroit, or transnational principles of merchant law as grown from trade practices.

The CISG was ratified both by Iraq (entry into force on April 1, 1991) and Greece (entry into force on February 1, 1999). It would not apply automatically, in view of the fact that its entry into force was posterior to the date of Contract (Article 100(2) CISG). The fact that it was actually ratified by both concerned States, even if after the date of the Contract, is however a strong indication that its rules are acceptable by both parties, and that its application would correspond to their legitimate expectations. Consequently the Arbitral Tribunal decides to select the United Nations Convention on Contracts for the International Sale of Goods as the applicable rules of law to the merits of the case.

Since, however, the CISG does not regulate all issues arising or asserted at the time of conclusion or performance of the international sale in question, the Arbitral Tribunal deems necessary to determine a complete national set of rules which is to apply supplementarily for filling in the gaps of the CISG. To this effect, it considers that Swiss material law is the most appropriate law. Being the law of the neutral place of arbitration, Swiss law is not directly related to either party and presents the completeness required for its supplementary application. The Arbitral Tribunal consequently decides that where the CISG rules are silent, Swiss laws will apply.

## VI.   ON VARIOUS DEFENSES RAISED BY RESPONDENT

Respondent had raised in the Terms of Reference four defenses pertaining to the merits of the dispute.

A.   "the Claimant has not obtained the necessary export licenses for the allegedly sold goods, and/or the Claimant has never delivered them in good condition, and/or they have not been accepted by the Defendant." (point 3.2.3. of the Terms of Reference)

This defense was neither substantiated nor pursued in any manner by Respondent in its various Briefs. In the absence of any element in the file which would support it, the Arbitral Tribunal rejects it.

B.   "the goods have been paid by the Defendant." (point 3.2.4. of the Terms of Reference)

C.   "Defendant has caused a bank, agreed upon by the Claimant, to issue an irrevocable letter of credit in favour of the Claimant and this letter of credit substitutes the bank's liability under the letter of credit to the buyer's liability under the agreement and/or the letter of credit has either never been presented for payment or has been paid or payment has been withheld for reasons of *force majeure (Prince's Restraint)*." (point 3.2.5. of the Terms of Reference)

Points B and C relate to the same defense. They have not be substantiated or pursued in Respondent's further Briefs. As far as we can understand such defense, it would be the following : the Contract obligated the Ministry to cause the Central Bank of Iraq to open an irrevocable letter of credit in favour of Pyrkal for the entire amount of the purchase price. The Ministry complied and the Central Bank of Iraq issued on January 1, 1986 an irrevocable letter of credit in the amount of US$ 83,622,000 (being the purchase price plus contractual interest for the extended terms of payment) which, however, was not confirmed, either by the National Bank of Greece as had been anticipated or by any other Greek or foreign bank. And as outlined under point II above, the embargo prevented the Central Bank of Iraq from honoring in full the letter of credit it had opened.

Respondent seems to contend that by causing the Central Bank of Iraq to issue the required letter of credit it would have discharged its payment obligations.

This is not the case. By causing a bank to open a letter of credit in favour of the seller, the buyer is not substituted by the opening bank as a party to the sales contract. This fundamental principle of the independence of the letter of credit from the contract underlying the bank's obligation is stated in Article 3 of the ICC Uniform Customs and Practice for Documentary Credits (1983 Revision), to which the letter of credit issued by the Central Bank of Iraq in the present case was expressly subjected as per its Article 10.

As the letter of credit opened by the Central Bank of Iraq in favour of Pyrkal did not result in Pyrkal being paid, the Ministry's obligations were not fulfilled. As to the contention that the Central Bank of Iraq would have been prevented from paying by reason of *Force Majeure*, this is irrelevant as, in view of the independence of the letter of credit from the sales transaction, a possible *Force Majeure* impediment of the Central Bank of Iraq would not affect the Ministry's obligations.

The Arbitral Tribunal consequently rejects this defense.

D.   "the current political crisis and the embargo imposed upon the Republic of Iraq constitute exceptional circumstances of "*Force Majeure*" which suspend the Defendant's obligations under the agreement." (point 3.2.6.)

This defense has been raised by Respondent in its capacity as non-performing party, thereby seeking its contractual obligations to be suspended as long as the exceptional circumstances subsist. The reference to exceptional circumstances is meant to point at the impossibility or futility of performance and to the unforseeability of such circumstances at the time of signing the contract. These are typical elements of the defense of *Force Majeure*.

1. The defense of *Force Majeure* is to be seen, first, in the context of the contractual framework established between the parties to the present case.

   The Contract refers to *Force Majeure* in Article 6. Under this Article, the Contract can be cancelled by anyone of the parties after negotiations due to delay of delivery caused by *Force Majeure* and after a mutual agreement in writing, provided that at least three (3) months have elapsed from said delay.

   Thus, the Contract provides for a limited *Force Majeure* clause to be applied in cases of undue delays of delivery of the contractual goods in question. However, this Article 6 *Force Majeure* clause is not applicable if Respondent raises the defense of *Force Majeure* in order to suspend payment for the contractual goods which undisputedly have been delivered in due course.

   As a consequence, the defense of *Force Majeure* as raised by Respondent cannot be based on the Contract, which does not stipulate specific rules regarding *Force Majeure* relating to the obligation to effect payment for goods which have been delivered under the Contract.

2. Secondly, the defense of *Force Majeure* as raised by Respondent is to be examined in the light of the applicable rules of law to the merits of the case, namely the CISG. The CISG, as well as most national legal systems provide that *Force Majeure* is a valid defense whenever the causal element is beyond the control of the party claiming it, and when such party could not reasonably be expected to avoid it. Article 79, paragraph 1 provides as follows :

   "A party is not liable for the failure to perform any of his obligations if he proves that the failure was due to an impediment beyond his control and that he could not reasonably be expected to have taken the impediment into account at the time of conclusion of the contract or to have avoided or overcome it or its consequences."

So far, only a few cases have been published dealing with Article 79(1) CISG and/or the defense of *Force Majeure* laid down in this Article. We would like to refer to the following three cases :

– The *Iron molybdenum from China* case (No. 4190 85/95, 2nd October 1995, District Court of Hamburg, confirmed by the Hamburg Court of Appeal No. 1 U 167/95, 28th February 1997, reported in Michael R. Will, CISG, The First 464 or so Decisions, 1998, p. 130).

Respondent requested the Court to reject the claim because "the non-delivery by the third party supplier was a non-predictable circumstance for him, resulting in an exemption from the liability according to the conditions of the contract respectively Article 79 CISG".

Under point 2 d of its opinion the Court said :

> "The liability of the Respondent is not excluded according to section 2 of the conditions of the contract ('*Force Majeure*') respectively Article 79 CISG. (...); it is not possible to ascertain that this clause, which had been included by the Respondent, goes beyond the arrangement of Article 79 CISG ...
>
> '*Force Majeure*' in this provision is meant as describing impediments which are not part of the risks to be assumed by one party and which are not under the control of the seller.
>
> Delivery by the own third party supplier is part of the general business risk (...), which has to be borne by the seller."

Therefore, the Court did not accept the defense of *Force Majeure* because the non-delivery was part of the seller's risks and was not to be understood as an impediment within the meaning of Article 79(1) CISG.

– The *Certain products* case (Arbitral Tribunal Hamburg (partial award dated 21st March 1996, reported in Michael R. Will, CISG, *op. cit.*, p. 144).

The Respondent claimed damages because of the non-performance by the Claimant (seller) of the contractual obligations. In the Arbitral Award, the Arbitral Tribunal said :

> "(...) 8. In particular the claim for damages is not excluded according to Article 79 CISG.

a)   According to Article 79 CISG the seller is not responsible for the non-performance if he proves that the failure was due to an impediment out of his control and that he could reasonably not be expected to have taken the impediment into account at the time of the conclusion of the contract or to have avoided or overcome it or its consequences.

b)   It is not an 'impediment outside of the sphere of influence' if the subcontractor (Chinese manufacturer) refuses the supply of certain goods unless the seller (Claimant) immediately provides significant liquidity.

(...)

bb)   The financial burden of the manufacturer and the liquidity problems are not to be understood as a non controllable risk respectively an exceptional occurrence as in the case of *Force Majeure* (...)."

Consequently, the defense of *Force Majeure* did not apply in this case either.

– The *powdered milk* case (No. VIII ZR 304/00, 9th January 2002, Federal Supreme Court of Germany; reported in 'CISG database', www.cisg.law.pace.edu)

Here the defendant requested the Court to reject the claim as the lipase infestation preventing the consumption of the powdered milk first occurred after the transfer of the risk, or at least it was not caused by the seller.

Under point I of the reasoning the court said:

"(...) the liability of the Defendant was not excluded under Art. 79 CISG. According to an expert report, the powdered milk was infested by lipase and it cannot be ruled out that the powdered milk was already infested by inactive lipase at the time of the transfer of the risk...

The Defendant did not sufficiently set forth the requirements of an exemption from the duty of compensation under Art.79 (1) CISG. (...) in any case the Defendant did not show that the causes for the inactive lipase were outside its sphere of influence. (...) or the lipase was caused by a development (force majeure) that was fateful for the Defendant...

> The Defendant can only be freed from its obligation to pay damages for its failure to comply with the contract if it can prove that any lipase infestation of the powdered milk was based on grounds that were outside of its sphere of influence. (force majeure)."

Therefore, the Court did not accept the defence of "force majeure" because the Defendant in this case could not prove that the infestation was a failure that was due to an impediment within meaning of Art. 79(1) CISG.

3. What can be deducted from the above, is that the provision of Article 79(1) of the CISG is to be read and construed in accordance with the traditional principles of the *Force Majeure* defense which are known both at the various national law levels and the transnational business law level. To raise a defense of *Force Majeure*, the non-performing party must prove : (1) the impossibility or futility of performance; (2) the unforseeability, at the time of signing the contract, of the circumstances that made performance impossible; and (3) prompt notification to the disappointed party of the inability to perform (cf. Craig / Park / Paulsson /, ICC Arbitration, 3rd ed., pp. 651 *et seq.*)

As regards the present case, it is to be noted that the first element of the *Force Majeure* defense is not fulfilled since, in spite of the embargo difficulties, the Respondent is not completely barred from honouring the payment obligations. This is evidenced by the Preliminary Settlement Agreement where parties convened that, pending the lifting of the embago, they would endeavour to achieve partial payments by means of rude oil and/or oil products (Article 2).

The second element of the *Force Majeure* defense is not fulfilled either. Respondent cannot sustain that the difficulties which stem from the UN embargo, were unforeseeable and insurmountable. Following the invasion of Kuwait by Iraq forces it was repeatedly stated by the UN competent authorities that Iraq was at fault in the invasion of Kuwait and consequently was responsible for the imposition of the UN embargo, as well as for its maintenance through its defiance of the UN resolutions. Having brought the embargo upon itself, Iraq cannot claim it as unforeseeable and insurmountable.

Under these circumstances it is considered to be immaterial that Respondent repeatedly notified the Arbitral Tribunal and the Claimant of the alleged impediments emanating from the embargo regime.

The Arbitral Tribunal rejects consequently the defense of *Force Majeure*.

## VII.  ON THE BALANCE OF THE CONTRACT PRICE

The outstanding principal amount claimed by Claimant was US$ 53,834,774.01.

The proceedings have evidenced that a slightly inferior amount, namely US$ 53,834,541.01 has been acknowledged as due by both parties.

In their Preliminary Settlement Agreement of November 25, 1996, parties acknowledged that, as far as the payment of the Contract purchase price was concerned, the situation was as follows :

— the Contract price, excluding contractual interest, was US$ 77,000,000;

— Pyrkal delivered ammunition shipments for a total of US$ 70,555,600;

— Pyrkal received in payment from the Ministry US$ 22,788,603.92;

— the outstanding principal amount (including contractual 4 % interest from presentation of shipment documents until contractual payment date) due by the Ministry to Pyrkal is consequently US$ 53,834,541.01. To this amount an interest of 4 % from the contractual date of payment until actual payment is to be added (Articles I.1. and 2, and II.5.).

Although the Preliminary Settlement Agreement was never followed by the contemplated Final Settlement Agreement due to the non-fulfillment of an unrelated condition, and it became consequently later on null and void, it remains that it had been signed by both parties and can consequently be considered as their conclusive acknowledgment of the outstanding principal amount. It should be further noticed that at no point during the proceedings did Respondent object to the probative value of the Preliminary Settlement Agreement or its admissibility.

During the evidentiary hearing of October 24-26, 2001 Respondent confirmed that the principal amount due was US$ 53,834,541.01, as follows :

> "THE CHAIRMAN:
>
> ...........................
>
> Can we have a statement on the record stating that both parties agree that the capital amount remaining due to Pyrkal is as mentioned in paragraph 2 of the Preliminary Settlement Agreement, namely US$ 53,834,541.01? Dr Kadhum, is that a statement which has your consent?
>
> DR KADHUM: No, because there is a disagreement of some dollars regarding this figure.

MR FRANGAKIS: This figure was the acceptance from our side of the figure you suggested because our figure was slightly higher.

DR KADHUM: Yes, you are right.

MR FRANGAKIS: So we have accepted your figure.

DR KADHUM: Yes, the figure as mentioned in paragraph 2.

THE CHAIRMAN: So you accept it? This statement is accepted by both parties. Good.

So we have dealt with this question of the disputed amount. I would like to thank both parties for their co-operative spirit in settling this question because it was certainly very important in the proceedings of this case."

(pages 188-189 of the Transcript)

Irrespective of the above, Respondent contends that Pyrkal's claim for payment of the outstanding principal amount should be dismissed as directed against the State of Iraq, which is not a party to these proceedings, rather than directed against the Ministry.

The Terms of Reference signed by both parties indicate the Ministry as Respondent. For the signification of the Terms of Reference within the ICC arbitration proceedings, see point X.I. below. The Arbitral Tribunal considers consequently that Pyrkal's action is directed against the Ministry and that its request to have, for the reasons set out in its various briefs, the Respondent designated as the State of Iraq is inclusive, not exclusive, of the Ministry. The Arbitral Tribunal is consequently unable to accept Respondent's objection

In view of the above the Arbitral Tribunal holds that the balance of the principal amount due by the Ministry to Pyrkal is US$ 53,834,541.01. It will order accordingly under point 3. of its Order.

VIII. <u>ON THE CLAIM FOR ADDITIONAL DAMAGES</u>

Pyrkal further claims US$ 260,429.00 as additional damages suffered by reason of the Ministry's default.

The amount claimed is made of the two following items :

– costs of supervising and securing the arrested ships, in the amount of US$ 240,498;

– costs of obtaining inscription in the Land-registry of conservatory measures on the real estate, in the amount of US$ 19,931.

Pyrkal grounds its claim in Article 74 CISG, which provides that the damages to be awarded for breach of contract equal the loss incurred by the injured party by reason of the breach.

Pyrkal had obtained in 1990 from the Piraeus Court of First Instance the arrest of two tanker ships belonging to the Iraqi Oil Tanker Company which were at that time anchored in the harbour of Piraeus, as a security for its claims in the present case. The expenses under the first item relate to the maintenance and guarding of these ships since their arrest.

Pyrkal had obtained as well from the Athens Court of First Instance an attachment on real estate situated in Greece and belonging to the State of Iraq. The expenses under the second item refer to the registration of such attachment.

The Arbitral Tribunal considers that the decision on reimbursement of the expenses associated with the implementation of measures ordered by State Courts, in our case the Greek State Courts, should be left to such Courts, which are best placed to consider the necessity and reasonabless of the expenses incurred.

The Arbitral Tribunal rejects consequently Pyrkal's claim for additional damages, and shall order accordingly under point 4. of its Order.

IX.   ON THE CLAIM FOR INTEREST

Claimant has formulated various claims concerning interest.

1. LIBOR + 3 % on the outstanding amounts from their contractual date of payment up to January 31, 2001. These interests capitalized by that date amount to US$ 53,329,394.54.

   The amended claim of capitalized interest up to June 30, 2002 filed by Claimant on June 20, 2002 was brought after the closing of the proceedings and without leave of the Arbitral Tribunal. It is considered consequently as inadmissible and is disregarded.

2. Interest as of February 1, 2001 on all the capital amount awarded until the date of the final award at the rate of 3-month US$ LIBOR + 3 %.

3. Post-award interest on the amounts awarded at the rate of 3-month US$ LIBOR + 3 %.

Claimant contends that the 4 % interest provided for at Article 3 of the Contract applies only to the time-period between presentation of shipment documents and payment on due date, not to delays beyond due date, the more so when such delays can exceed ten years. It claims that the interest for multi-years overdue payment must compensate for the economic loss actually incurred, and that the LIBOR rate + 3 % is more appropriate in this respect.

Respondent objects to the LIBOR + 3 % rate as being not customary and exorbitant.


The Respondent is in default of payment since the lapse of the contractually fixed payment periods, and is liable for late-payment interest on the outstanding capital amount as determined under point VII above. The question is how to determine the rate of such late-payment interest.

The terms of the Contract make clear that the 4 % interest was meant to cover exclusively the two extended periods of payment, namely 24 months for 25 % of the purchase price, and 36 months for 55 % of the purchase price. There is no indication in the Contract that parties had intended such contractual interest to apply as well in case of default of payment.

As seen under point VII. above, in the Preliminary Settlement Agreement of November 25, 1996 parties had convened, under its Article II.1., that the outstanding capital amount would bear interest at the rate of 4 % until actual payment. The Arbitral Tribunal considers, however, that parties' acceptance of such 4 % interest was not an acknowledgment of a contractually due interest for late payment, but rather the result of their negotiations in order to reach a settlement.

In view of the absence of parties' agreement on a late-payment interest, it is consequently necessary to turn to the rules applicable to the merits of the case.

We should first notice that the Claimant's claim for default interest at the rate of LIBOR + 3 % to count from the day of failure of Respondent to pay the due price may not be granted, as this default interest is based on Greek material law (Act of the Ministers' Cabinet No. 36/1990) which, however, is not the applicable law in the present case.

The CISG provides, at its Article 78, that in case of payment in arrears, the creditor is entitled to interest on it. It does not, however, specify a particular rate of interest nor gives any indication as to how to determine it. It is consequently necessary to turn to the laws applicable in case of silence of the CISG, namely the Swiss laws.

Article 104, paragraph 1, of the Swiss Code of Obligations provides that the debtor who has defaulted on payment has to pay interest at a rate of 5 %. Article 104, paragraph 3, provides that between merchants, late-payment interest may be calculated at a higher rate if the usual bank discount at the place of payment is higher than 5 %.

As there is no indication in the file as to what such a usual bank discount might have been, interest is to be awarded at the rate of 5 %.

Pyrkal in its prayer for relief had actually proceeded to the capitalization of the late-payment interest at January 31, 2001, and requested interests as well on such capitalized amount since January 31, 2001. The Swiss Code of Obligations prohibits, however, interest on late-payment interest (Article 105, paragraph 3). Consequently the request for capitalization of the late-payment interest at January 31, 2001 is denied.

Pyrkal claims that the Ministry has failed to pay the following balances of the following respective invoices which were due on the following respective contractual dates, i.e. the dates falling immediately due and/or two and/or three years respectively from the following respective dates on which the respective shipping documents were presented to the Respondent by the Claimant. As the Ministry has not contested these figures in the proceedings, and there is no element in the file which would put them in doubt, the Arbitral Tribunal considers that the following chart reflects accurately the respective balances and their due dates :

| | Invoice no. | Date of presentation of shipping documents | Falling due 0, 2 or 3 years | Contractual date of payment | Balance overdue |
|---|---|---|---|---|---|
| 1. | EX/86-1244 | 04-02-1986 | 3 | 04-02-1989 | 4,829,440.00 |
| 2. | EX/86-1254 | 16-04-1986 | 3 | 16-04-1989 | 3,449,600.00 |
| 3. | EX/86-1259 | 25-04-1986 | 3 | 25-04-1989 | 3,311,616.00 |
| 4. | EX/86-1260 | 28-04-1986 | 3 | 28-04-1989 | 2,600,170.80 |
| 5. | EX/86-1266 | 12-06-1986 | 3 | 12-06-1989 | 2,766,357.00 |
| 6. | EX/86-1277 | 14-08-1986 | 3 | 14-08-1989 | 1,754,328.57 |
| 7. | EX/86-1278 | 14-08-1986 | 3 | 14-08-1989 | 1,554,278.88 |
| 8. | EX/86-1283 | 29-10-1986 | 2 | 29-10-1988 | 948,742.00 |
| 9. | EX/86-1283 | 29-10-1986 | 3 | 29-10-1989 | 2,164,537.76 |
| 10. | EX/86-1284 | 29-10-1986 | 2 | 29-10-1988 | 883,604.00 |
| 11. | EX/86-1284 | 29-10-1986 | 3 | 29-10-1989 | 2,015,928.00 |
| 12. | EX/86-1285 | 29-10-1986 | 2 | 29-10-1988 | 250,266.00 |
| 13. | EX/86-1285 | 29-10-1986 | 3 | 29-10-1989 | 570,978.00 |
| 14. | EX/86-1286 | 31-10-1986 | 2 | 31-10-1988 | 840,732.00 |
| 15. | EX/86-1286 | 31-10-1986 | 3 | 31-10-1989 | 1,918,115.00 |
| 16. | EX/86-1287 | 31-10-1986 | 2 | 31-10-1988 | 651,499.00 |
| 17. | EX/86-1287 | 31-10-1986 | 3 | 31-10-1989 | 1,486,383.00 |
| 18. | EX/86-1298 | 23-12-1986 | 2 | 23-12-1988 | 1,172,200.00 |
| 19. | EX/86-1298 | 23-12-1986 | 3 | 23-12-1989 | 2,674,352.00 |
| 20. | EX/86-1299 | 23-12-1986 | 2 | 23-12-1988 | 1,136,859.00 |
| 21. | EX/86-1299 | 23-12-1986 | 3 | 23-12-1989 | 2,593,722.00 |
| 22. | EX/86-1300 | 23-12-1986 | 2 | 23-12-1988 | 509,000.00 |
| 23. | EX/86-1300 | 23-12-1986 | 3 | 23-12-1989 | 1,161,273.00 |
| 24. | EX/87-1317 | 26-03-1987 | 2 | 26-03-1989 | 922,320.00 |
| 25. | EX/87-1317 | 26-03-1987 | 3 | 26-03-1990 | 2,104,256.00 |
| 26. | EX/87-1329 | 17-06-1987 | 2 | 17-06-1989 | 1,210,205.00 |
| 27. | EX/87-1329 | 17-06-1987 | 3 | 17-06-1990 | 2,761,059.00 |
| 28. | EX/87-1338 | 04-08-1987 | 2 | 04-08-1989 | 1,097,712.00 |
| 29. | EX/87-1338 | 04-08-1987 | 3 | 04-08-1990 | 2,504,410.00 |
| 30. | EX/88-1367 | 15-03-1988 | 0 | 15-03-1988 | 205,050.00 |
| 31. | EX/88-1367 | 15-03-1988 | 2 | 15-03-1990 | 276,817.00 |
| 32. | EX/88-1367 | 15-03-1988 | 3 | 15-03-1991 | 631,552.00 |
| 33. | EX/89-1433 | 24-05-1989 | 2 | 24-05-1991 | 267,322.00 |
| 34. | EX/89-1433 | 24-05-1989 | 3 | 24-05-1992 | 609,856.00 |

The Arbitral Tribunal holds consequently that the outstanding principal amount awarded under point VII above will bear simple interest at the rate of 5 % annually from the contractual date of payment until actual payment, and that such interest will be computed on these various balances at their respective contractual due dates. It will order accordingly under point 5. of its Order.

X.   ON THE IDENTITY OF RESPONDENT

Pyrkal contends that the Respondent in the present case is the State of Iraq itself, and that the award should be made against the State of Iraq and not the Ministry.

It bases its claim on the following :

1.   On the designation of Respondent in the Request for Arbitration

Claimant explains that its Request for Arbitration filed on December 4, 1990 was directed specifically against the State of Iraq, indicating it was domiciled for the purpose of these proceedings with the Ministry of Defence – Directorate of Armament and Supplies, Baghdad.

Thereafter the ICC Secretariat would have changed, for reason unknown to Pyrkal, the heading of the case, substituting instead "The Ministry of Defence – Directorate of Armament and Supplies, Baghdad". Pyrkal contends that the ICC, either its International Court of Arbitration or its Secretariat, could not change the identity of a party against which arbitration is requested, and consequently the ICC's as well as the Arbitral Tribunal's reference to "The Ministry of Defence – Directorate of Armament and Supplies, Baghdad" must be understood as meaning "the State of Iraq, domiciled for the purpose of the arbitration in the Ministry of Defence – Directorate of Armament and Supplies, Baghdad".

Respondent contests that the State of Iraq be a party to this arbitration.

The ICC Secretariat's duty is to verify with each new case that there is an agreement to arbitrate between the parties mentioned in the request for arbitration, as otherwise it would have to conclude that the ICC has no jurisdiction on the case and the arbitration cannot proceed (cf. Article 7 of the 1988 ICC Rules). In the present case the agreement to arbitrate was contained in the Contract signed by Pyrkal with a party designated as "The Ministry of Defence of Iraq", and it is consequently fully understandable that the ICC Secretariat registered the case with "The Ministry of Defence" as responding party, rather than the State of Iraq.

Had Pyrkal not agreed with the ICC Secretariat's action, it would have had ample opportunity to object—first, when it received the ICC Secretariat's letter of December 13, 1990 acknowledging receipt of the Request for Arbitration and, more important, when reviewing the Terms of Reference before signing them.

One of the functions of the Terms of Reference in the ICC arbitral system is to define with all necessary precisions the parties, and one can expect them to exercise great care in making sure that such description is accurate. By signing the Terms of Reference with, as Defendant "The Ministry of Defence", rather than "The State of Iraq" as contained in the Request for Arbitration, Pyrkal acknowledged that such description of its responding party was accurate. Even if, as is quite possible, Pyrkal did not pay at that time much importance to the difference in the description as it appeared to them of no practical importance, Pyrkal's assent to Respondent's definition as in the Terms of Reference remains.

The Arbitral Tribunal consequently cannot accept Pyrkal's contention.

2. <u>On the legal nature of the Ministry of Defence</u>

Pyrkal contends that by essence a Ministry is an instrumentality of the State, a part of it. The Ministry of Defence of Iraq being a part of the Iraqi government cannot consequently be dissociated from the Iraqi State, and suing the Ministry of Defence is factually suing the State of Iraq of which it is a part.

Pyrkal grounds its views not only in the universal understanding of a Ministry being an instrumentality of the State which is consequently liable for its actions, but more precisely in decisions of the Governing Council of the UN Compensation Commission, the authority established following Iraq invasion of Kuwait in 1990 for the purpose to compensate the victims of the invasion. In a report by a panel of Commissioners dated July 3, 1998, it is stated that the word "Iraq" as used by the Governing Council of the UN Compensation Commission in relation to contracts to which Iraq was a party meant the Government of Iraq, its political subdivision, any agency, ministry, instrumentality or entity (including public sector enterprises) controlled by the Government of Iraq.

Respondent invokes primarily Iraqi laws. It relies as well on an ICC Interim Award rendered on January 16, 1995 (ICC case No. 7472) which stated that the State of Iraq was not a party to contracts concluded with the Iraqi Ministry of Defence due to the separate legal personality of Ministries under Iraqi laws.

The parties did not dispute that, in application of the generally accepted rule that the legal status of entities must be determined by the laws under which they exist, the legal nature of the Ministry of Defence was a question to be determined under the laws of Iraq. In view of the importance of the issue, the Arbitral Tribunal had appointed an expert-witness, Mr. Abdul Hamid El-Ahdab, with the mission to determine the legal status under the laws of Iraq of the Ministry of Defence of the State of Iraq for the period from 1985 (year of signature of the Contract) to current.

The expert-witness filed on October 17, 2001 its Opinion which concluded that the Ministry of Defence is, by virtue of Article 29 of the Iraqi Code of Procedure number 83/1969 as well as paragraph 2 of Article 1 of the Executive Power Law number 50/1964, a legal person separate from the legal person of the State, having its own assets and entering into its own contractual commitments, separate from those of the State.

Mr. El-Ahdab was questioned at length on his Opinion by counsel and the arbitrators during the October 24-25, 2001 evidentiary hearing. While it appeared that several aspects of Iraqi laws remain obscure, the witness-expert's conclusion that under Iraqi laws the Ministry of Defence is an independent legal person distinct from the State was not put in doubt.

As to Pyrkal's contention that it was not during the Contract's negotiations in a position to know of the Ministry's separate legal entity in view of the latter's failure to disclose it, the Arbitral Tribunal cannot accept it. The record shows that during the Contract's negotiations Pyrkal benefited from the assistance of the Greek governmental authorities including the Greek embassy in Iraq, and through the latter Pyrkal could be fully briefed on all relevant Iraqi laws parameters and more particularly the existence of the Executive Power Law number 50/1964.

The Arbitral Tribunal consequently cannot accept Pyrkal's contention that under Iraqi laws the Ministry of Defence and the State are the same legal person.

3. On the behaviour of the State of Iraq

Pyrkal contends that the Iraqi State's involvement in the performance of the Contract and the settlement negotiations constituted conclusive behaviour that it is the real party in this case, not the Ministry of Defence.

The record shows that the involvement of the State of Iraq through its various organs in the successive phases of the Contract, from its negotiations to its performance, was maximal, which is quite normal as maintaining its armed forces adequately supplied with ammunitions is a function inherent to the State.

The involvement of the State of Iraq was also maximal in the various settlement negotiations. This was less obvious as the Ministry of Defence might conceivably have handled these negotiations itself or through its agents.

Such involvement went to the point where the Preliminary Settlement Agreement in its preamble stated as a party to the Contract the Government of Iraq, not the Ministry of Defence.

Notwithstanding the above, the Arbitral Tribunal considers that, in the particular circumstances of the present case, it is not in a position to grant Claimant's request that the State of Iraq be declared a party to the present arbitration case. Indeed the facts that the Terms of Reference mentioned as a party the Ministry and not the State of Iraq, as had been the case in the Request for arbitration, and that such Terms of Reference were signed by Claimant without reserve, indicate Claimant's consent to have the Ministry rather than the State of Iraq as Respondent party. The parties and the Arbitral Tribunal proceeded in this case on the basis of the Terms of Reference in force, and the conducted proceedings cannot now be retroactively modified with the insertion in the final award of a party which had not been asked during the whole life of the proceedings to participate.

It will state accordingly under point 6. of its Order.

XI.   ON COSTS

Pyrkal has for the main part prevailed in this arbitration. The Arbitral Tribunal considers consequently as appropriate that the entire ICC arbitration costs and expenses be borne by the Ministry, and that Pyrkal receives a contribution towards its legal costs.

– ICC Arbitration Costs

The advance on costs fixed by the ICC Court at US$ 425,000 was paid entirely by Pyrkal. As the Court has fixed the cost of these proceedings at US$ 425,000, the Ministry has to reimburse Pyrkal US$ 425,000.

The Arbitral Tribunal will order accordingly under point 7. of its Order.

– Legal Representation Costs

Pyrkal claims legal fees of US$ 369,000, as well as three items of costs (CHF 5,700, Euro 40,961 and US$ 12,000).

The Arbitral Tribunal considers that the fees items concerning the proceedings before the Greek Courts as well as the settlement negotiations should be disallowed, as they have been incurred outside the present arbitral procedure. It consequently grants Pyrkal US$ 260,000 for its legal representation costs.

Concerning the costs, it allows the item of CHF 5,700, disallowing the other two items which were not sufficiently substantiated.

It will order accordingly under point 8. of its Order.

## ORDERS

### IN VIEW OF THE FOREGOING THE ARBITRAL TRIBUNAL ORDERS AS FOLLOWS :

1. The Ministry's request for a further suspension of the proceedings is denied.

2. The exception of lack of jurisdiction raised by the Ministry is denied.

3. The Ministry shall pay to Pyrkal as outstanding principal amount under the Contract US$ 53,834,541.01 (fifty-three million eight hundred and thirty-four thousand five hundred and forty-one U.S. dollars and one cent).

4. Pyrkal's claim for additional damages is denied.

5. The Ministry shall pay to Pyrkal a simple interest at the rate of 5 (five) percent per annum on the amount awarded under point 3. above from the contractual dates of payment until actual payment. Such interest will be computed on the various balances and their respective due dates as specified under point IX of the present Award.

6. Pyrkal's petition that the State of Iraq be declared as the Respondent is denied.

7. The ICC arbitration costs as fixed by the Court at US$ 425,000 shall be borne entirely by the Ministry, which shall reimburse Pyrkal US$ 425,000 (four hundred and twenty-five thousand U.S. dollars).

8. The Ministry shall pay Pyrkal US$ 260,000 (two hundred and sixty thousand U.S. dollars) as well as CHF 5,700 (five thousand seven hundred Swiss francs) for its legal representation costs.

9. All other claims of the parties are denied.

Place of arbitration : Geneva, January 31, 2003

Anthony Antapassis

Hans-Jürgen Schroth

Jacques Werner

## EXHIBIT 4.B

*Greek Powder and Cartridge Company S.A. v. Ministry of Defence (Iraq)*

**B.  Expert Legal Opinion of Abdel Hamid El-Ahdab dated October 27, 2001**

DECLARATION OF HANAN M. NASSEF

Cabinet D'avocats
# Abdel Hamid AHDAB
Docteur en Droit
Avocat à la Cour

**BEYROUTH**
Hazmieh – El Fayadieh –
Après bifurcation du Palais
Présidentiel – Face Grundig
Imm. Gardénia – 3ème étage
B.P. 443 Hazmieh
Tél: (05) 951827 – Fax: (05) 951973
E-mail: ahdab@destination.com.lb

**PARIS**
CP WEISSBERG GAETJENS ZIEGENFEUTER
CABINET D'AVOCATS
34, Avenue Marceau
75008 PARIS
Tél: 01 39 27 27 00 – Téléfax: 01 39 27 22 84

Me. Jacques Werner
13, rue de Rhône
1204 Genève

Reference: ICC Arbitration N0. 7094/CK/AER/ACS
Greek Powder and CARTRIDGE company S.a. (Greece) vs.
The Minister of Defense (Iraq)

In reply to your letter dated 21/9/2001 including the following documents.

1. The Procedural Order  No. 24, with issue  4. My nomination.

2. The Contract of 10.11.85 between The  Ministry of Defense of Iraq and The Greek Powder and Cartridge Company.

3. The Brief  of Claimants. The issues concerning my mission at pages 25 to 26 (items 27 to 32).

4. The ICC award in case No. 7472 as annex L8 to the Claimants' Brief.

5. The Defendant counselor's letter dated 17 February 1999.

6. Legal pleas of the Iraqi party.

After reviewing all Iraqi laws pertaining to the  issues contained in the Procedural Order, No. 24 – issue 4,  please find hereinafter my legal opinion related thereto.

1

29. Claimant's original Request for Arbitration clearly expressed this when it requested that the arbitration be set in motion "VERSUS the State of IRAQ, domiciled for this purpose in the Ministry of Defense – Directorate of Armament and supplies, Baghdad, legally represented". (Cf. 1sr page of Claimant's Request for arbitration). For more reason, which the Claimant is not aware of, the ICC changed the heading referring to a dispute between "GREEK POWDER AND CARTRIDGE COMPANY S.A. and The Ministry of Defense of Iraq – Directorate of Armament and Supplies" when acknowledging receipt of the Request for Arbitration. (Claimant Exhibit No 12, Letter dated 13.12.1990 from ICC to PYRKAL).

30. Neither the International Court of arbitration of the ICC nor its Secretariat can simply change the identity of a Party against which arbitration is requested. Therefore, the Secretariat's reference to "The Ministry of Defense – Directorate of Armament and Supplies" must be understood as meaning "the State of Iraq, domiciled for the purpose of the arbitration in the Ministry of Defense – Directorate of Armament and supplies, Baghdad", exactly as it was initially formulated in Claimant's Request for arbitration. This is also how the arbitral Tribunal must have understood the case when it drew up the Terms of Reference on the basis of the Parties' most recent submissions. (Article 13.1 of the ICC Rules). So far the State of Iraq has not contested that it was the defendant in this case.

31. What appears to be an exercise in belaboring the obvious, is necessary because of a fact which Claimant only learned long after its request for arbitration, in the course of the contractual settlement negotiations with Representatives of the State of Iraq. During one of these negotiations sessions the Iraqi delegation handed Claimant's counsel the copy of an ICC award issued in ICC case 7472. In the above mentioned case, an ICC arbitral tribunal decided that the State of Iraq was not a party to contracts signed by the Iraqi Ministry of Defense-Directorate for Armament and another Ministry, because of the fact that, in Iraqi internal administrative law, Ministries are independent legal persons and therefore do not directly bind the State. (Claimant Exhibit No. L8, Interim Award in case No. 7472 dated January 16, 1995).

32. Not only did the Respondent inform Claimant of this award; its counsel also expressly Stated in his letter of February 17, 1999 to the Arbitral Tribunal that:

This is not possible (obtaining an award by consent) without an amicable settlement of the dispute, involving the Government of Iraq. The reason is that the Ministry of Defense enjoys distinct identity. The Government of Iraq would therefore have to enter into the Arbitration proceedings in [to] order for such a settlement to be effective and binding on the Iraqi Government.

(Claimant Exhibit No. 30, Letter of February, 1999 from Counsel for Defendant to the Arbitral Tribunal).

3

Therefore the object of this legal opinion based on Iraqi law is:

1- The legal status of the Ministry

2- Is the outcome of the Arbitration proceedings against the Ministry binding the State?

3- Is the State liable for contracts entered into by ministries? And under which conditions?

4- Is it possible to file a lawsuit against the State if the contract was signed with a ministry?

5- Has the State the right to be domiciled in one of its ministries? And what are the legal consequences related thereto?

The answer to these five points under Iraqi law resides in the following issues:

1- The concept of the State under Iraqi law.
2- The concept of the ministry under Iraqi law.
3- The relation between the State and the present claim.
4- The consequences.

In light of the preceding, the five points object of the present opinion will be answered as follows:

## First – The concept of the State under Iraqi law

### 1- History

Since the creation of the world, human being felt the need to regulate his existence and to have a leader to organize people. Therefore, the concept of leadership and organization preceded the concept of state.

When boundaries were created between grouping of people, the need for a government started developing to reach the constituent conditions of a state that are a nation, a people and a government.

4

The general political situation that prevailed in Iraq since the beginning of their dynasties was the presence of many independent cities forming a state having there own boundaries and governing family with particular rules and regulations[1].

The royal system has always existed until 1958. The famous King Hamourabi was reputed for collecting the laws and codifying them under the famous Code of Hamourabi comprising 283 articles encompassing various aspects of life. For the administrative matters, Hamourabi adopted a centralized system and made his governors reporting to him and to the capital Babel. King Nabuchodonosor was in charge of the palace in southern Babel which became the place of his government[2].

## 2- **The modern concept of the state**

The state is a body of administrative and political systems and its existence depends upon the political distinction between the governing class and the non-governing one. When a group of individuals seize the largest force of a particular category of people, such social category will form thereafter a state[3]. In such kind of state, rules must

be established for the administrative and political affairs. The constitution determines the various departments of the administration and the nature of the political regime[4]. The powers of the head of the state vary depending upon the form of the government whereby in a presidential regime the executive powers are centralized in the head of the State, and he is the head of the executive power, whereas in a parliamentary regime, his powers are less prominent[5].

Although article 8 of the Iraqi Constitution of 1970 provides about decentralization, article 37 also provides about the political centralization by stating that "the Council of the Revolution is the highest authority of the State".

It results from such article that the Council of the Revolution represents the State for being the highest authority, carries out executive and legislative powers as well by issuing general rules called law or regulations with force of law as per article 42 (a) of the 1970 Constitution and is presided by the President of the Republic by virtue of article 38 (a) of the Constitution.

---

[1] Doctor Amer Suleiman- Sides of ancient Iraq civilization- Irak History- 1983

[2] Doctor Sami Said Al Ahmad- The dynasty of Babel- Irak 1983.

[3] Mounzer Al Chaoui- The Constitution and the Institutions in Irak- p. 27/28 –1966.

[4] Art. 8 of the Iraqi Constitution provides that: "the Republic of Iraq is divided in decentralized administrative units.

[5] Principles and rules of administrative law – Doctor Ali Mohamad Badir – Doctor Issam Abdel Wahab Al Berzenji – Doctor Mehdi Al Salami – University of Bagdad – College of Law 1993 – p. 77.

## Second – The concept of the ministry under Iraqi law

### 1- Meaning of the term "Ministry"

The term "Ministry" means one of the ministries, and at the same time means the government, which is a collective body having its proper powers independently of the powers of the head of State. The Council of Ministers is the authority that takes the major resolutions collectively, and when the ministers convene under the chairmanship of the Prime Minister, it is called Council of the Ministries; whereas, when the ministers convene under the presidency of the President of Republic, it is called Council of Ministers[6].

The head of the "ministry" is the "minister" who is the highest authority of one of the major units that constitute the executive power of the State[7]. The first time that the term "ministry" was used in Iraq was in 1921, year of its independence and the promulgation of its Constitution.

### 2- The legal significance of the "Ministry" before 1970

The ministry in Iraq is an instrument of government and one of the constituent elements of the executive power in addition to the Council of the Revolution and the President of Republic, similarly to the executive power after the Constitution of 1970.

The ministry was the body that comprises the persons in charge of the executive power affairs[8]; thereafter the source of power became centralized in the person of Abdel Karim Kassem, after the change of regime from royal to republican subsequently to the revolution of 14 July 1958, who cumulated the positions of the chief commander of the armed forces, the prime minister and the minister of Defense, bearing in mind that the council of ministers has exercised both the executive and legislative powers[9].

---

[6]Doctor Mounzer Al Chaoui – Concept of the State – Publications of legal studies – Bagdad 1981.

[7]The simplified Arab Encyclopedia - Dar Al Nahda – Lebanon for publishing – Beirut, Lebanon 1987.

[8]Part 4 of the Constitution of 1925.

[9]The general Theory of the Iraqi constitutional law. Doctor Ihssan Al Moufariji – Doctor Kotran Nehme – Doctor Raad Al Jaddeh – Ministry of the High Education and scientific research – University of Bagdad – College of Law 1990 – p. 358.

After the Revolution of 8 February 1963, the Constitution was published on 4 April 1963. Such Constitution did not define the powers of the government since the National Council of the Revolution was the supreme authority holding solely the political power[10].

On 22 April 1964, law number 61/1964 concerning the National Council of the Revolution was issued confirming the first announcement of the military coup d'état of 18 November 1963 which designated the President of the Republic the holder of the power, and the Constitution was cancelled subsequently to the cancellation of the Council of the Revolution. Such act was considered by many as a coup d'état against the constitutional institutions in Iraq for reason that said Council was a major element in the administrating of power [11].

On 29 April 1964, the temporary Constitution was published by virtue of which the President of the Republic, the government and the Council of National Defense exercised the authority. Article 65 of said Constitution defined the government as "the highest executive and administrative body of the State."

On 17 July 1968, a popular revolution lead by the Arab Socialist Baath party, and the Council of the Revolution was formed; the power was shared by the Council of the Revolution, the President of the Republic and the ministries. And by virtue of article 62 as amended of the Constitution of 21 September 1968, the government remained the executive and administrative body composed of the President of the Republic and the ministries.

On 16 July 1970, and following the appointment of a commission by the Council of the Revolution to prepare the project, the Constitution was published by the Council of the Revolution number 792[12].

Part 4 of said Constitution defined the institutions of the Republic of Iraq which are: the Council of the Revolution, the National Assembly, the President of the Republic, the Council of Ministries and the Judiciary.

In addition to its legislative power, the Council of the Revolution has also executive powers described in article 44 (4) concerning the control and supervision of the ministries and the governmental administrations acts, and to convene the ministries to discuss their ministries affairs, presided by the President of the Republic, as per article 38 (a) of the Constitution.

---

[10]Doctor Mounzer Al Chaoui – supra – p. 164.

[11]Doctor Mounzer Al Chaoui – supra – p. 184.

[12]Iraqi Facts – Issue 1900 – 19 July 1970.

### 3- The Ministry under the temporary Constitution number 792 issued on 16 July 1970 – The executive power

The Council of Ministers is composed of the Prime Minister and his assistants, the ministers[13]. Such Council is the executive and administrative body presided by the Prime Minister by virtue of article 63 (g) of the Constitution.

If the ministry, as commonly admitted under the Constitution has a homogeneous administrative position in administrative matters of the entire government and carries out such activities in the name and for the government[14], and belongs to the body of the government either through its budget, which is a part of the budget of the government, or with regard to its liability resulting from its faults[15], the Iraqi legislator considered that the Council of Ministries and each ministry are independent legal persons as provided in Law Number 50 of 4 April 1964 and according to the Statement number one issued from the Council of the Revolution and as proposed by the Prime Minister and approved by the Council of Ministers. Such Statement was issued after the February 1963 Revolution and is as follows:

> " *Such awakening of our people and army with the purpose of*
> *"continuing the victory march of the glorious July Revolution*
> *"cannot but achieve two purposes: the first being the*
> *"national reunification of our people; the second, being the*
> *"participation of the people in the directing and managing of*
> *"the power."*

Based on the above-mentioned Statement, the Law Number 50 of 1964 known as the Executive Power Law was promulgated.

Article 1, paragraph 2 stipulates:

> *"The Council of Ministries and each ministry is a legal*
> *"person having all rights contained in the Civil Code and*
> *"other laws, and each one is considered as having the*
> *"significance of the term government. "*

---

[13] The Council of the Revolution, Resolution number 83/1991 as amended by Art. 61 of the temporary Constitution of 1970.

[14] Kamal Al Ghali – The general Administration – Damascus 1975 – 1976 p. 70.

[15] Doctor Abdel Fattah Hassan – Principles on Koweiti law – Dar Al Nahdah – Beirut 1969 p. 85.

After reviewing "the Iraqi facts", the gazette that published the laws issued by the Council of the Revolution from 1964 until 1987, as well as the "law review" since 1988 until 2000 which replaced the "Iraqi Facts", there is no indication that article one, paragraph two of Law Number 50 of 1964 was amended, which means that the ministry is still considered as a legal person having the rights defined in the Civil Code and other laws.

## Third: The relation between the State and the present claim

The constituent elements of a State are the human factor, the territory and the executive power or government.

In Iraq, the Council of the Revolution is a constituent element of the State headed by the President of the Republic:

> "The President of the Republic is the head of State and the "commander in chief of the armed forces, and assumes the "executive power directly or by the intermediary of the "Council of Ministers [16]."

The above text indicates that the President of Republic cumulates the legislative and executive powers. The legislative power is materialized by signing and promulgating the laws and by proposing projects of law. The executive power means to perform the governmental and administrative duties. This was confirmed by the Council of

Revolution's resolution number 83 dated 23 March 1991 which amended article 61 of the Constitution [17] and became final after the President of Republic having occupied directly the position of Prime Ministry.

It appears from the contract, object of the claim, that the contract is entered into between the Claimant and the Ministry of Defense which is a legal person (personne morale) by virtue of paragraph two of article one of Law Number 50/1964, which does not mention the term State.

And if the acts of the state, as commonly admitted, are characterized by the sovereignty "which are those carried out by the government due to the fact that it is a governing power not an administrative one"[18], therefore it cannot perform the same acts that individuals perform such as commercial contracts. The situation is not the same in Irak since commercial activities are included in the State duties as stipulated in the Iraki Code of Commerce:

---

[16]Article 57 (a) of the Constitution.

[17]Iraqi Facts (official gazette) 3347- 1/4/1991 p. 42.

[18]Supreme court No. 1948/h/65 – 9/5/1966 – Pr. Diah Khattab in Summary of Code of Procedure – Bagdad – 1973 – p. 139.

> *"The commercial activities performed by the State are within*
> *"its main obligations in order to assure the commodities and*
> *"services to the citizens [19]."*

The State of Iraq is represented by the President of Republic, who is the head of the Council of the Revolution and assumes the executive power either directly or through the Council of Ministers, and is a legal entity [20]. Therefore and based on the above, the State may be a party in commercial contracts, the same as for individuals, and is represented by its representative designated by the Constitution, who is the President of Republic. This is not the case in the contract object of the present claim for reason that the Defendant is the Ministry of Defense, that is a legal person according to paragraph 2 of Article one of Law number 50/1964.

And if the Iraki Civil Law number 40/1951 did not describe the legal person, article 48 of the same law has nevertheless stipulated as follows:

*1- The legal person must have a representative that expresses its intention.*
*2- The legal person has all rights except those inherent to the individual and within the limits set forth by the law.*
*3- The legal person is financially independent.*
*4- The legal person may perform within the limits set forth in the contract and the law.*
*5- The legal person has the right to go to court.*
*6- The legal person has a domicile; is considered its domicile the location of its headquarters.*

In addition to those characteristics, which are common to the private legal person, the public legal person has the prerogatives of the public authority in the exercise of its activities and is subject at the same time to what the public legal person is subject to [21]. The Iraqi Code of Civil Procedure as amended and promulgated under number 83 in 1969 stipulates:

> *"The civil courts have jurisdiction over all legal persons and*
> *"individuals including the government, and are competent to*
> *"settle all disputes except as stipulated otherwise."*

---

[19]Code of Commerce, art. 2 No. 30/1984 promulgated by the Council of the Revolution No. 328 – 15/3/1984.

[20]Civil code, art. 47 (a) number 40/1951.

[21]Principles of adminsitrative law –Doctor Maher Al Jamboury – 1966 p. 32.

10

## Four : The Consequences

According to the Request for Arbitration, the State of Iraq is the Defendant, and it was mentioned in the acknowledgment receipt delivered by the ICC upon receiving the Request for Arbitration that the Defendant was the Ministry of Defense.

Such Statement was accurate since it was the Ministry of Defense that was a party to the contract. Thus, and based on the preceding and on the Request for Arbitration in which it was Stated that the Defendant was the State of Iraq, it cannot be said that the Ministry of Defense is the Defendant in the present claim. Under Iraqi law the ministry does not represent the State and is a legal person (entity) represented by the Minister who represents the State when he signs a contract concerning the affairs of his respective ministry as provided in article 2 of the Executive Power Law number 50/1964 still currently in force.

## THEREFORE

And, in reply to the five questions set forth above:

### I – What is the legal status of the ministry?

The ministry under Iraqi law is a legal person (personne morale ayant une personnalité juridique propre) according to article 29 of the Iraqi Code of Procedure number 83/1969 which stipulates that the government is a legal person; furthermore paragraph 2 of article one of the Executive Power Law number 50/1964 stipulates also that the ministry has the significance of a government and is a legal person.

### II – Is the outcome of the Arbitration proceedings against the Ministry binding the State?

The claim against the Ministry does not bind the State due to the fact that the Ministry is a legal person and is financially independent from the financial assets (or account) of the State that is in its turn an independent legal person according to article 47 of the Iraqi Civil Code number 40/1951 represented by the head of State i.e. the President of Iraq who is also the chief of the executive power directly or through the Council of the Ministries as per article 57 of the temporary Constitution of 1970, as amended by resolution number 567 of the Council of Revolution published in the official gazette "Iraqi Facts" number 2662 on 22/7/1973, and who is also the head of the Council of Revolution that is the highest authority of the State according to article 37 of the temporary Constitution dated 16/7/1970.

### III- Is the State liable for contracts entered into by ministries? and under which conditions?

The State is bound by the contracts concluded by the ministries when the respective Minister has signed those contracts in his capacity as in charge of the administrative and executive affairs of his respective ministry as set forth in article 2 of the Executive Power Law number 50/1964 and as per paragraph 2 of article one of the same law which stipulates that the term Ministry has the significance of the term Government. The Government is among the State institutions defined in part four of the temporary Constitution to which chapter four relating to the Council of the Ministers was added by resolution number 567 of the Council of the Revolution published in "Iraqi Facts" issue number 2662 dated 22/7/1973.

This means that it must be the respective Minister that has signed the contract in his capacity of Minister of such Ministry in order to bind the State by the contract ratified by the Ministry. Furthermore the contract must also contain a provision clearly stating that it is the Minister who signed the contract otherwise the contractual obligations will remain limited to the Ministry itself and within it financial assets.

Therefore, and since the signatory of the contract is the Chief of Staff and not the Minister, the State shall not be held liable, and the contractual obligations must be limited to the Ministry.

### IV- Is it possible to file a lawsuit against the State if the contract was signed with a Ministry?

Article 47 of the Iraqi Civil Code Stated that the government is a legal person. Article 57 of the 1970 temporary Constitution amended by resolution number 567/1973 of the Council of Revolution provided that the President of the Republic is the head of a legal person. Paragraph 2 of article one of the Executive Power Law number 50/1964 stipulates that the ministry is a legal person, therefore the State is a legal person and the ministry is a separate legal person.

Consequently if the contract is signed with a ministry- which is an independent legal person with independent financial assets- the lawsuit must be filed against said ministry and not against the State which is a separate legal person: neither the status of the ministry should be assimilated to the State, nor the status of the State should be assimilated to the one of the ministry.

## V- Has the State the right to be domiciled in one of the ministries? And what are the legal consequences related thereto?

Article 48 paragraph 6 of the Iraki Civil Code number 40/1951 provides that the legal person has a domicile and considers that the place of domicile is where its head-quarters are located. However, that provision does not prevent any person either legal or individual to have a domicile for purpose of notification for reason that if it appears afterwards that said person has changed domicile to a known location, he could be served at the place indicated by the party that requests the notification. And if the new domicile is unknown, the serving notice may be by announcement published in two daily newspapers, according to article 21 (1)(2) of the Iraqi Code of Procedure number 83/1969.

In any event no legal person can replace another legal person unless one of them is doing it according to article 3 of the Code of Procedure, and due to the fact that:

(i) the Government is a legal person, and the ministry is another legal person, thus no one of these two entities can be served in lieu of the other, and this by virtue of article 48 (1) of the Iraqi Civil Code number 40/1951 which provides that every legal person must have a representative to express its will, and (ii) due to the fact that the State is represented by the President of Republic according to article 57 as amended of the temporary Constitution of 1970, and the minister is in charge of the ministry's affairs as provided in article 2 of the Executive Power Law number 50/1964. Therefore notifying one of those entities instead of the other is in violation of Iraqi laws eventhough if one of those entities has elected domicile at the location of the other.

The Code of Civil Procedure number 83/1969 applies also on the public legal person as set forth in article 25 that provides: "The civil courts have jurisdiction over legal persons (entities) as well as over individuals including the Government unless it is stipulated otherwise". Doctor Maher Jabouri (supra) in his book " Principles of Administrative Law" page 197 declares that there is no provision in the Iraqi legal system including the Constitution, laws and regulations, that prevent the civil courts to oversee the acts of the public administration except those that are closely related to administrative acts; this is not the case.

Hoping that the above answers your queries.

I stand ready to clarify any of the parties' questions.

Sincerely yours,

**Abdel Hamid El-Ahdab**
**Attorney at Law**

Beirut , 17/10/2001

14